214-08/MEU/SL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

VARDHMAN SHIPPING PVT LTD,

**08 CV 3620 (RMB)**

-against-

HERNING SHIPPING AS,

Defendant.

---------------------------------------------------------------x

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR COUNTER-SECURITY**

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
VARDHMAN SHIPPING PVT LTD.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

Of Counsel
Michael E. Unger (MU 0045)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ii

PRELIMINARY STATEMENT 1

STATEMENT OF FACTS 2

A. The Charterparties 2

B. The Vetting Clause and Placing of the Vessel Off-hire for Non-Compliance 2

C. The Arbitration in London and Rule B Action in New York 4

ARGUMENT

POINT I

COUNTER-SECURITY IS NOT MANDATORY 5

POINT II

THE COUNTERCLAIMS ADVANCED BY PLAINTIFF ARE NON-ACTIONABLE AS A MATTER OF LAW, FRIVOLOUS AND SPECULATIVE 7

A. The Claim For Bunkers 10

B. The Claim For Repositioning Costs 12

C. The Claim For Unpaid Hire 14

D. The Claim For Lost Profits 14

CONCLUSION 16

**TABLE OF AUTHORITIES**

**Cases**

*Afram Lines Int'l Inc. v. M/V CAPETAN YIANNIS*, 905 F.2d 347 (11th Cir. 1990) .......... 6

*Expert Diesel, Inc. v. Yacht FISHIN FOOL*, 627 F. Supp. 432 (S.D. Fl. 1986) ................ 9

*North Offshore AS v. Rolv Berg Drive* AS, 2007 U.S. Dis. LEXIS 87648 (November 29, 2007 S.D.N.Y.) .......... 1

*Result Shipping Co. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394 (2d Cir. 1995) ........... 1, 6

*Sea Transp. Contrs., Ltd. v. Indus. Chemiques Du Sengal*, 411 F. Supp. 2d 386 (S.D.N.Y. 2006) .......... 10

*Titan Navigation Inc. v. Timsco, Inc.*, 808 F.2d 400 (5th Cir. 1987) .......... 6

*Trinidad Foundry & Fabricating, Ltd. v. M/V KAS CAMILLA*, 776 F. Supp. 1555 (S.D. Fl. 1991) .......... 6, 8

*U.S. Maritime Services Inc. v. Trade Ventures Inc.*, No. CIV A. 98-0499 U.S. Dist. LEXIS 10608 (E.D.La. July 8, 1998) .......... 9

*Ythan Ltd. v. Americas Bulk Transport Ltd.*, 336 F. Supp. 2d 305 (S.D.N.Y. 2004) ... 9, 13

**Other Authorities**

7A James W. More Et.Al., Moore's Federal Practice ¶ E.15-756 (2d Ed. 1995).............. 6

Plaintiff VARDHMAN SHIPPING PVT LTD. (hereinafter "VARDHMAN" or "Plaintiff"), by its undersigned counsel, Freehill Hogan & Mahar, LLP, submits this Memorandum of Law in Opposition to the motion of Defendant HERNING SHIPPING AS ("HERNING" or "Defendant") which seeks an Order directing the posting of counter-security for the counterclaims asserted in its Answer. For the reasons set forth herein, HERNING's should be denied in all respects.

**PRELIMINARY STATEMENT**

In the context of a Rule E(7) counter-security application, a grant of counter-security is far from automatic. Rule E(7) limits a counter-security application to counterclaims arising from the same transaction or occurrence that is the subject of the original action. Furthermore, outside of the requirements of Rule E(7), as confirmed by the Second Circuit Court of Appeals, the Court has considerable discretion in deciding whether to order counter-security. In exercising this discretion the Court should be guided by two principles; placing the parties on equal footing and preventing the imposition of such burdensome costs on a Plaintiff that it might prevent it from bringing suit. See, *Result Shipping Co. v. Ferruzzi Trading* USA, 56 F.3d 394 (2d Cir. 1995); see also, *North Offshore AS v. Rolv Berg Drive* AS, 2007 U.S. Dis. LEXIS 87648, *4 (November 29, 2007 S.D.N.Y.).

In addition, the Court has the discretion to deny a counter-security application for cause shown, including where the counterclaim is frivolous, speculative, and/or clearly lacking in merit. This principle was recently reaffirmed in *North Offshore*, 2007 U.S. Dis. LEXIS 87648, *4 (November 29, 2007 S.D.N.Y.) in which Judge Stein denied an

application for counter-security under Rule E(7) because the defendant's counterclaim appeared to be frivolous on its face.

As will be more fully addressed herein, HERNING's motion for counter-security should be denied in substantial part because: 1) HERNING's counterclaims are frivolous; and 2) equity favors the Plaintiff against the plain backdrop of the Defendant's contrived effort to obtain leverage by asserting non-sensical claims which cannot be advanced in good faith.

## STATEMENT OF FACTS

The relevant facts are set out in the accompanying Declarations of Saurin Shah, the Managing Director of VARDHMAN, and John Hicks, the English solicitor representing Plaintiff in the ongoing London arbitration between the parties.

### A. The Charterparties.

Pursuant to a Charterparty dated November 15, 2006, VARDHMAN agreed to charter the M/T KRISTINA THERESA from HERNING, the vessel's disponent owner. HERNING had chartered the vessel from her Head Owners, non-party MS "PAUL SCHULTE" Shiffahrtsgesellschaft mbH & Co. KG ("Schulte") pursuant to a Charterparty dated February 10, 2006. It is understood that the head charter between HERNING and Schulte and the charter between HERNING and VARDHMAN were on "back-to-back" terms in all respects except for the length of the charter, date hire payments were to be made, and rate of hire. (Shah Declaration ¶2-4)

### B. The Vetting Clause and Placing of the Vessel Off-hire for Non-Compliance.

The M/T KRISTINA THERESA is a tanker and was specifically chartered by VARDHMAN in order to carry oil ,chemicals and other liquid cargoes. Under the

vetting clause of the charter, Clause 65, HERNING warranted that within four (4) months of delivery to VARDHMAN the vessel and her management would be approved to receive and discharge cargoes from four of the following major oil companies: ExxonMobil, ChevronTexaco, Shell, BP-Amoco, Total-Final-Elf, Stat Oil and Kuwait Petroleum, and that not later than six months after delivery the vessel and her management would be approved by the remaining three oil majors listed above. Clause 65 further provided that if HERNING failed to comply with the vetting clause, VARDHMAN had the option to place the vessel off-hire (after giving 15 days notice of its intent to do so) until such time as HERNING ensured that the vessel and her management were in compliance. (Shah Declaration ¶5-7)

The vessel was delivered on November 29, 2006. Four months after delivery, as of March 29, 2007, there were no approvals in place by any of the oil majors. Six months after delivery, as of May 29, 2007, the vessel had finally been approved by four oil majors[1] but HERNING was still not in compliance with the vetting clause.[2] After giving proper prior notice of its intent to do so, on March 19, 2008, VARDHMAN advised HERNING that due to its failure to comply with the vetting clause VARDHMAN declared the vessel off-hire, without prejudice to VARDHMAN's right to claim for damages for losses sustained by reason of HERNING's breach. (Shah Declaration ¶8-10)

---

[1] The approval given by ExxonMobil was withdrawn on June 5, 2007 due to the Master being found to be in charge of the vessel with excess alcohol.

[2] As a result of HERNING's non-compliance with the vetting clause VARDHMAN had suffered a loss of income during the 13 months it had chartered the ship. Having given HERNING more than sufficient time to obtain the necessary approvals, VARDHMAN decided to exercise its right to place the vessel off-hire as of mid-March 2008. (See Complaint ¶8-12).

Notwithstanding its March 19, 2008 off-hire declaration, VARDHMAN had previously paid hire to HERNING through March 26, 2008, in accordance with the charter terms which required hire to be paid every fourteen (14) days in advance. VARDHMAN declined to pay further hire beyond March 26, 2008, having invoked Clause 9(i) of the charterparty which provides that VARDHMAN is entitled to deduct from future hire payments for "any hire which charterers reasonably estimate to relate to off-hire periods". Accordingly, no hire was due to be paid to HERNING after March 18, 2008 until such time as the vessel was back on hire (i.e. the vetting clause had been complied with by HERNING). (Shah Declaration ¶11-12)

Under the terms of the Head Charter, hire was payable by HERNING to Schulte on a monthly basis, in advance, commencing the first of each month. HERNING admits that it failed to pay to Schulte the hire due on April 1, 2008. Schulte then withdrew the vessel from HERNING's service on April 9, 2008. Later the same day HERNING sent a message to VARDHMAN purportedly withdrawing the vessel on the basis of VARDHMAN's alleged failure to pay hire. (Shah Declaration ¶13-14)

**C. The Arbitration in London and Rule B Action in New York.**

In order to recoup its losses incurred by reason of HERNING's breach of the charter, VARDHMAN commenced arbitration against HERNING. On April 15, 2008, in order to obtain jurisdiction over HERNING and to obtain security for its claims in the arbitration of approximately $5.76 million exclusive of interest, arbitration costs and attorneys' fees, VARDHMAN commenced this action and applied for an *ex parte* order of maritime attachment and garnishment against HERNING's property within this District. Plaintiff's application was granted and an *ex parte* order and accompanying writ

of attachment were issued in the amount of approximately $7.65 million. Plaintiff served the *ex parte* Orders and Process of Maritime Attachment and Garnishment on garnishee banks within the District believed to be holding Defendant's funds including Deutsche Bank and JPMorgan Chase Bank. A total of approximately $591,000 of Defendant's funds was attached. HERNING thereafter agreed to provide VARDHMAN with substitute security in the form of a bank guarantee in the full amount of the security sought. Upon the Court's approval of the form of the bank guarantee the restrained funds were released. On May 20, 2008 HERNING made the instant application for counter-security in respect to the counterclaims set forth in its Answer and Counterclaim filed on May 1, 2008.

The counterclaims interposed by HERNING are each frivolous, non-actionable as a matter of English law, the law of the governing Charterparty contract, and have been set forth for the sole purpose of attempting to exhert pressure upon VARDHMAN to reach a settlement of VARDHMAN's claims against HERNING. Accordingly, HERNING's counterclaims and request for counter-security should be denied in all respects.

## ARGUMENT

### Point I

### COUNTER-SECURITY IS NOT MANDATORY

HERNING's request for an order directing the posting of counter-security is made pursuant to Rule E(7)(a) which provides in relevant part:

> When a person is given security for damages in the original action asserts a counterclaim that arises from the same transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages demanded in the

> counterclaim unless the Court for cause shown directs otherwise.

Fed. R. Civ. P. Supp. R.E(7)(a)

While this rule's language makes it appear that the posting of counter-security is mandatory whenever its conditions are satisfied, "the final clause of the quoted language makes clear that the trial court possesses broad discretion in deciding whether to order counter-security under such condition." *Result Shipping Co. v. Ferruzzi Trading USA Inc.*, 56 F.3d 394, 399 (2d Cir. 1995) (citing *Afram Lines Int'l Inc. v. M/V CAPETAN YIANNIS*, 905 F.2d 347, 349 (11th Cir. 1990); *Titan Navigation Inc. v. Timsco, Inc.*, 808 F.2d 400, 403 (5th Cir. 1987); 7A James W. Moore Et.Al., Moore's Federal Practice ¶ E.15-756 (2d Ed. 1995)).

While the purpose of Rule E(7) is to permit a counterclaimant to likewise receive security in appropriate instances, counter-security under Rule E(7) is not appropriate where a defendant asserts frivolous counterclaims. See e.g., *Result Shipping*, 56 F.3d at 400; see also *Titan Navigation*, 808 F.2d at 404; *Trinidad Foundry & Fabricating, Ltd. v. M/V KAS CAMILLA*, 776 F. Supp. 155, 1558 (S.D.Fl. 1991). In each case, the court is to use its discretion to determine, based on the totality of circumstances, whether the posing of counter-security should be ordered. *Result Shipping*, 56 F.3d at 400 (quoting *Titan Navigation*, 808 F.2d at 404; citing *Afram Lines*, 905 F.2d at 349-50).

As shown in Plaintiff's supporting Declarations and documents, and as discussed below, Defendant's counter-security application should be denied because HERNING's "counterclaims" are a manufactured artifice designed to place Plaintiff at a tactical advantage in negotiating a favorable resolution of VARDHMAN's claims -- the very situation warned against in numerous decisions. When a plaintiff must choose between

maintaining security for its claims or having to surrender such security in the face of unjustified counterclaims, courts have routinely refused to grant a defendant's demand for counter-security. This Court should follow the precedents cited herein and deny the instant motion for counter-security.

**Point II**

**THE COUNTERCLAIMS ADVANCED BY PLAINTIFF ARE NON-ACTIONABLE AS A MATTER OF LAW, FRIVOLOUS, AND SPECULATIVE**

In its Answer and Counterclaim HERNING sets forth four substantive counterclaims for which it has requested counter-security in this motion[3]. HERNING's counterclaims are the epitome of frivolousness in that they are non-actionable as a matter of English law, cannot be pursued in good faith as a matter of fact, and are totally lacking in merit. Every one of HERNING's counterclaims lack substance and have been asserted in this proceeding solely as retaliation for Plaintiff's attachment.

Rule E(7)(a) cannot be employed by a defendant for the purpose of forcing a plaintiff to post counter-security for frivolous claims simply in order to give the defendant an advantage in negotiating a settlement. This is exactly what HERNING is attempting here. Courts have cautioned against the granting of counter-security on a defendant's dubious counterclaims when the only conclusion that can be drawn is that the request for counter-security is solely to secure a negotiating advantage. In *Titan Navigation* the court stated:

> [T]he Court should not require counter-security where the counterclaim is frivolous or so lacking in merit that the

---

[3] Plaintiff also seeks counter-security for interest on its principal claims as well as for estimated costs of the London arbitration which include arbitrators' fees and attorneys' fees.

> court can only conclude that the counterclaim was advanced solely to secure a negotiating advantage over the complainant.

808 F.2d at 404. Consistent with this, courts in a variety of circumstances have refused to order the posting of counter-security where a counterclaim is frivolous, lacking in merit, or too speculative to be entitled to the normal presumption that counter-security is appropriate. Several representative examples, discussed below, demonstrate how courts have addressed this issue.

In *Trinidad Foundry & Fabricating, Ltd. v. M/V KAS CAMILLA*, 776 F. Supp. 1555 (S.D.Fl. 1991), the plaintiff arrested the defendant's vessel in connection with its claims for repairs and necessaries. *Id.* at 1556. The defendant shipowner counterclaimed for damage to the vessel due to the plaintiff's alleged negligence, breach of warranty, and breach of contract and applied to the court for counter-security under Rule E(7). *Id.* at 1558. In it application, the defendant contended that the plain language of Rule E(7) required the plaintiff to post counter-security. *Id.* The court disagreed and, after examining the facts surrounding defendant's purported "counterclaim", refused to order the posting of counter-security:

> [Defendant] argues that the plain language of Rule E(7) requires Plaintiff to post a bond or other security on the Counterclaims filed in this action. The Court is not persuaded by Defendant's reasoning in this regard. Rule E(7) mandates the posting of counter-security in this instance unless the Court, for cause shown, directs otherwise. In the present case, Defendant's authorized representative executed Plaintiff's Notice of Repairs Satisfactorily Completed, confirming that the repairs performed by Plaintiff to the Vessel had been satisfactorily completed. The undersigned believes that this fact alone indicates that Defendants' Counterclaims may be frivolous

> and constitutes sufficient cause shown to remove the presumption of counter-security dictated by Rule E(7).

*Id.*

In *Expert Diesel, Inc. v. Yacht FISHIN FOOL*, 627 F. Supp. 432 (S.D.Fl. 1986), the court refused to grant the defendants' request for counter-security on counterclaims similar to those asserted by the defendants in *KAS CAMILLA*. See *Id.* In so holding, the court stated it was "reluctant to compel Plaintiff to post a bond in light of Defendant's damage claim of a general rather than a precisely detailed, nature." *Id.* at 433.

In *U.S. Maritime Services Inc. v. Trade Ventures Inc.*, 1998 U.S. Dist. LEXIS 10608 (E.D.La. July 8, 1998), the defendants counterclaimed for damages arising over a "lost charter". *Id.* at *6. In denying the defendants' motion for counter-security, the court ruled that the counterclaim was too speculative and insufficiently supported to justify an order directing the posting of counter-security.

> The defendant's claim for the alleged lost charter is too speculative to sustain an order for counter-security. Unlike plaintiff's claim which is based on past events reasonably able to be ascertained and quantified, defendant's losses due to a 'road not taken' cannot be so readily ascertained and quantified. The Baldwin affidavit is insufficient by itself to determine what the defendants estimated actual loss is after expenses and other items are deducted, even assuming the voyage would have occurred but for the plaintiff's alleged broken agreement.

*Id.*

Courts are also reluctant to award counter-security for highly speculative damages, even when under a certain sets of facts such damages could theoretically be awarded on the underlying action. In *Ythan Ltd. v. Americas Bulk Transport Ltd.*, 336 F. Supp. 2d 305 (S.D.N.Y. 2004), the defendant sought $4.4 million in counter-security on a cargo indemnity claim. In denying that portion of the defendant's counter-security

request, the court ruled that the "highly contingent" nature of the defendant's claim made posting of such counter-security inappropriate. *Id.* at 309.

Likewise, in *Sea Transp. Contrs., Ltd. v. Indus. Chemiques Du Sengal,* 411 F. Supp. 2d 386, 396 (S.D.N.Y. 2006), the court denied the full amount of security requested by the plaintiff as overreaching. In that case, plaintiff sought security for loss of profits over 30 years for breach of a contract which, if it had not been breached, by its terms could have been renewed interminably. Notwithstanding the merits of the claim under English law, the court limited the amount of security because while the contract could theoretically have been renewed forever, the court found this scenario highly improbable and the damages were highly speculative and remote.

Here, HERNING has offered even less substance than the defendants in the cases cited above. HERNING summarily asserts via attorney affidavit that it has counterclaims for over $1.67 million, but does not produce any witness statements or other evidence or proof that these claims have any basis in fact or law. As the cases cited above make clear, general claims or unsupported allegations are not given the presumption of validity that a well supported and documented claim is to receive. Accordingly, even assuming that Defendant's application for counter-security is facially proper, Defendant's claims are much too speculative and otherwise so frivolous as not to warrant an order directing the posting of counter-security.

We examine below the individual counterclaims set forth by HERNING.

**A. The Claim For Bunkers.**

HERNING's claims for the cost of bunkers consumed while the vessel was off-hire from March 26 to April 9, 2008, allegedly in the sum of $51,753.12, fails as it is

completely frivolous. It was, in fact, VARDHMAN which furnished the bunkers to the ship, not HERNING.

Pursuant to Clause 7 of the charter, it was VARDHMAN's obligation to provide and pay for all fuel used by the vessel during the pendency of the charter, except for fuel used while the vessel was off-hire. (Shah Declaration Ex. A) On February 27, 2008 VARDHMAN arranged for 250.14 metric tons of IFO bunkers to be supplied to the ship in the Port of Tema, Ghana by Monjasa A/S. The cost of the bunkers was $137,076.72. On March 26, 2008 VARDHMAN remitted payment for the bunkers in full to Monjasa A/S via wire transfer through Nordea Bank. (Shah Declaration ¶20-21, Ex. A Copies of the bunker invoice, bunker delivery receipt and wire transfer payment for the bunkers are attached hereto as Exhibit B to the Shah Declaration.)

The vessel's Master confirmed by email dated March 19, 2008 that 207.4 mt of IFO and 13.6 mt of MGO bunkers remaining onboard as of that date. (Shah Declaration ¶22and Ex. C) The vessel consumes between 0.06 to 0.8 metric tons of IFO per hour while idling in port and at sea, respectively. Thus, all of the fuel consumed during the period from March 19 to April 9, 2008, while the vessel sat off the coast of West Africa, was fuel which VARDHMAN purchased. In fact, VARDHMAN has demanded that HERNING pay for the fuel remaining on board as of both March 19 and April 9, 2008 but HERNING has failed to do so. (Shah Declaration ¶23 and Ex. A)

Since the bunkers on board the vessel were at all times the property of VARDHMAN under the terms of the charter between VARDHMAN and HERNING, both as a matter of fact and more significantly as a matter of law, HERNING has no claim for the cost of bunkers consumed. (Hicks Declaration ¶15) Contrary to the

allegation in its Counterclaim at ¶37, HERNING is not out of pocket anything in respect to the bunkers consumed during the off-hire period. Rather, HERNING owes VARDHMAN for the bunkers which remain on board the vessel.[4] The HERNING bunkers claim is the epitome of frivolousness and no counter-security should be required.

The next three counterclaims advanced by HERNING are each premised upon the unwarranted premise that VARDHMAN breached the charter by failing to pay hire to HERNING, and in turn HERNING's assumed justification in not paying hire to Head Owner Schulte. If HERNING genuinely believed the vessel had the appropriate oil major approvals and it was in compliance with the vetting clause (Clause 65) of the charter, upon receiving VARDHMAN's notification that it was placing the ship off-hire HERNING could and should have continued to pay hire to the Head Owners under the Head Charter. HERNING admits, however, that it failed to pay hire to the vessel's Head Owners[5] which resulted in Schulte exercising its right to withdraw the vessel from HERNING's service as of April 9, 2008. (Hicks Declaration ¶10,14) This action, of itself, means that HERNING was undoubtedly the author of its own misfortune.

**B. The Claim For Repositioning Costs.**

HERNING's claim for the cost of repositioning the vessel from Cotonou, West Africa to Gibraltar in the sum of $214,137.23 is also frivolous on its face. These costs, said to have been incurred to remove the vessel to a place for routine redelivery under the Head Charterparty, only arose, if at all, because: 1) HERNING wrongly terminated the charter with VARDHMAN; and 2) HERNING did not pay hire to the Head Owners so that,

---

[4] VARDHMAN reserves the right to seek additional security for the value of the bunkers for which HERNING has failed to compensate it.

[5] HERNING apparently failed to place the vessel off-hire under its charter with Schulte.

following the Head Owners' withdrawal from the Head Charterparty, HERNING was unable to trade the vessel for its own account in the geographical position where they had wrongfully terminated the Sub-charterparty with VARDHMAN. (Hicks Declaration ¶16) Additionally, VARDHMAN was within its rights to declare the vessel off-hire regardless of her current position. (Shah Declaration ¶25)

More to the point, however, **the repositioning costs for which HERNING seeks counter-security have never been incurred!** Attached as Exhibit D to the Shah Declaration are printouts from the Lloyd's MIU website which confirm the vessel has remained off the coast of Cotonou/Lagos between April 29 and May 12, 2008. It is understood that the vessel has remained in the same location since April 9, 2008. (Shah Declaration ¶25) VARDHMAN is obtaining further confirmation of this fact and will supply additional proof in the next few days.

Accordingly, it is clear that HERNING has indeed not actually incurred any costs for re-delivery of the vessel from Cotonou to Gibraltar as falsely claimed at ¶37 of its counterclaim. Nor is there any evidence that such costs will be incurred by HERNING in the future. The situation presented here is similar to the "highly contingent" indemnity claim set forth in *Ythan Ltd.*, 336 F. Supp. 2d 305 (S.D.N.Y. 2004) and the "highly speculative damages" claim made in *Sea Transp. Contrs., Ltd.* , 411 F. Supp. 2d at 396 (S.D.N.Y. 2006) which makes the posting of counter-security inappropriate.

Thus the counterclaim for repositioning costs is entirely frivolous and speculative and no counter-security should be required to be posted by Plaintiff.

**C. The Claim For Unpaid Hire.**

HERNING makes a claim for $209,324.50 representing hire not paid by VARDHMAN during the period March 26 (the date through which VARDHMAN had paid hire in advance of declaring the vessel off-hire on March 19) to April 9, 2008 (the date the vessel was withdrawn from HERNING service by Schulte). As explained by Messrs. Hicks and Shah, pursuant to Clause 65 of the HERNING-VARDHMAN charter, VARDHMAN had the absolute right to place the vessel off-hire if HERNING had not obtained the approval of the seven listed major oil companies to trade the vessel within six (6) months from the date the vessel was delivered. As these approvals were not in place, VARDHMAN exercised its right and placed the vessel off-hire.

No hire was owed by VARDHMAN to HERNING while the vessel was off-hire. Under Clause 9(i) of the charter, VARDHMAN was entitled to deduct from future hire payments "any hire which Charterers reasonably estimate to relate to off-hire periods". (Shah Declaration ¶16-17; Hicks Declaration ¶12-13) Because VARDHMAN had placed the vessel off-hire due to HERNING's non-compliance with the vetting clause, the entire period beyond March 19, 2008 until HERNING improperly withdrew the vessel on April 9, 2008 was off-hire and therefore VARDHMAN had no obligation to pay any additional hire. Thus, the claim for unpaid hire fails as both a matter of fact and law.

**D. The Claim For Lost Profits.**

HERNING's request for counter-security on its claim for $439,176purportedly representing the profit it contends it lost over the 232 days remaining under the

HERNING-VARDHMAN charter[6] is similarly unworthy of consideration. In order to be entitled to seek its lost profit HERNING must, as a matter of English law, have had the right to let the ship to VARDHMAN. Here it did not.

HERNING's claim for lost profits is legally untenable under English law as set forth in the accompanying Declaration of VARDHMAN's English solicitor John Hicks. HERNING admits that "as a consequence" of Schulte having withdrawn the vessel due to its failure to pay hire to Schulte, HERNING subsequently (and purportedly) withdrew the vessel under its charter with VARDHMAN.[7] As Mr. Hicks explains, once the vessel was withdrawn by Schulte on April 9, 2008 HERNING had no vessel to let to VARDHMAN. As the vessel was lost to HERNING by reason of its own admitted failure to pay hire to Head Owners, as a matter of English law, HERNING cannot advance a claim for the profit it otherwise would have made had the charter with VARDHMAN continued beyond April 9, 2008. (Hicks Declaration ¶14) Thus, HERNING's claim for loss of profits beyond April 9, 2008 fails both as a matter of logic and law.

All in all, each of the four Counterclaims asserted by HERNING fail as a matter of English law, as a matter of fact, are wholly unsupported by nothing other than the "say-so" of Defendant's New York counsel, and are otherwise so frivolous and/or speculative that they are undeserving of an Order for counter-security.

---

[6] HERNING calculates this supposed loss as follows: the hire differential between the hire rate under the HERNING-VARDHMAN charter of $14,683/day and the rate under the Head Charter between HERNING and Schulte of $$12,790/day = $1,893/day times 232 days = $439,176.

[7] See Counterclaim at ¶34.

## CONCLUSION

For the reasons set forth above, HERNING's motion for counter-security should be denied in all respects as each of the claims asserted are either barred as a matter of English law, frivolous or entirely speculative.

Dated: New York, New York
May 30, 2008

Respectfully submitted,

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
VARDHMAN SHIPPING PVT LTD.

By: ______________________
Michael E. Unger (MU 0045)
80 Pine Street
New York, NY 10005
(212) 425-1900 / (212) 425-1901 (fax)