214-08/MEU/SL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
VARDHMAN SHIPPING PVT LTD.,

                    Plaintiff,

    - against -

HERNING SHIPPING AS,

                    Defendant.
-----------------------------------------------------------------x

**08 CV 3620 (RMB)**

**DECLARATION OF
SAURIN SHAH**

I, SAURIN SHAH, pursuant to Section 1746 of Title 28 of the United States Code, hereby declare and say the following under penalty of perjury:

I am the Managing Director of Plaintiff VARDHMAN SHIPPING PVT LTD. ("VARDHMAN").

1.    I submit this Declaration in opposition to the motion filed by Defendant HERNING SHIPPING AS ("HERNING") which seeks an order directing VARDHMAN to post counter-security in the sum of $1,675,802.60.

2.    By way of background, pursuant to a Charterparty dated November 15, 2006, VARDHMAN agreed to charter the M/T KRISTINA THERESA from HERNING, the vessel's disponent owner.  A clear copy of the relevant sections of the charterparty are attached hereto as Exhibit A.

3.    Subsequent to entering in the charter with HERNING, VARDHMAN was informed that HERNING had previously chartered the vessel from her Head Owners, non-party MS "PAUL SCHULTE" Shiffahrtsgesellschaft mbH & Co. KG ("Schulte" or "Head Owners") pursuant to a Charterparty dated February 10, 2006.

4.     It is understood that the head charter between HERNING and Schulte and the charter between HERNING and VARDHMAN were on "back-to-back" terms in all respects except for the length of the charter, date hire payments were to be made, and rate of hire.

5.     The M/T KRISTINA THERESA is a tanker and was specifically chartered by VARDHMAN in order to carry oil ,chemicals and other liquid cargoes.

6.     Under the vetting clause of the charter, Clause 65, HERNING warranted that no longer than four (4) months after the vessel was delivered to VARDHMAN the vessel and her management would be approved to receive or discharge cargoes from four of the following major oil companies: ExxonMobil, ChevronTexaco, Shell, BP-Amoco, Total-Final-Elf, Stat Oil and Kuwait Petroleum, and that not later than six (6) months after the vessel was delivered to VARDHMAN the vessel and her management would be approved to receive cargoes from the remaining three (3) major oil companies listed above.

7.     Clause 65 further provided that if HERNING failed to comply with the vetting clause, VARDHMAN had the option to place the vessel off-hire after giving 15 days notice until such time as HERNING insured that the vessel and her management were in compliance.

8.     The vessel was delivered on November 29, 2006. As of March 29, 2007 there were no approvals in place by any of the oil majors for the vessel.

9.     By May 29, 2007 the vessel had been approved by BP, Shell, Chevron and ExxonMobil (although the ExxonMobil approval was withdrawn on June 5, 2007 due to the Master being found to be in charge of the vessel with excess alcohol).    Still

outstanding as of May 29, 2007 were the approvals from Total, Stat Oil and Kuwait Petroleum.

10.    On March 19, 2008, VARDHMAN advised HERNING that due to its failure to comply with the vetting clause of the Charterparty, VARDHMAN declared the vessel off-hire, without prejudice to VARDHMAN's right to claim for damages for losses sustained by reason of HERNING's breach. VARDHMAN had also given HERNING the required notice in advance before off-hiring the vessel.

11.    Notwithstanding the March 19, 2008 off-hire declaration, VARDHMAN had previously paid hire to HERNING through March 26, 2008, in accordance with the charter terms which required hire to be paid every fourteen (14) days in advance.

12.    VARDHMAN declined to pay further hire beyond March 26, 2008 having invoked clause 9(i) of the Charterparty which provides that VARDHMAN is entitled to deduct from future hire payments for "any hire which charterers reasonably estimate to relate to off-hire periods". Accordingly, no hire was due to be paid to HERNING after March 18, 2008 until such time as the vessel was back on hire (ie. the vetting clause had been complied with by HERNING).

13.    It is understood that hire was payable by HERNING to Schulte on a monthly basis, in advance, commencing the first of each month. HERNING failed to pay to Schulte the hire due on April 1, 2008. It is not known whether HERNING declared the vessel off-hire.

14.    Schulte withdrew the vessel from HERNING's service on April 9, 2008 at 18:09 hours Central European time. Later the same day HERNING sent a message to

VARDHMAN withdrawing the vessel on the basis of VARDHMAN's alleged failure to pay hire.

15.     I am advised that HERNING has filed a counterclaim in the instant New York attachment action in which it seeks counter-security for the following:

| a | unpaid hire | $209,324.50 |
|---|---|---|
| b | lost profits | $439,176.00 |
| c | unpaid costs of bunkers consumed while the vessel was off-hire | $51,753.12 |
| d | unpaid costs of repositioning the vessel from Cotonou, West Africa to Gibraltar | $214,137.23 |
| e | interest on the principal claims at 7% compounded quarterly for three (3) years | $211,411.79 |
| f | estimated attorneys fees and costs of prosecuting the counterclaim in London arbitration | $550,000.00 |

TOTAL                $1,675,802.60

16.     As to the claim for unpaid hire for the period March 27-April 9, 2008, as set forth above, because the vessel was off-hire by reason of HERNING's breach of the vetting clause, Clause 65, and because no hire was required to be paid for periods during which the vessel was off-hire as per Clause 9(i), the claim must fail.

17.     Even if the Court were to consider that HERNING is entitled to counter-security in respect of the unpaid hire claim, HERNING is not entitled to security for the full amount of the sum claimed. By its own admission HERNING did not pay hire to Schulte from April 1 to April 9, 2008, the date Schulte withdrew the vessel from HERNING's service. To allow counter-security for this eight (8) day period at the full $14,683.00 per day hire rate would be inequitable in that HERNING admittedly did not pay to Head Owners the $12,790.00 per day due under the head charter. At best,

HERNING should be entitled to the $1,893.00 per day differential between the hire rate under the HERNING – VARDHMAN charter and the SCHULTE – HERNING Head charter for a total of $15,144.00.

18.     I leave it to Mr. John Hicks, VARDHMAN's London solicitor who has also submitted a Declaration in opposition to this motion, to explain why HERNING is not be entitled to counter-security for the claim for loss of profit of $439,176.00 - representing the difference in the hire rate for the 232 days remaining under the HERNING – VARDHMAN charter and the hire rate under the head charter.

19.     As to the claim advanced by HERNING in respect to the cost of bunkers allegedly consumed during the off-hire period, $51,753.12, this claim is completely frivolous as HERNING has incurred no loss.

20.     Pursuant to Clause 7 of the Charterparty, it was VARDHMAN's obligation to provide and pay for all fuel used by the vessel during the pendency of the charter, except for fuel used while the vessel was off-hire.

21.     On February 27, 2008 VARDHMAN arranged for 250.14 metric tons of IFO bunkers to be supplied to the ship in the Port of Tema, Ghana by Monjasa A/S. The cost of the bunkers was $137,076.72.   On March 26, 2008 VARDHMAN remitted payment for the bunkers in full to Monjasa A/S via wire transfer through Nordea Bank. Copies of the bunker invoice, bunker delivery receipt and wire transfer payment for the bunkers are attached hereto as Exhibit B.

22.     Pursuant to a message received from the vessel's Master on March 19, 2008, the Master confirmed the quantity of bunkers remaining onboard as 207.4 mt of IFO and 13.6 mt of MGO.  See attached Exhibit C.

23.     The charterparty declares that the vessel consumes between 0.06 to 0.8 metric tons of IFO per hour while idling in port and at sea respectively.  Thus, all of the fuel consumed during the period between March 19 to April 9, 2008, while the vessel sat off the coast of West Africa was fuel for which VARDHMAN paid.   In fact, VARDHMAN has demanded that HERNING pay for the fuel remaining on board as of both March 19 and April 9, 2008 but HERNING has failed to do so.

24.     As to HERNING's claim for repositioning costs in the sum of $214,137.23, it is understood that the vessel has remained off the coast of Cotonou/Lagos from April 9 to date.  Attached as Exhibit D is confirmation obtained from the Lloyd's MIU website that the vessel remained off the coast of Cotonou/Lagos between April 29 and May 12, 2008.  The undersigned is obtaining confirmation of the vessel's position between April 9 and 29 and will supplement this Declaration in the next several days.

25.     Accordingly, it is clear that HERNING has indeed not actually incurred any costs for re-delivery of the vessel from Cotonou to Gibraltar as claimed in their counterclaim as the vessel has not undertaken a voyage to Gibraltar.  VARDHMAN was within its rights to declare the vessel off-hire regardless of her current position. As such, HERNING should not be entitled to security for this non-existent item of damages.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed at Gujarat, India
on May 30, 2008.

_____
SAURIN SHAH

# Exhibit A

## Declaration of Saurin Shah



Code word for this Charter Party
"SHELLTIME 4"

Issued December 1984 amended December 2003

**Time Charter Party**

~~LONDON~~  15 NOV 2006

herning shipping france sarl as agents to herning shipping a.s. ,

IT IS THIS DAY AGREED between herning, denmark 1
(hereinafter referred to as "Owners"), being Time Charter Owners 2
of the good motor/steam* vessel called MS Kristina Theresa One new building tanker ex Samho Shipyard Hull 1056
(hereinafter referred to as "the vessel") described as per Clause 1 hereof and Vardhman Shipping (P) Ltd, R.V. Shah's
(hereinafter referred to as "Charterers"):        Bunglow, Surendranagar - 363001, Gujarat, India
Starchems Antwerp remains responsible for the performance of the charter party.

| | | | |
|---|---|---|---|
| Description And Condition of Vessel | 1. | At the date of delivery of the vessel under this charter and throughout the charter period: | 6 |

(a) she shall be classed by a Classification Society which is a member of the International 7
Association of Classification Societies; 8

(b) she shall be in every way fit to carry crude petroleum and/or its products including cargoes of the types 9
stated in clause 69 hereof;

(c) she shall be tight, staunch, strong, in good order and condition, and in every way fit for the 10
service, with her machinery, boilers, hull and other equipment (including but not limited to hull 11
stress calculator, radar, computers and computer systems) in a good and efficient state; 12

(d) her tanks, valves and pipelines shall be oil- tight; 13

(e) she shall be in every way fitted for burning, in accordance with the grades specified in Clause 14
29 hereof; 15

   (i) at sea, fuel oil for main propulsion and ~~fuel oil~~/marine diesel oil* for auxiliaries; 16

   (ii) in port, ~~fuel oil~~/marine diesel oil* for auxiliaries; 17

(f) she shall comply with the regulations in force so as to enable her to pass through the Suez and 18
Panama Canals by day and night without delay; 19

(g) she shall have on board all certificates, documents and equipment required from time to time by 20
any applicable law to enable her to perform the charter service without delay; 21

(h) she shall comply with the description in the Timecharter Description ~~OCIMF Harmonised Vessel~~ 22
~~Particulars Questionnaire~~ appended hereto as Appendix A, provided however that if there is any conflict 23
between the provisions of this questionnaire and any other provision, including this Clause 1, of this charter 24
such other provisions shall govern; 25

(i) her ownership structure, flag, registry, classification society and management company shall 26
not be changed without Charterers' prior consent. Such consent shall not be unreasonable withheld ; 27

| | | |
|---|---|---|
| Safety Management | (j) | Owners will operate: |

   (i) a safety management system certified to comply with the International Safety 29
Management Code ("ISM Code") for the Safe Operation of Ships and for 30
Pollution Prevention; 31

   (ii) a documented safe working procedures system (including procedures for the 32
identification and mitigation of risks); 33

   (iii) a documented environmental management system; 34

   (iv) documented accident/incident reporting system compliant with flag state 35
requirements; 36

(k) Owners shall submit to Charterers a monthly written report detailing all accidents/incidents and 37
environmental reporting requirements, in accordance with the "Shell Safety and Environmental 38
Monthly Reporting Template" appended hereto as Appendix B; 39

(l) Owners shall maintain Health Safety Environmental ("HSE") records sufficient to demonstrate 40
compliance with the requirements of their HSE system and of this charter. Charterers reserve 41
the right to confirm compliance with HSE requirements by audit of Owners. 42

(m) Owners will arrange at their expense for a SIRE inspection to be carried out at intervals of twelve 43
months plus or minus thirty days, subject to vessel's schedule and trading area/ pattern 44
and to availability of sire inspector (see also Clause 65).

─────────────────────
• Delete as appropriate
• Delete as appropriate



ORIGINAL

compelled to pay in respect of any such liability. Any amounts allowable in general average for wages | 157
and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a | 158
Period when the vessel is on-hire. | 159

**Charterers to Provide** 7 (a) Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage | 160
and pilotage and shall pay agency fees, port charges, commissions, expenses of loading and | 161
unloading cargoes, canal dues and all charges other than those payable by Owners in | 162
accordance with Clause 6 hereof, provided that all charges for the said items shall be for | 163
Owners' account when such items are consumed, employed or incurred for Owners' purposes or | 164
while the vessel is off-hire (unless such items reasonably relate to any service given or distance | 165
made good and taken into account under Clause 21 or 22); and provided further that any fuel | 166
used in connection with a general average sacrifice or expenditure shall be paid for by Owners. | 167
(b) In respect of bunkers consumed for Owners' purposes these will be charged on each occasion | 168
by Charterers on a "first-in- first-out" basis valued on the prices actually paid by Charterers. | 169
(c) If the trading limits of this charter include ports in the United States of America and/or its | 170
protectorates then Charterers shall reimburse Owners for port specific charges relating to | 171
additional premiums charged by providers of oil pollution cover, when incurred by the vessel | 172
calling at ports in the United States of America and/or its protectorates in accordance with | 173
Charterers orders. | 174

**Rate of Hire** 8. Subject as herein provided, Charterers shall pay 14 days in advance for the use and hire of the | 175
vessel at the rate of 1st year : usd 14.683 pdpr (incl brokerage comm.) 2nd year : usd 15.417 pdpr (incl brokerage comm.)
States Dollars       per day, and pro rata for any part of a day, from | 176
the time and date of her delivery (local time) to Charterers until the time and date of redelivery (local | 177
time) to Owners. Hire to include overtime onboard. Communication / Representation | 178
at United States Dollars 600 per month, and pro rata for any part of a month.

**Payment of Hire** 9. Subject to Clause 3 (c) and 3 (e), payment of hire shall be made in immediately available funds | 179
to: | 180
Directly into owners designated bank account as per details given on time | 181
charter hire invoices. | 182

| 183

| 184

in United States Dollars per calendar 14 days in advance ~~date to~~ | 185
(i) ~~any such payment which Charterers reasonably estimate to relate to off-hire periods, and;~~ | 186
(ii) any amounts disbursed on Owners' behalf, any advances and commission thereon, and | 187
charges which are for Owners' account pursuant to any provision hereof, and; | 188
(iii) any amounts due or reasonably estimated to become due to Charterers under Clause 3 (c) | 189
or 24 hereof, | 190
any such adjustments to be made at the due date for the next monthly payment after the facts | 191
have been ascertained. Charterers shall not be responsible for any delay or error by Owners' | 192
bank in crediting Owners' account provided that Charterers have made proper and timely | 193
payment. | 194
In default of such proper and timely payment: | 195
(a) Owners shall notify Charterers of such default and Charterers shall within seven days of receipt | 196
of such notice pay to Owners the amount due, including interest, failing which Owners may | 197
withdraw the vessel from the service of Charterers without prejudice to any other rights Owners | 198
may have under this charter or otherwise; and, | 199
(b) Interest on any amount due but not paid on the due date shall accrue from the day after that date | 200
up to and including the day when payment is made, at a rate per annum which shall be 1% | 201
above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank in New York at | 202
12.00 New York time on the due date, or, if no such interest rate is published on that day, the | 203
interest rate published on the next preceding day on which such a rate was so published, | 204
computed on the basis of a 360 day year of twelve 30-day months, compounded semi-annually. | 205

**Space Available to Charterers** 10. The whole reach, burthen and decks on the vessel and any passenger accommodation (including | 206
Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the | 207
vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the | 208
weight of stores on board shall not, unless specially agreed, exceed 50 tonnes excluding fresh water | 209
and bunker and lub oil at any time during the
charter period. | 210

**Segregated Ballast** 11. In connection with the Council of the European Union Regulation on the Implementation of IMO | 211
Resolution A747(18) Owners will ensure that the following entry is made on the International Tonnage | 212
Certificate (1969) under the section headed "remarks": | 213
"The segregated ballast tanks comply with the Regulation 13 of Annex I of the International | 214
Convention for the prevention of pollution from ships, 1973, as modified by the Protocol of 1978 | 215
relating thereto, and the total tonnage of such tanks exclusively used for the carriage of segregated | 216

Additional Clauses



### Clause 65  (Vetting clause)

Owners warrant that no later than 4 (four) months after delivery the vessel and her management are approved by 4 (four) of the following major oil companies: Exxon Mobil, Chevron Texaco, Shell, BP-Amoco, Total-Final-Elf, Stat oil and Kuwait Petroleum, and 6 (six) months after delivery the remaining 3 (three) Major oil companies approvals, as listed above, to be obtained. These 7(seven) approvals to be maintained during the currency of this Charter.
If Owners are or become in breach of this warranty, they are immediately to make necessary arrangement in order for the Owners/vessel to again comply.

Should Owners fail to comply and become in breach of this warranty and one of the above major oil company's approval is outstanding (not available) 6 (six) months after delivery or during the currency of this Charter Owners fail to renew/extend an approval and same is outstanding for more than 16 (sixteen) days, ~~Charterers will have the option to put the vessel off-hire until Owners have ensured the vessel and her Management again are in compliance. In the instance that the Charterers should exercise such option to put the vessel off-hire, then the vessel shall cease to be at the Charterers' disposal until such time as the vessel is again on-hire it being understood that Owners shall do their utmost to have the vessel comply with this clause as soon as possible.~~

It is understood that the Owners shall not be held responsible for not obtaining and maintaining oil major approvals should a) the vessel trade to areas where the oil majors will not inspect or b) the oil majors have no commercial interest in the vessel (and is thus not willing to inspect).

### Clause 66

Owners warrant that the vessel will be at all times in compliance with the Marpol regulations currently in force and applicable to the vessel basis her construction date or as possibly amended during the charter and is certified to carry Marpol annex I and II cargoes in accordance with vessel's Cargo list and Certificate of Fitness and has corresponding valid certificates at all times on board.

### Clause 67



**Additional Clauses**

Cont'd Appendix A

* Vessel is able to discharge a homogenous cargo at 1.200 m3/hr (excluding
  stripping).
* Vessel is able to discharge 4 grades simultaneously at 1.200 M3/hour.
  Discharge rate for each grade 300 M3/hour.
  The above warranties are based on no restriction from shore line(s).

Speed/consumption:

Speed + consumption:
Laden   : 13,0 knots in max BF4 on 19 mt ifo380 mtpd
Ballast : 14,0 knots in max BF4 on 19 mt ifo380 mtpd

Boiler running full cpacity : about 0,866 mts/hour.
In port discharging with max number of pumps : about 0,23 mts/hour.
At sea idle : about 0,8 mts/hour In port idle : about 0,06 mts/hour.
Maneuvering : about 0,13 mts/hour. Boiler is running on HFO and generators on HFO.

# Exhibit B

## Declaration of Saurin Shah

# MONJASA
### Bunkering knowledge

| | INVOICE # | 24064 |
|---|---|---|

M/V KRISTINA THERESA and/or master and/or
owners and/or charterers and/or
managers and/or operators and/or
Vardham Shipping
c/o Holger Kristiansen Succsr
Marina House
Femøgade 4, P.O.Box 228
4800 - Nykøbing Falster
Denmark

| Invoice Date | 14-03-2008 |
|---|---|
| Delivery Date | 27-02-2008 |
| Your Ref | Andreas Christensen |
| Your VAT# | 27959601 |

We hereby debit you concerning KRISTINA THERESA (imo: 9321641) delivered at Tema as follows:

| Product Description | Quantity | Unit | Price/Unit | Total |
|---|---|---|---|---|
| FO-380 Cst RMG380 | 250,1400 | Mts.fob | 548,00 | 137.076,72 |

| Total amount due in USD (Free of VAT) | 137.076,72 |
|---|---|

Remark:
*Bunker Reciept(s) enclosed.*

**PAYMENT MUST BE RECIEVED IN FULL BY OUR BANK BEFORE OR ON DUE DATE AND
WITHOUT ANY DEDUCTIONS. ALL BANK CHARGES ARE FOR BUYER'S ACCOUNT.**

Payment should be instructed from you no later than: 26-03-2008

For Late payment, a monthly interest of 2% per month will apply.
The interest will be calculated for each overdue day.

| Please pay to: | Beneficiary | Monjasa A/S | S.W.I.F.T | NDEADKKKXXX |
|---|---|---|---|---|
| | Reference | Invoice no. 24064 | Account / IBAN | DK60 2000 5006 9915 38 |
| | Bank | Nordea Bank Danmark A/ | Bank slip to fax | +45 70 260 233 |

Please scan a copy of your bank slip and email it to accounts@monjasa.com or fax it to +45 70 260 233

In case of questions, you are welcome to contact our accounts department on phone +45 70 260 230

| Monjasa A/S | | | Phone | +45 70 260 230 |
|---|---|---|---|---|
| Strevelinsvej 4 | | | Fax | +45 70 260 233 |
| DK-7000 Fredericia | VAT No. DK25480531 | | Email | denmark@monjasa.com |

**BUNKER DELIVERY RECEIPT**

DATE OF ISSUE: 27 FEB. 08

VESSEL: MT KRISTINA THERESA

IMO: 9321641

PORT: TEMA, GHANA

DELIVERY DATE: 27 FEB. 08

CUSTOMER:

| GRADE | ENVIR. QUANTITY KGMS | LTRS | LTRS AT 15°C | BILLING QUANTITY M.T. | DENSITY AT 15°C |
|-------|------|------|------|------|------|
| IFO 380 CST | | | | 250.14 M/T | 0.9870 |
| SULPHUR (% m/m) 2.8 | | | | | OBSERVED TEMPERATURE 31°C |

Quantity (written in full) TWO HUNDRED FIFTY DEC ONE FOUR

| PUMPING HRS | METHOD OF DELIVERY | |
|-------------|-------------------|--|
| STARTED 0845H | BARGE M/T AEGEAN TULIP MONROVIA | EX - PIPE |
| FINISHED 1210H | | |

A. YOU ARE KINDLY REQUESTED TO WITNESS THE OPENING AND CLOSING METER READING AND BARGE SOUNDINGS BEFORE COMMENCING AND AFTER COMPLETION OF BUNKERING OPERATIONS. THESE READINGS WILL BE USED AS FINAL MEANS OF MEASUREMENT AND WILL BE THE OFFICIAL BASIS IN DETERMINING THE QUANTITY DELIVERED VESSEL OWNERS AND/OROPERATORS AND/OR CHARTERERS OF THE VESSEL TO BE JOINTLY AND SEVERALLY LIABLE FOR THE PAYMENT OF ALL AND ANY BUNKERS SUPPLIED HEREUNDER AND UNTIL THE AMOUNT DUE UNDER THE INVOICE FOR THEM HAS BEEN PAID IN FULL THE PROPERTY OF SUCH BUNKERS REMAIN WITH THE SUPPLIERS. ALL DISPUTES THAT MIGHT ARISE FROM THIS BUNKERING OPERATION WILL BE SETTLED BY THE GREEK COURTS. THE SAMPLE IS VALID FOR (15) FIFTEEN DAYS ONLY.
B. DECLARATION: THE FUEL OIL COMPLIES WITH REGULATIONS 14 AND 18 OF ANNEX VI OF MARPOL 73/78.

| AEGEAN BUNKERING (GHANA) LTD FOR ACCOUNT: AEGEAN MARINE PETROLIUM SA. | RECEIVING VESSEL | REMARKS |
|---|---|---|
| | VESSEL'S SEAL | |
| | CAPTAIN | |
| | AND/OR | |
| | CHIEF ENGINEER | |



**Betalingsbekræftelse**
Udbetaling

2205

VARDHMAN SHIPPING APS
C/O HOLGER KRISTIANSENS EFTF.A/S
FEMØGADE 4
4800 NYKØBING F



Dato 26.03.2008
Side 1 af 2 sider

Konto nr. 5036186293

**Valutakontooverførsel**          Reference: 3807705347          Unitelreference: 6970792102750212

| | | |
|---|---:|---|
| Overført valuta og beløb | 137.076,72 | USD |
| Omkostninger | 3,13 | USD |
| Vi har den 26.03.2008 (valør 26.03.2008 ) hævet på konto 2205 5036 186 293 | 137.079,85 | USD |

Betalingsmodtager:
5005991538
MONJASA A/S
STREVELINSVEJ 4
7000 FREDERICIA

Meddelelse til modtager:
M/T "KRISTINA THERESA" - 24064

Reference til ordregiver:
MONJASA

# Exhibit C

# Declaration of Saurin Shah

# UNGER, MICHAEL E.

**From:** krisax [mailto:fixit@krisax.dk]
**Sent:** Monday, May 05, 2008 2:25 PM
**To:** George Rebollo
**Subject:** Re: RE: Kristina theresa



Ref: 080505-AC00000289.

Ashwin / Andreas

Thanks for your mail of yesterday, pls find below answers of your questions. If you need any more information pls call.

**1.The invoice for purchase of bunkers:** Pls find attached the bunker invoice and receipt

**2. Payment proof by vardhman for the bunkers:** Pls find attached the payment proof from Nordea

**3.Vardhmans email asking herning to return their bunkers:** Pls see following:

quote
TO: ODIN EUROPE
FM: VARDHMAN SHIPPING

REF KRISTINA THERESA
HERNING / VARDHMAN CP
=====================
CHARTERERS OBJECT TO THE OWNER'S WITHDRAWAL OF THE VESSEL FROM THE CHARTER, AND ITS TERMINATION.


5/29/2008

OUR FUEL REMAINS ON BOARD, AND WE RESERVE LIBERTY TO ARREST THE  KRISTINA THERESA /
HER SISTER SHIP/ ANY OTHER VESSEL OWNED BY HERNING SHIPPING AS FOR ILLEGALLY AND
WRONGLY CONSUMING / CONVERTING VARDHMAN'S BUNKERS WORTH US $ 113.655,20 .WITHOUT
MAKING PAYMENTS FOR THE SAME
FURTHERMORE CHARTERERS'  CLEANING MATERIALS WORTH US $ 5.136,00 , REMAIN ON BOARD AS
WELL .

BEST REGARDS
VARDHMAN SHIPPING
unquote

**4. Quantity of remaining bunkers during offhire declaration:** Pls see following:

quote
fm : Kristina Theresa

to : KRISAX


19-Mar-08  07:00 lt, 06:00 utc


 At Cotonou roads, awaiting order.

Position   : Lat : 06-09'N  Long : 002-32'E

Cons 24 hrs: IFO  2.4 mts (ME- 0.00 mts/ AE-1.50 mts/ Boiler- 0.90 mts)
        MGO  0.0 mts

Present weather : Wind SW-ly/4  Sea SW/3

   Bunkers ROB : IFO- 207.4 mts, MGO- 13.6 mts



brgds/master
unquote
**5. and during withdrawal of vessel: Pls see following**

This is the last report we received from the master on the 8th april.

quote
fm : Kristina Theresa

to : KRISAX


08-Apr-08  07:00 lt, 06:00 utc


 At Cotonou roads, awaiting order.

Position   : Lat : 06-09'N  Long : 002-32'E

Cons 24 hrs: IFO  2.4 mts (ME- 0.00 mts/ AE-1.50 mts/ Boiler- 0.90 mts)
        MGO  0.2 mts

Present weather : Wind SW-ly/2  Sea SW/2

Bunkers ROB : IFO- 157.7 mts, MGO- 42.2 mts

brgds/master
unquote

++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++·

Dear Thomas,

Could you send to me again (1) the invoice for purchase of bunkers (2) payment proof by vardhman for the bunkers (3) vardhmans email asking herning to return their bunkers (4) quantity of remaining bunkers during offhire declaration (5) and during withdrawal of vessel.

Herning have claimed in NY that their bunkers were consumed during the offhire periods.

unqte

Brgds / Andreas

Krisax

# Exhibit D

# Declaration of Saurin Shah

| Place | Country | Area | Arrival | Sailed | Details |
|-------|---------|------|---------|--------|---------|
| — Lome | Togo | W Africa | 25 Apr 2008 | 27 Apr 2008 | |
| — Lome | Togo | W Africa | 25 Feb 2008 | 26 Feb 2008 | |

# AIS Sightings For: Kristina Theresa

Date Range:⬚$B"*⬚(BKey - Recent Sightings (updated in last 30 minutes)

Stopped Approaching Distancing

| Type | Stay | Nearest Port | Distance | From | To | Destination | ETA | AIS |
|------|------|--------------|----------|------|-----|-------------|-----|-----|
| Stopped | 23h50m | Apapa-Lagos | 7 | 11 May 2008 12:54 | 12 May 2008 12:45 | COTONOU | 05 Dec 2008 | details |
| Stopped | 11h49m | Apapa-Lagos | 12 | 09 May 2008 21:13 | 10 May 2008 09:03 | LAGOS OFFSHORE | 05 May 2008 | details |
| Stopped | 5h28m | Apapa-Lagos | 29.1 | 05 May 2008 15:47 | 05 May 2008 21:15 | LAGOS OFFSHORE | 02 May 2008 | details |
| Stopped | 2h36m | Apapa-Lagos | 25.8 | 04 May 2008 02:09 | 04 May 2008 04:45 | LAGOS OFFSHORE | 02 May 2008 | details |
| Stopped | 1d 5h | Apapa-Lagos | 6.8 | 01 May 2008 22:19 | 03 May 2008 03:46 | LAGOS OFFSHORE | 02 May 2008 | details |
| Stopped | 22h18m | Apapa-Lagos | 5.3 | 30 Apr 2008 08:26 | 01 May 2008 06:44 | LAGOS | 30 Apr 2008 | details |
| Stopped | 2h19m | Apapa-Lagos | 26.1 | 29 Apr 2008 02:24 | 29 Apr 2008 04:44 | LAGOS | | 29 Apr 2008 | details |

5/28/2008