```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
VARDHMAN SHIPPING PVT. LTD                       :
                                                 :    08 Civ. 3620(RMB)
                              Plaintiff,         :
       - against -                               :
                                                 :
                                                 :
HERNING SHIPPING AS,                             :
                                                 :
                              Defendant.         :
------------------------------------------------------------------X
```

### DECLARATION OF JOHN HICKS IN OPPOSTION TO PLAINTIFF'S MOTION FOR COUNTER-SECURITY

I, John Hicks, pursuant to Section 1746 of Title 28 of the United States Code, hereby declare and say the following under penalty of perjury:

1. I am the Senior Partner in the shipping law firm, Waterson Hicks, English Counsel for the Plaintiff.

2. I am instructed on behalf of the Plaintiff VARDHMAN SHIPPING PVT. LTD. ("VARDHMAN" or "Charterers") in this matter and am authorised to make this Declaration on their behalf in relation to the motion for counter-security in respect to its counterclaims now being brought by Defendant HERNING SHIPPING AS ("HERNING" or "Owners").

3. The underlying dispute arises out of breach by Defendant HERNING of Clause 65 of the Charterparty. Clause 65 provides :

   "Owners warrant that no later than 4 (four) months after delivery the vessel and her management are approved by 4 (four) of the following major oil companies :

   EXXON Mobil, Chevron Texaco, Shell, BP, AMOCO, Total-Final-Elf, Statoil and Kuwait Petroleum, and 6 (six) months after delivery the remaining 3 (three) major oil companies' approvals, as listed above, to be obtained. These 7 (seven) approvals to be maintained during the currency of this Charter. If Owners are or become in breach of this warranty, they are immediately to make necessary arrangement in order for the Owners/vessel to again comply.

> Should Owners fail to comply and become in breach of this warranty and one of the above major oil company's approval is outstanding (not available) 6 (six) months after delivery or during the currency of this Charter Owners fail to renew/extend an approval and same is outstanding for more than 16 (sixteen days) Charterers will have the option to put the vessel offhire until Owners have ensured the vessel and her management again are in compliance. In the instance that the Charterers should exercise such option to put the vessel off-hire then the vessel shall cease to be at the Charterers' disposal until such time as the vessel is again on-hire it being understood that Owners shall do their utmost to have the vessel comply with this Clause as soon as possible.
>
> It is understood that the Owners shall not be held responsible for not obtaining and maintaining oil major approvals should (a) the vessel trade to areas where the oil majors will not inspect or (b) the oil majors have no commercial interest in the vessel (and is thus not willing to inspect)."

4. I believe the meaning of this Clause is clear enough in the circumstances.

5. The vessel was delivered on 29 November 2006. The four month threshold by when at least four of the major's approvals had to be obtained was therefore 29 March 2007. I understand however there were actually no approvals in place at all by that date.

6. All seven approvals were required to be in place not later than 6 months after delivery i.e. by 29 May 2007. As at that date I understand the following approvals had been obtained:-

BP approved on 20th April 2007 - Expiry 1 September 2007;

Shell approved on 20th April 2007 based on the BP approval;

Chevron approved on 17th May 2007 - Expiry October/November 2007;

Exxon approved on 18th May 2007, no expiry date given. However the Exxon approval was lost on 5th June 2007 due to the Master being caught in charge of the vessel with excess alcohol.

It is to be noted that when these approvals were expiring the vessel was trading in the United States where it would have been straightforward to procure renewed inspections.

7. I understand the following approvals remained outstanding as of 29 May 2007 :

Total, Statoil and Kuwait Petroleum.

8. HERNING had 16 further days from this date to rectify the absence of any approvals. HERNING failed to do so. Therefore on 18th March 2008 VARDHMAN advised HERNING the vessel would be offhire, despite that VARDHMAN had paid hire to HERNING in advance up to 26th March 2008.

9. I note that HERNING merely denies the provisions of the complaint where it is asserted that the vessel lacked major approvals. A mere denial in my submission should not be considered to reflect a serious defence. To the contrary it suggests to me that HERNING has no specific defence to raise either on the facts or upon the Charterparty terms.

10. Curiously the Counterclaim asserts in paragraph 24 that HERNING withdrew the vessel from the subject Charterparty as a reaction to the Head Owners withdrawing the vessel from their Head Charterparty, rather than this being because HERNING felt it appropriate to withdraw from their Charterparty with VARDHMAN. This action of itself means that HERNING was undoubtedly the author of its own misfortune: if they genuinely believed the vessel had appropriate approvals and complied with Clause 65 of the Charterparty they could and should have continued to pay hire to the Head Owners under the Head Charterparty, yet they chose not to do so. Since the Charterparties are apparently back-to-back save as to the rates of hire and due dates for payment (Counterclaim paragraph 31) HERNING is trying to have things both ways. Either the vessel had the requisite major approvals or it did not have them. If it had the approvals HERNING should have paid hire to the Head Owners; if it did not have the approvals HERNING has no counterclaim against VARDHMAN as a matter of English law.

11. In paragraph 40 of their Counterclaim HERNING lists several categories of alleged damages, all of which are not recoverable as a matter of English law.

12. HERNING claims unpaid hire in the amount of US$209,324.50 for the period 26th March to 9th April. Since the vessel was clearly offhire during this time by reason of lacking major approvals this is not a recoverable claim.

13. Even if the Court were to consider that HERNING is entitled to counter-security in respect of the unpaid hire claim, HERNING is not entitled to security for the full amount

3

of the sum claimed. By its own admission HERNING did not pay hire to Schulte from April 1 to April 9, 2008, the date Schulte withdrew the vessel from HERNING's service. To allow counter-security for this eight (8) day period at the full $14,683.00 per day hire rate would be inequitable in that HERNING admittedly did not pay to Head Owners the $12,790.00 per day due under the head charter. At best, HERNING should be entitled to the $1,893.00 per day differential between the hire rate under the HERNING – VARDHMAN charter and the SCHULTE – HERNING Head charter for a total of $15,144.00.

14. Secondly HERNING claims US$439,176 (being the hire differential between the Subcharterparty and the Head Charterparty) which HERNING says they would have earned had the Charterparty with VARDHMAN continued. As I have explained above, HERNING could have maintained the Charterparty in existence between themselves and the Head Owners by paying hire to the Head Owners. It being their decision not to do so, responsibility for the lost opportunity to make a profit must rest with HERNING alone. As HERNING had no right to the ship after Head Owners withdrew the vessel from HERNING on 9 April 2008, HERNING had no vessel to let to VARDHMAN after that date. Thus, as a matter of both logic and law, HERNING has no claim for lost profits.

15. HERNING also claims for bunkers consumed during the offhire period in the sum of US$51,753.12. Since the bunkers on board the vessel were the property of VARDHMAN under the terms of the Time Charter between VARDHMAN and HERNING, both as a matter of fact and more significantly as a matter of law, HERNING has no claim for the cost of bunkers consumed. VARDHMAN is entitled to debit HERNING for the cost of bunkers consumed while the vessel is offhire (and during the redelivery), but this not a proper claim to be raised by HERNING against VARDHMAN.

16. Finally HERNING claims US$214,137.23 being vessel repositioning costs from Cotonou to Gibraltar. These costs, said to be incurred to remove the vessel to a place for routine redelivery under the Head Charterparty, only arose, if at all, because HERNING wrongly terminated the Charterparty with VARDHMAN and secondly because HERNING did not pay hire to the Head Owners so that, following the Head Owners' withdrawal from the Head Charterparty, HERNING was unable to trade the vessel for its own account in the geographical position where they had wrongfully terminated the Subcharterparty with VARDHMAN.

NYDOCS1/305597.1

17. Notwithstanding, I am informed that the vessel remains off the coast of West Africa and therefore cannot have been redelivered by HERNING to Head Owners in Gibraltar. Thus, this aspect of HERNING's counterclaim fails as well since no costs have been incurred by HERNING.

18. All in all, each of these four Counterclaims fail as a matter of English law and must be dismissed by the arbitral tribunal.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on 30 May 2008
in London, England

_____
JOHN HICKS

NYDOCS1/305597.1