UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
VARDHMAN SHIPPING PVT LTD.,          :          08 Civ. 3620 (RMB)
                                     :
                    Plaintiff,       :          ECF Case
                                     :
    - against -                      :
                                     :
HERNING SHIPPING AS,                 :
                                     :
                    Defendant.       :
-------------------------------------------------------------X


## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE WHY COUNTERSECURITY SHOULD NOT BE POSTED BY PLAINTIFF, OR, IN THE ALTERNATIVE, TO VACATE MARITIME ATTACHMENT


LENNON, MURPHY & LENNON, LLC
Attorneys for Defendant
HERNING SHIPPING AS,
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
Telephone:    (212) 490-6050
Facsimile:    (212) 490-6070
Charles E. Murphy (CM 2125)

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.............................................................................1

FACTS...........................................................................................................1

ARGUMENT

POINT I

A HEARING ON THIS APPLICATION SHOULD
BE HELD WITHIN THREE (3) DAYS OF ITS FILING...........................................8

POINT II

HERNING IS ENTITLED UNDER SUPPLEMENTAL
ADMIRALTY RULE E(7)(a) TO SECURITY IN THE
AMOUNT OF $1,675,802.60 FOR ITS COUNTERCLAIM........................................8

POINT III

VARDHMAN'S ATTACHMENT SHOULD BE VACATED IF IT FAILS
TO PROVIDE SECURITY FOR HERNING'S COUNTERCLAIM...............................11

CONCLUSION...............................................................................................12

Defendant, HERNING SHIPPING AS, (hereinafter "Herning" or "Defendant"), by its undersigned counsel, Lennon, Murphy & Lennon, LLC, files the within Memorandum of Law in Support of Order to Show Cause Why Countersecurity Should Not Be Posted. For the reasons set forth herein, and in the supporting Declaration of Charles E. Murphy, Plaintiff should be ordered to post countersecurity in the amount of $1,675,802.60. In the event that Plaintiff is unwilling or unable to do so, the attachment should be vacated and the substitute security posted by Defendant in the amount of $7,654,605.84 should be returned.

## PRELIMINARY STATEMENT

Defendant's motion should be granted because: (1) Supplemental Admiralty Rule E(7)(a) plainly provides for the provision of security for Defendant's counterclaim; (2) the Plaintiff has obtained security from the Defendant in the sum of $7,654,605.84 for Plaintiff's claims alleged in the Verified Complaint dated April 15, 2008; (3) the Defendant's counterclaim arises from the same charter party contract as the one relied upon by the Plaintiff in support of its alleged claims; and (4) it would be inequitable to deny Defendant countersecurity in the amount of $1,675,802.60 for its counterclaim in these circumstances where the Plaintiff has already obtained security for its alleged claims and in an amount vastly superior to the sum total of security being sought by the Defendant for its Counterclaim.

## STATEMENT OF FACTS

The relevant facts are set out in the Declaration of Herning's counsel, Charles E. Murphy, to which the Verified Complaint and Defendant's Verified Answer and Counterclaim are annexed.

The Plaintiff, Vardhman Shipping Pvt Ltd. (hereinafter "Vardhman" or "Plaintiff") commenced this action sounding in admiralty seeking process of maritime attachment and garnishment (hereinafter "PMAG") pursuant to Supplemental Admiralty Rule B. Plaintiff filed its

Verified Complaint on April 15, 2008. Plaintiff's Verified Complaint prayed for the issuance of an ex parte Order authorizing the issuance of a PMAG against Defendant's assets located in this District in the amount of $7,654,605.84 inclusive of estimated interest, attorneys' fees and costs. *See a copy of Plaintiff's Verified Complaint attached as Exhibit "1" to the Declaration of Charles E. Murphy.*

On or about April 15, 2008 Plaintiff obtained, on an ex parte basis, an order of maritime attachment in the amount $7,654,605.84. The Clerk of Court subsequently issued a PMAG in the same amount. Plaintiff thereafter served the attachment order and PMAG on several New York banks within the Southern District of New York. Defendant's funds were attached as a result. As to the funds that were attached, on April 21, 2008 an electronic funds transfer in the amount of $392,139.84 being sent to Defendant was restrained at Deutsche Bank. On the same day, an electronic funds transfer in the amount of $199,500.00 also being sent to Defendant was restrained at J.P. Morgan Chase. Thus, a total of $591,639.84 of Defendant's funds was attached pursuant to the ex parte attachment order that authorized the attachment of up to $7,654,605.84.

As the ex parte attachment order was causing a serious disruption to Defendant's business because Defendant could neither send nor receive U.S. Dollar payments to or from its customers, and because the existence of the attachment order made it impossible to pay salaries to the crewmembers serving on board its vessels, Defendant reluctantly agreed to provide Plaintiff with substitute security in the form of a bank guarantee in the amount of $7,654,605.84, which was acceptable to Plaintiff. As demonstrated by the Stipulation and Order Approving Posting of Substitute Security to Secure Release of Attached Funds, which this Court signed on May 7, 2008, Defendant posted substitute security without prejudice to any of its rights. *See Stipulation and Order Approving Posting of Substitute Security to Secure Release of Attached Funds dated May 7,*

2

*2008 attached as Exhibit "2" to the Declaration of Charles E. Murphy.* Specifically, Defendant expressly reserved *inter alia* its right to move this Court for countersecurity. Notwithstanding Defendant's commercial decision to post substitute security to lift the burden of the attachment, Defendant strongly disputed, and continues to strongly dispute, the allegations raised by Plaintiff in the Verified Complaint, *e.g.*, that Defendant breached the charter party by failing to obtain approvals with major oil companies pursuant to the Vetting Clause. Plaintiff's claims, however, are subject to London arbitration such that it would not be for this Court to pre-judge the merits of the claims in the course of this ancillary attachment action. This was the holding of *Aqua Stoli Shipping Ltd. v. Gardner Smith*, 460 F.3d 434 (2d Cir. 2006), which concluded that a plaintiff need only allege a valid *prima facie* admiralty claim in its verified complaint against a defendant who cannot be found in the District for a valid maritime attachment to issue. Consequently, Defendant shall properly argue to the arbitration panel the reasons why Plaintiff's claims are frivolous and grossly exaggerated.

As above, Plaintiff's claims arise out of an alleged breach of a charter party with Defendant entered into between the parties on November 15, 2006. The charter party provided for the use of the M/T KRISTINA THERESA for the carriage of several cargoes of oil products. Particularly, Plaintiff has alleged that Defendant failed to perform its duty to obtain requisite approvals from Exxon Mobil, Chevron Texaco, Shell, BP-Amoco, Total –Final-Elf, Stat Oil and Kuwait Petroleum. Plaintiff further alleged that it was within its right to place the Vessel off-hire on March 18, 2008 due to Defendant's failure to obtain approvals with major oil companies pursuant to the Vetting Clause. Plaintiff claimed the following damages in its Verified Complaint: (a) lost profits during the charter party, prior to Plaintiff declaring the Vessel off-hire, for 368.44 days in the amount of $3,409,565.86; (b) lost profits after the Plaintiff had declared the Vessel off-hire in the amount of

3

$2,359,785.30. Thus, Plaintiff has alleged that the total lost profits, exclusive of interest, costs, and legal fees, total $5,769,785.30. To that principal claim, Plaintiff's Verified Complaint added $550,000.00, which it estimates will be its recoverable attorneys' fees and costs awarded in the London arbitration, and $1,335,254.68 in interest at the rate of 7% compounded quarterly for three years.

Importantly, contrary to Plaintiff's position, Defendant has alleged in its Counterclaim that it was Plaintiff that unlawfully breached its obligations under the charter party. *See a copy of Defendant' Verified Answer with Counterclaim attached as Exhibit "3" to the Declaration of Charles E. Murphy.* In its Counterclaim, Defendant has alleged that it did not breach the Vetting Clause as alleged in the Verified Complaint and, thus, Plaintiff unjustifiably and unlawfully ceased making hire payments to Defendant in breach of Clause 8 of the charter party that required Plaintiff to pay Defendant fourteen days in advance for the use of the Vessel at a hire rate of $14,683.00 per day, and *pro rata* for any part of a day, from the time and date of the Vessel's delivery to Plaintiff until the time and date of redelivery to Defendant.

The Counterclaim has alleged that Defendant had previously become the disponent owner, *i.e.*, the chartered owner, of the Vessel by virtue of its head charter party contract dated February 10, 2006 ("Head Charter Party") on the "Shelltime 4" charter party form, for a five-year term, with a non-party named MS "PAUL SCHULTE" Schifffahrtsgesellschaft mbh & Co. KG ("Schulte"), who was the head owner of the Vessel. Under the Head Charter Party between Schulte and Defendant, the hire rate was $12,790.00 per day, and pro rata for any part of a day, from the time and date of the Vessel's delivery to Defendant until the time and date of redelivery to Schulte.

As explained in the Counterclaim, the two charter parties referenced above were on back-to-back, *i.e.*, identical, terms except for the charter period and the terms concerning the rate and

4

payment of hire. As discussed above, certain disputes arose between Defendant and Plaintiff regarding *inter alia* Plaintiff's breach of its charter party with Defendant by failing to pay hire that was due and owing to Defendant. Specifically, Plaintiff wrongfully declared the Vessel off-hire on or about March 19, 2008 at 17:54 hours Central European Time. At that time, Plaintiff had paid hire until March 26, 2008 through 12:00 hours. Despite due demand by Defendant for payment, Plaintiff failed to pay outstanding hire for all periods after March 26, 2008.

The two charter parties had different hire payment schedules. While the Head Charter Party provided that hire would be paid monthly in advance, the Sub Charter Party provided that hire would be paid fourteen days in advance. Due to the differing hire payment schedules, and due to Plaintiff's failure to pay hire to Defendant, Defendant ceased hire payments to Schulte on April 1, 2008. Head owner, Schulte, withdrew the Vessel on April 9, 2008 at 18:09 Central European Time and placed Defendant on notice for unpaid hire. Consequently, Defendant withdrew the Vessel from Plaintiff on the same day and for the same reason.

As a result of Plaintiff's breach of the Sub Charter Party as described above, Defendant has sustained damages for unpaid hire from March 26, 2008 at 12:00 hours to April 9, 2008 at 18:09 hours at $14,683 per day, *i.e.*, 14 days 06:09 hours x $14,683 per day, in the amount of $209,324.50. Additionally, Defendant has suffered damages from Plaintiff's breach in respect of the hire differential between the Sub Charter Party rate less the Head Charter Party rate, *i.e.*, $14,683 - $12,790 = $1,893, which differential Defendant would have earned for an additional 232 days, which was the time remaining under the Sub Charter for which Plaintiff never paid. Thus, the hire rate differential due from Plaintiff to Defendant is $439,176 (*i.e.*, 232 days x $1,893).

Furthermore, Defendant has suffered damages from Plaintiff's breach in respect of bunkers consumed by the Vessel from the time that Plaintiff wrongfully declared the Vessel off-hire until

the time when Defendant withdrew the Vessel. The cost of bunkers consumed during this period, for which Plaintiff is liable, is $51,753.12.

Still further, Plaintiff's unjustified declaration of off-hire and cessation of paying hire, which was the cause of the termination of the Sub Charter Party, resulted in Defendant having to incur Vessel repositioning costs in the amount of $214,137.23. Specifically, Plaintiff left the vessel open in Cotonou, West Africa notwithstanding that it was obligated to redeliver the Vessel to Northern Europe or Mediterranean Sea. Gibraltar was the closest redelivery point to Cotonou. The distance from Cotonou to Gibraltar is 3,096 nautical miles. At 14 knots per hour, sailing time for the Vessel is 221:09 hours or 9 days 05:09 hours at $23,240 per day (time charter cost plus bunkers ($12,790 + 19 mt fuel per day x $550 pmt)). Thus, Plaintiff is liable to Defendant for damages in respect of Vessel repositioning in the amount of $214,137.23.

As alleged in the Counterclaim, pursuant to the Sub Charter Party, all disputes arising thereunder are to be submitted to arbitration in London with English Law to apply. Plaintiff and Defendant are currently engaged in an ongoing London arbitration to resolve their claims and counterclaims.

On the basis of the foregoing, Defendant's Counterclaim against Plaintiff is summarized as follows:

| a. | Unpaid hire: | $209,324.50; |
|----|--------------|--------------|
| b. | Unpaid hire rate differential: | $439,176.00; |
| c. | Unpaid cost of bunkers consumed: | $51,753.12; |
| d. | Unpaid cost of Vessel repositioning: | $214,137.23; |
| e. | Interest on principal claims at 7% | |
| | compounded quarterly for 3 years: | $211,411.79: |
| f. | Estimated attorneys' fees and costs of prosecuting | |
| | the Counterclaim in London arbitration: | $550,000.00. |

6

As itemized above, Defendant's Counterclaim against Plaintiff, inclusive of estimated recoverable interest, attorneys' fees and costs totals $1,675,802.60.¹

Defendant's Counterclaim concerns *inter alia* Plaintiff's breach of the Sub Charter Party, which contract also forms the basis for Plaintiff's suit against Defendant. The issues of whether the Vessel was off-hire beginning on or about March 19, 2008, and which party was responsible for breaching the charter, are common to both Plaintiff's claim and Defendant's Counterclaim. Therefore, Defendant's Counterclaim arises from the same transaction that forms the basis of Plaintiff's Verified Complaint.

While reserving all of its rights and defenses, Defendant has posted substitute security in the form of a bank guarantee to Plaintiff in the amount of $7,654,605.84 in order to relieve itself of the burden of the ex parte order of maritime attachment obtained by Plaintiff in this case. Despite due demand, Plaintiff has refused to provide countersecurity to Defendant in the amount of $1,675,802.60 notwithstanding Supplemental Admiralty Rule E(7)'s mandate that a Plaintiff *must* give security for damages in the counterclaim unless the court for cause shown directs otherwise. For this reason, Defendant seeks from this Honorable Court an order pursuant to Rule E(7) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure directing Plaintiff to post countersecurity in favor of Defendant in the amount of $1,675,802.60.

---

¹ Defendant has adopted from Plaintiff 's Verified Complaint the interest rate and term, *i.e.*, 7% compounded quarterly for 3 years, as well as the estimated recoverable costs and fees for prosecuting its claim in arbitration, *i.e.*, $550,000.00.

7

## ARGUMENT

### POINT I

### A HEARING ON THIS APPLICATION SHOULD BE HELD WITHIN THREE (3) COURT DAYS OF ITS FILING

In order to ensure the constitutionality of the attachment mechanism provided for under Rule

B, Supplemental Admiralty Rule E(4)(f) and Local Admiralty Rule E.1 provide for a prompt

adversary hearing following any attachment.  Rule E(4)(f) provides that whenever property is

attached any person claiming an interest in it shall be entitled to a prompt post-attachment hearing

where the plaintiff will be required to show cause why the attachment should not be vacated or

other relief granted consistent with the Admiralty Rules.  In this regard, the Local Rule, entitled

Adversary Hearing Following Arrest, Attachment or Garnishment, specifies:

> The adversary hearing following arrest or attachment of garnishment that is called
> for in supplemental Rule E(4)(f) shall be conducted within three (3) court days,
> unless otherwise ordered.

S.D.N.Y. Local Rule E.1.

Based on the foregoing, Defendant respectfully requests that this Honorable Court set a

hearing for as close to May 27, 2008 as possible.

### POINT II

### HERNING IS ENTITLED UNDER SUPPLEMENTAL ADMIRALTY RULE E(7)(a) TO SECURITY IN THE AMOUNT OF $1,675,802.60 FOR ITS COUNTERCLAIM

Supplemental Admiralty Rule E(7)(a) provides in relevant part as follows:

> When a person who has given security for damages in the original action asserts a
> counterclaim that arises from the transaction or occurrence that is the subject of the
> original action, a plaintiff for whose benefit the security has been given must give
> security for damages in the counterclaim unless the court for cause shown directs
> otherwise.  Proceedings on the original claim must be stayed until this security is
> given, unless the court direct otherwise.

8

*See* Supp. Admiralty R. E(7)(a) of the Fed. R. Civ. P. In *Result Shipping Co. v. Ferruzzi Trading USA, Inc.*, 56 F.3d 394, 399 (2d Cir. 1995), the Court held that the purpose of the Rule is "to place the parties on an equality as regards security." *Id.* at 399-400 *citing Titan Navigation Inc. v. Timsco, Inc.*, 808 F. 2d 400, 403 (5th Cir. 1987) (*quoting Washington-Southern Navigation Co. v. Baltimore & Philadelphia Steamboat Co.*, 263 U.S. 629,638-39 (1924)). Countersecurity is appropriate and routinely granted when a defendant whose property has been attached asserts non-frivolous counterclaims growing out of the same transaction, especially when the counterclaimant could have proceeded *in rem* or *quasi in rem* in an independent suit. Consistent with *Result Shipping*, courts have consistently held that Rule E(7) entitles a defendant to countersecurity to place the parties on an equality with respect to security. *See e.g. Americas Bulk Transport Ltd. v. Volcano Shipping S.A.*, 2008 U.S. Dist. LEXIS 4269 (S.D.N.Y. 2008); *Clipper Shipping Lines, Ltd. v. Global Transporte Oceanico S.A.*, 2007 U.S. Dist. LEXIS 18827 *4 (S.D.N.Y. 2007); *Finecom Shipping Ltd. v. Multi Trade Enterprises AG*, 2005 U.S. Dist. LEXIS 25761 *2 (S.D.N.Y. 2005); *Ythan Limited v. Americas Bulk Transport Limited*, 336 F. Supp. 2d 305, 307 (S.D.N.Y. 2004).

The trial court possesseS broad discretion in deciding whether to order countersecurity. *See Result Shipping Co., supra*; *Dongbu Express Co. Ltd. v. Navios Corp.*, 944 F.Supp. 235, 239 (S.D.N.Y. 1996). As stated by the court in *Finecom Shipping Ltd. v. Multio Trade Enterprises AG*, 2005 U.S. Dist LEXIS 25761, 2005 AMC 2952 (S.D.N.Y. 2005):

> While courts have identified a number of factors to be considered in exercising this discretion, the core purpose of the countersecurity rule is to place the parties on an even footing; if one party is deprived of the use of its property during the litigation but the adverse party is not, despite the pendency of reciprocal claims, the party with the security may have unfair leverage in the action.

*Finecom Shipping Ltd.*, 2005 U.S. Dist LEXIS 25761 at *2 (citations omitted). In *Result Shipping*, the Second Circuit stated that a court should be guideD primarily by two principals in exercising its

9

discretion regarding countersecurity. First, courts must consider that the purpose of the Rule is to place the parties on an equality as regards security. This factor mandates the ordering of countersecurity where, as here, a defendant whose property has been attached asserts non-frivolous counterclaims growing out of the same transaction. Second, Rule E(7)(a) is not intended to impose burdensome costs on a plaintiff that might prevent it from bringing suit. *See Result Shipping Co., supra.*

In this case, it is clear that both Plaintiff's alleged claims and Defendant's Counterclaim arise from the charter party dated November 15, 2006 entered into between the parties. Concisely stated, the parties' competing claims both concern whether or not Plaintiff had the right under the charter party to declare the Vessel off-hire. Therefore, Defendant's counterclaim arose from the same transaction or occurrence that is the subject of the original action and satisfies the requirement listed in Supplemental Admiralty Rule E(7)(a). Also, Defendant's Counterclaim cannot be characterized as frivolous as it is axiomatic that Defendant will be entitled to the damages it has alleged in the Counterclaim *unless* Plaintiff can successfully carry its burden in the London arbitration to prove that it was justified in declaring the Vessel off-hire. For the avoidance of doubt, Defendant maintains that Plaintiff breached the Sub Charter Party when it unjustifiably ceased to pay hire as it was required to do under the contract. Further, this is not a situation where an order requiring Plaintiff, which is a substantial business entity, to post countersecurity in the amount of $1,675,802.60 would pose any undue burden. In this regard, the instant case is unlike the situation where, for example, an individual seaman has sued for unpaid crew wages and his employer has demanded countersecurity.

An Order directing Plaintiff to provide countersecurity in the instant scenario would also serve equitable purposes. Plaintiff has already obtained security for its alleged claims in the amount

10

of \$7,654,605.84. Thus, Plaintiff should now be required, pursuant to Supplemental Admiralty Rule E(7)(a), to give security to Defendant for its counterclaim in the amount of \$1,675,802.60. The concept of reciprocal security for claims is expressly provided for by the Supplemental Admiralty Rules and the mechanism for such has been construed as furthering the goal of placing the parties on equal footing. As the counterclaim arises directly from the contract entered between the parties, and the provision of countersecurity would be equitable, Defendant is entitled to the security it seeks herein.

## POINT III

### VARDHMAN'S ATTACHMENT SHOULD BE VACATED IF IT FAILS TO PROVIDE SECURITY FOR HERNING'S COUNTERCLAIM

The failure of a party to post security for a counterclaim where such party is already benefiting from security on its claim would violate the goal of establishing 'equal footing' of the parties *vis-à-vis* reciprocal security. *See Result Shipping, supra.* An acknowledged remedy for such a failure is to vacate the underlying attachment. *See Verton Navigation, Inc. v. Caribica Shipping Ltd.,* 1992 U.S. Dist. LEXIS 517, *5 (S.D.N.Y. 1992).

Thus, in the event that Plaintiff fails to provide countersecurity to Defendant for its counterclaim this Court should dismiss this action with prejudice and order Plaintiff to return the bank guarantee to Defendant. It is within this Court's authority to order the return of the bank guarantee because, *inter alia*, the Stipulation and Order Approving Posting of Substitute Security to Secure Release of Attached Funds dated May 7, 2008 provided that the bank guarantee was given by Defendant to Plaintiff as substitute security to secure the release of Defendant's property attached in the Southern District of New York and was intended to stand in the place of Defendant's attached property as though the bank guarantee was a bond within the meaning of Supplemental Admiralty Rule E(5) of the Federal Rules of Civil Procedure. Failure to provide for such an

11

equitable remedy would permit the injustice of Plaintiff retaining full security for its alleged claims whereas Defendant would be left without any security for its counterclaim.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, and also for those reasons set out in the Declaration of Charles E. Murphy, Plaintiff should be ordered to provide security for Defendant's Counterclaim in the sum of $1,675,802.60, in the form of a bond, or other mutually acceptable form, within ten (10) calendar days following issuance of an Order from this Court compelling Plaintiff to provide such security. Should Plaintiff fail to provide such security then the $7,654,605.84 bank guarantee provided by Defendant should be immediately returned and this action dismissed with prejudice.

Dated: May 20, 2008
New York, NY

LENNON, MURPHY & LENNON, LLC
Attorneys for Defendant
HERNING SHIPPING AS

By: _____

Charles E. Murphy (CM 2125)
The Gray Bar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 - phone
(212) 490-6070 - facsimile
cem@lenmur.com

12

## AFFIRMATION OF SERVICE

I hereby certify that on May 21, 2008, a copy of the foregoing Memorandum of Law in

Support of Order to Show Cause Why Countersecurity Should Not Be Posted was served upon

plaintiff's counsel via DHL courier and via email at the following addresses:

UNGER@FREEHILL.COM
Michael Unger, Esq.
Freehill Hogan & Mahar LLP
80 Pine Street
New York, NY 10005-1759
(212) 425-1900

By: _____

Charles E. Murphy (CM 2125)

13