UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| VARDHMAN SHIPPING PVT LTD., Plaintiff, - against - HERNING SHIPPING AS, Defendant. | 08 Civ. 3620 (RMB) ECF Case |

**ATTORNEY DECLARATION OF CHARLES E. MURPHY IN SUPPORT OF HERNING SHIPPING AS' ORDER TO SHOW CAUSE WHY COUNTERSECURITY SHOULD NOT BE POSTED**

Charles E. Murphy declares under penalty of perjury of the laws of the United States of America as follows:

1. I am an attorney admitted to practice before this Honorable Court and act as counsel for the Defendant herein, Herning Shipping AS ("Defendant").

2. I submit this Declaration based on facts and information known to me personally, as well as documents and information provided to me by Defendant and its representatives, all of which I believe to be true and accurate.

3. The Plaintiff, Vardhman Shipping Pvt Ltd. ("Plaintiff") commenced this action sounding in admiralty seeking process of maritime attachment and garnishment (hereinafter "PMAG") pursuant to Supplemental Admiralty Rule B. Plaintiff filed its Verified Complaint on April 15, 2008. Plaintiff's Verified Complaint prayed for the issuance of an ex parte Order authorizing the issuance of a PMAG against Defendant's assets located in this District in the amount of $7,654,605.84 inclusive of estimated interest, attorneys' fees and costs. *See a copy of Plaintiff's Verified Complaint attached as Exhibit "1".*

4. On or about April 15, 2008 Plaintiff obtained, on an ex parte basis, an order of maritime attachment in the amount $7,654,605.84. The Clerk of Court subsequently issued a PMAG in the same amount. Plaintiff thereafter served the attachment order and PMAG on several New York banks within the Southern District of New York. Defendant's funds were attached as a result. As to the funds that were attached, on April 21, 2008 an electronic funds transfer in the amount of $392,139.84 being sent to Defendant was restrained at Deutsche Bank. On the same day, an electronic funds transfer in the amount of $199,500.00 also being sent to Defendant was restrained at J.P. Morgan Chase. Thus, a total of $591,639.84 of Defendant's funds was attached pursuant to the ex parte attachment order that authorized the attachment of up to $7,654,605.84.

5. As the ex parte attachment order was causing a serious disruption to Defendant's business because Defendant could neither send nor receive U.S. Dollar payments to or from its customers, and because the existence of the attachment order made it impossible to pay salaries to the crewmembers serving on board its vessels, Defendant reluctantly agreed to provide Plaintiff with substitute security in the form of a bank guarantee in the amount of $7,654,605.84, which was acceptable to Plaintiff. As demonstrated by the Stipulation and Order Approving Posting of Substitute Security to Secure Release of Attached Funds, which this Court signed on May 7, 2008, Defendant posted substitute security without prejudice to any of its rights. *See Stipulation and Order Approving Posting of Substitute Security to Secure Release of Attached Funds dated May 7, 2008 attached as Exhibit "2"*. Specifically, Defendant expressly reserved *inter alia* its right to move this Court for countersecurity. Notwithstanding Defendant's commercial decision to post substitute security to lift the burden of the attachment, Defendant strongly disputed, and continues to strongly dispute, the allegations raised by Plaintiff in the Verified Complaint, *e.g.*, that Defendant breached the charter party by failing to obtain approvals with major oil companies pursuant to the

Vetting Clause. Plaintiff's claims, however, are subject to London arbitration such that it would not be for this Court to pre-judge the merits of the claims in the course of this ancillary attachment action. This was the holding of *Aqua Stoli Shipping Ltd. v. Gardner Smith*, 460 F.3d 434 (2d Cir. 2006), which concluded that a plaintiff need only allege a valid *prima facie* admiralty claim in its verified complaint against a defendant who cannot be found in the District for a valid maritime attachment to issue. Consequently, Defendant shall properly argue to the arbitration panel the reasons why Plaintiff's claims are frivolous and grossly exaggerated.

6.     As above, Plaintiff's claims arise out of an alleged breach of a charter party with Defendant entered into between the parties on November 15, 2006. The charter party provided for the use of the M/T KRISTINA THERESA for the carriage of several cargoes of oil products. Particularly, Plaintiff has alleged that Defendant failed to perform its duty to obtain requisite approvals from Exxon Mobil, Chevron Texaco, Shell, BP-Amoco, Total –Final-Elf, Stat Oil and Kuwait Petroleum. Plaintiff further alleged that it was within its right to place the Vessel off-hire on March 18, 2008 due to Defendant's failure to obtain approvals with major oil companies pursuant to the Vetting Clause. Plaintiff claimed the following damages in its Verified Complaint: (a) lost profits during the charter party, prior to Plaintiff declaring the Vessel off-hire, for 368.44 days in the amount of $3,409,565.86; (b) lost profits after the Plaintiff had declared the Vessel off-hire in the amount of $2,359,785.30. Thus, Plaintiff has alleged that the total lost profits, exclusive of interest, costs, and legal fees, total $5,769,785.30. To that principal claim, Plaintiff's Verified Complaint added $550,000.00, which it estimates will be its recoverable attorneys' fees and costs awarded in the London arbitration, and $1,335,254.68 in interest at the rate of 7% compounded quarterly for three years.

7. Importantly, contrary to Plaintiff's position, Defendant has alleged in its Counterclaim that it was Plaintiff that unlawfully breached its obligations under the charter party. *See a copy of Defendant' Verified Answer with Counterclaim attached as Exhibit "3"*. In its Counterclaim, Defendant has alleged that it did not breach the Vetting Clause as alleged in the Verified Complaint and, thus, Plaintiff unjustifiably and unlawfully ceased making hire payments to Defendant in breach of Clause 8 of the charter party that required Plaintiff to pay Defendant fourteen days in advance for the use of the Vessel at a hire rate of $14,683.00 per day, and *pro rata* for any part of a day, from the time and date of the Vessel's delivery to Plaintiff until the time and date of redelivery to Defendant.

8. The Counterclaim has alleged that Defendant had previously become the disponent owner, *i.e.*, the chartered owner, of the Vessel by virtue of its head charter party contract dated February 10, 2006 ("Head Charter Party") on the "Shelltime 4" charter party form, for a five-year term, with a non-party named MS "PAUL SCHULTE" Schifffahrtsgesellschaft mbh & Co. KG ("Schulte"), who was the head owner of the Vessel. Under the Head Charter Party between Schulte and Defendant, the hire rate was $12,790.00 per day, and pro rata for any part of a day, from the time and date of the Vessel's delivery to Defendant until the time and date of redelivery to Schulte.

9. As explained in the Counterclaim, the two charter parties referenced above were on back-to-back, *i.e.*, identical, terms except for the charter period and the terms concerning the rate and payment of hire. As discussed above, certain disputes arose between Defendant and Plaintiff regarding *inter alia* Plaintiff's breach of its charter party with Defendant by failing to pay hire that was due and owing to Defendant. Specifically, Plaintiff wrongfully declared the Vessel off-hire on or about March 19, 2008 at 17:54 hours Central European Time. At that time, Plaintiff had paid

hire until March 26, 2008 through 12:00 hours. Despite due demand by Defendant for payment, Plaintiff failed to pay outstanding hire for all periods after March 26, 2008.

10. As alleged in Defendant's Counterclaim, the two charter parties had different hire payment schedules. While the Head Charter Party provided that hire would be paid monthly in advance, the Sub Charter Party provided that hire would be paid fourteen days in advance. Due to the differing hire payment schedules, and due to Plaintiff's failure to pay hire to Defendant, Defendant ceased hire payments to Schulte on April 1, 2008. Head owner, Schulte, withdrew the Vessel on April 9, 2008 at 18:09 Central European Time and placed Defendant on notice for unpaid hire. Consequently, Defendant withdrew the Vessel from Plaintiff on the same day and for the same reason.

11. The Counterclaim alleges that as a result of Plaintiff's breach of the Sub Charter Party as described above, Defendant has sustained damages for unpaid hire from March 26, 2008 at 12:00 hours to April 9, 2008 at 18:09 hours at $14,683 per day, *i.e.*, 14 days 06:09 hours x $14,683 per day, in the amount of $209,324.50. Additionally, Defendant has suffered damages from Plaintiff's breach in respect of the hire differential between the Sub Charter Party rate less the Head Charter Party rate, *i.e.*, $14,683 - $12,790 = $1,893, which differential Defendant would have earned for an additional 232 days, which was the time remaining under the Sub Charter for which Plaintiff never paid. Thus, the hire rate differential due from Plaintiff to Defendant is $439,176 (*i.e.*, 232 days x $1,893).

12. Furthermore, Defendant has properly alleged damages from Plaintiff's breach in respect of bunkers consumed by the Vessel from the time that Plaintiff wrongfully declared the Vessel off-hire until the time when Defendant withdrew the Vessel. The cost of bunkers consumed during this period, for which Plaintiff is liable, is $51,753.12.

13. Still further, Defendant has sufficiently alleged that Plaintiff's unjustified declaration of off-hire and cessation of paying hire, which was the cause of the termination of the Sub Charter Party, resulted in Defendant having to incur Vessel repositioning costs in the amount of $214,137.23. Specifically, Plaintiff left the vessel open in Cotonou, West Africa notwithstanding that it was obligated to redeliver the Vessel to Northern Europe or Mediterranean Sea. Gibraltar was the closest redelivery point to Cotonou. The distance from Cotonou to Gibraltar is 3,096 nautical miles. At 14 knots per hour, sailing time for the Vessel is 221:09 hours or 9 days 05:09 hours at $23,240 per day (time charter cost plus bunkers ($12,790 + 19 mt fuel per day x $550 pmt)). Thus, Plaintiff is liable to Defendant for damages in respect of Vessel repositioning in the amount of $214,137.23.

14. As alleged in the Counterclaim, pursuant to the Sub Charter Party, all disputes arising thereunder are to be submitted to arbitration in London with English Law to apply. Plaintiff and Defendant are currently engaged in an ongoing London arbitration to resolve their claims and counterclaims.

15. On the basis of the foregoing, Defendant's Counterclaim against Plaintiff is summarized as follows:

| | | |
|---|---|---|
| a. | Unpaid hire: | $209,324.50; |
| b. | Unpaid hire rate differential: | $439,176.00; |
| c. | Unpaid cost of bunkers consumed: | $51,753.12; |
| d. | Unpaid cost of Vessel repositioning: | $214,137.23; |
| e. | Interest on principal claims at 7% compounded quarterly for 3 years: | $211,411.79: |
| f. | Estimated attorneys' fees and costs of prosecuting the Counterclaim in London arbitration: | $550,000.00. |

As itemized above, Defendant's Counterclaim against Plaintiff, inclusive of estimated recoverable interest, attorneys' fees and costs totals $1,675,802.60.

16.    Defendant's Counterclaim concerns *inter alia* Plaintiff's breach of the Sub Charter Party, which contract also forms the basis for Plaintiff's suit against Defendant. The issues of whether the Vessel was off-hire beginning on or about March 19, 2008, and which party was responsible for breaching the charter, are common to both Plaintiff's claim and Defendant's Counterclaim. Therefore, Defendant's Counterclaim arises from the same transaction that forms the basis of Plaintiff's Verified Complaint.

17.    While reserving all of its rights, Defendant has posted substitute security in the form of a bank guarantee to Plaintiff in the amount of $7,654,605.84 in order to relieve itself of the burden of the ex parte order of maritime attachment obtained by Plaintiff in this case. Despite due demand, Plaintiff has refused to provide countersecurity to Defendant in the amount of $1,675,802.60 notwithstanding Supplemental Admiralty Rule E(7)'s mandate that a Plaintiff *must* give security for damages in the counterclaim unless the court for cause shown directs otherwise. For this reason, Defendant seeks from this Honorable Court an order pursuant to Rule E(7) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure directing Plaintiff to post countersecurity in favor of Defendant in the amount of $1,675,802.60.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on May 20, 2008

Charles E. Murphy

**AFFIRMATION OF SERVICE**

I hereby certify that on May 21, 2008, a copy of the foregoing Murphy Declaration in Support of Order to Show Cause Why Countersecurity Should Not Be Posted was served upon plaintiff's counsel via DHL courier and via email at the following addresses:

UNGER@FREEHILL.COM
Michael Unger, Esq.
Freehill Hogan & Mahar LLP
80 Pine Street
New York, NY 10005-1759
(212) 425-1900

By: ______________________
Charles E. Murphy (CM 2125)

# EXHIBIT 1

Judge Berman

08 CV 3620

214-08/MEU/SL
FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
VARDHMAN SHIPPING PVT LTD.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Michael E. Unger (MU 0045)

APR 15 2008
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VARDHMAN SHIPPING PVT LTD.,

Plaintiff,

-against-

HERNING SHIPPING AS,

Defendant.

08 Civ ______ (_____)

**VERIFIED COMPLAINT**

Plaintiff, VARDHMAN SHIPPING PVT LTD. (hereinafter "VARDHMAN") for its Verified Complaint against Defendant HERNING SHIPPING AS (hereinafter "HERNING") alleges upon information and belief as follows:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract of charter party. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333 and the Court's federal question jurisdiction pursuant to 28 U.S.C. §1331 in that the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201, *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1, *et seq.*

2. At all times material hereto, Plaintiff VARDHMAN was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at R.V. Shah's Bunglow, Surendranagar 363001, Gujarat, India.

3. At all times relevant hereto, Defendant HERNING was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at Theresavej 1, 7400 Herning, Denmark.

4. On or about November 15, 2006, Defendant HERNING, as disponent owner[1], entered into a maritime contract of charter party with Plaintiff VARDHMAN, as charterer, for use of the M/T KRISTINA THERESA to carry several cargos of oil products produced by various major oil companies.

5. Under the Vetting Clause of the charter, Defendant HERNING warranted that no later than four months after the vessel was delivered to VARDHMAN, the vessel and her management would be approved to receive cargos from four of the following major oil companies: Exxon Mobil, Chevron Texaco, Shell, BP-Amoco, Total-Final-Elf, Stat Oil and Kuwait Petroleum, and that no later than six months after the vessel was delivered to VARDHMAN, the vessel and her management would be approved to receive cargos from the remaining three major oil companies listed above.

6. Should HERNING fail to comply with the Vetting Clause, the charter provided that Plaintiff VARDHMAN had the option to place the vessel off-hire until such time Defendant HERNING ensured that the vessel and her management were in compliance.

7. During the course of the charter, VARDHMAN negotiated for the carriage of several cargos with various major oil companies, which failed due to HERNING's failure to obtain the necessary approvals pursuant to the Vetting Clause, in breach of the charter.

[1] HERNING is not the actual owner of the vessel but instead had chartered the vessel from another entity.

8.    Due to HERNING's breach of the charter, VARDHMAN was forced to negotiate with non-major oil companies at a lower-rate.

9.    Out of the total 440 days the vessel was actively in the service of VARDHMAN, the vessel was able to carry four cargos of major oil companies over a period of 71.03 days for an average income of $24,568.22 per day.

10.    For a period of 368.44 days, the vessel was only able to carry the cargos of lesser earning non-major oil companies for an average income of $15,314.16 per day.

11.    Accordingly, due to HERNING's breach of the charter, VARDHMAN suffered a loss of income in the amount of $3,409,565.86 = $9,254.06 per day x 368.44 days.

12.    On March 18, 2008, VARDHMAN exercised its right under the charter to place the vessel off-hire due to HERNING's failure to obtain approvals with major oil companies pursuant to the Vetting Clause.

13.    In further breach of the charter, HERNING wrongfully terminated the charter on April 9, 2008.

14.    Accordingly, for the remaining balance of the charter from March 18 to November 27, 2008 (or 255 days), VARDHMAN suffered additional lost profits of $9,254.06 per day (the difference between the average income generated by cargos of major oil companies and non-major oil companies) for a total loss of $2,359,785.30.

15.    In sum, the damages arising out of Defendant HERNING's breaches of the charter include:

    (a)    lost profits for 368.44 days in the amount of $3,409,565.86;
    (b)    lost profits from March 18 and November 27, 2008 in the amount of $2,359,785.30,

for a sum total of $5,769.351.16.

16. The charter party provides for the application of English law and disputes between the parties to be resolved by arbitration in London, and VARDHMAN specifically reserves its right to arbitrate the substantive matters at issue. Arbitration has been commenced.

17. This action is brought *inter alia* pursuant to 9 U.S.C. §8 in order to obtain security for Plaintiff VARDHMAN's claims made or to be made in the London arbitration under English law, as agreed by the parties.

18. As a regular feature of English law and arbitration, attorneys fees are awarded to the successful litigant, along with costs, disbursements, the cost of the arbitration, and interest, all of which constitutes a part of the Plaintiff's main claim and the amount sued for herein.

19. Plaintiff VARDHMAN estimates, as nearly as can presently be computed, that the legal expenses and costs of prosecuting its claims in London arbitration will be $550,000. Interest anticipated to be awarded is estimated to be $1,335,254.68 (calculated at the rate of 7% per annum compounded quarterly for a period of 3 years, the estimated time for completion of the proceedings in London).

20. In all, the claim for which Plaintiff VARDHMAN sues in this action, as near as presently may be estimated, totals **$7,654,605.84**, no part of which has been paid by Defendant HERNING, despite due demand. Plaintiff VARDHMAN specifically reserves its right to amend this figure and to seek an increase in the amount of security should such sum appear to be insufficient to fully secure VARDHMAN.

**Request for Rule B Relief**

21. Upon information and belief, and after investigation, Defendant cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff believes that Defendant has, or will shortly have,

assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant HERNING SHIPPING AS (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in its name and/or being transferred for its benefit at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

22. The total amount sought to be attached pursuant to the above is **$7,654,605.84**.

WHEREFORE, Plaintiff VARDHMAN SHIPPING PVT LTD. prays:

a. That process in due form of law according to the practice of this Court may issue against Defendant citing it to appear and answer the foregoing;

b. That if Defendant cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant up to and including **$7,654,605.84** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant HERNING SHIPPING AS, including but not limited to ASSETS in its name and/or being transferred for its benefit at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c. That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to the recognition and enforcement of any award entered against the Defendant in the London proceedings; and

d. For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
April 15, 2008

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
VARDHMAN SHIPPING PVT LTD.

By: ______________________
Michael E. Unger (MU 0045)
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 (fax)

## ATTORNEY VERIFICATION

State of New York )
) ss.:
County of New York )

MICHAEL E. UNGER, being duly sworn, deposes and says as follows:

1. I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2. The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by solicitors representing our client.

3. The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

Michael E. Unger

Sworn to before me this
15th day of April 2008

Notary Public

MELISSA COLFORD
Commissioner of Deeds
City of New York-No. 5-1692
Certificate Filed in New York
Comm... Expires 4/1/ /8

# EXHIBIT 2

Berman

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 5/7/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VARDHMAN SHIPPING PVT LTD.,

Plaintiff,

- against -

HERNING SHIPPING AS,

Defendant.

08 Civ. 3620 (RMB)

**STIPULATION AND ORDER APPROVING POSTING OF SUBSTITUTE SECURITY TO SECURE RELEASE OF ATTACHED FUNDS**

WHEREAS, the Plaintiff, VARDHMAN SHIPPING PVT LTD., ("Plaintiff") has obtained an Ex Parte Order authorizing issuance of Process of Maritime Attachment and Garnishment against the Defendant, HERNING SHIPPING AS, ("Defendant") in the amount of $7,654,605.84 as security for its claim as alleged in a Verified Complaint dated April 15, 2008; and

WHEREAS the Defendant seeks to provide substitute security in the form of a bank guarantee (in the form attached as Exhibit One) for such alleged claims without waiver or prejudice of any of Defendant's rights or defenses including, but not limited to, any and all defenses to the claims set forth in Plaintiff's Verified Complaint, Defendant's right to challenge the validity of the ex parte order of maritime attachment, Defendant's right to seek a reduction in the amount of the guarantee pursuant to Supplemental Admiralty Rule E(6) of the Federal Rules of Civil Procedure, and Defendant's right to seek countersecurity from Plaintiff pursuant to Supplemental Admiralty Rule E(7) of the Federal Rules of Civil Procedure; and

WHEREAS the bank guarantee is to be given by Defendant to Plaintiff as substitute security to secure the release of Defendant's property attached in the Southern District of New York and is intended to stand in the place of Defendant's attached property as though the bank guarantee was a bond within the meaning of Supplemental Admiralty Rule E(5) of the Federal Rules of Civil Procedure; and

WHEREAS the parties agree that this action shall not be voluntarily dismissed without the consent of the Defendant in order to allow Defendant sufficient time to file a responsive pleading and *inter alia* a motion to vacate the attachment and/or a motion to reduce the attachment and/or a motion for countersecurity; and

WHEREAS in the event the bank guarantee is ordered to be returned or reduced by any court of competent jurisdiction or by the London arbitration tribunal, Plaintiff shall not be deemed to have waived any right that it may have to seek other security for its claims elsewhere in the world; and

WHEREAS if the quantum of the security provided under the bank guarantee is ordered by any court of competent jurisdiction and/or the London arbitration tribunal to be reduced, Defendant will arrange for a substitute bank guarantee in the reduced amount; and

WHEREAS the Plaintiff does not concede that the London arbitral Tribunal is the proper body to address any application by Defendant to reduce the amount or order the return of the bank guarantee to be posted by Defendant; and

WHEREAS the Plaintiff shall not be deemed to have waived any right that it may have to take actions to prosecute its claims or defend against counterclaims including, but not limited to, for example, commencing proceedings to obtain discovery in the form of testimony or documents from non-parties;

And now, on the stipulation as indicated above of counsel for Plaintiff, Vardhman Shipping Pvt Ltd., and counsel for Defendant, Herning Shipping AS, Defendant, to the amount of substitute security to be posted, pursuant to Supplemental Admiralty Rule E(5) and 28 U.S.C. § 2464, for the purpose of dissolving the maritime attachment issued hereunder;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

1. In exchange for Defendant's posting of substitute security in the form of a bank guarantee in the amount $7,654,605.84 in favor of Plaintiff to secure the claims as alleged in the Verified Complaint, that the maritime attachment of the Defendant's property in the hands of any and all garnishees in the within proceedings is hereby dissolved and vacated and that the case shall proceed in ordinary course; and

2. Any garnishee holding property of the Defendant pursuant to any ex parte order of maritime attachment issued in this case is hereby ordered and directed to release such property pursuant to written instructions to be provided by letter from Defendant's counsel to any such garnishee, together with a copy of this Order.

Dated: May 7, 2008

RMB

RICHARD M. BERMAN, U.S.D.J.

The parties stipulated and consent to the entry of the above Order:

The Plaintiff,
VARDHMAN SHIPPING PVT LTD.,

By: ______________________
Michael E. Unger (MU 0045)
FREEHILL HOGAN & MAHAR LLP
80 Pine Street
New York, NY 10005
Phone (212) 425-1900
Fax (212) 425-1901
Unger@freehill.com

The Defendant,
HERNING SHIPPING AS,

By: ______________________ 5/7/08
Charles E. Murphy (CM 2125)
LENNON, MURPHY & LENNON, LLC
420 Lexington Ave., Suite 300
New York, NY 10170
Phone (212) 490-6050
Fax (212) 490-6070
cem@lenmur.com

EXHIBIT 1

# Handelsbanken

Vardhman Shipping Pvt Ltd.
Shah's Bungalow, Surendranager
363001, Gujarat
India

Trade Finance
Østergade 2, 7400 Herning
Tlf. 4456 2303
Fax 9626 2898
Telex 62 107 SWIFT: HANDDKKK
www.Handelsbanken.dk

30. April 2008

**BANK GUARANTEE NO. 7620/0120715**

We hereby issue our guarantee in your favour as follows:

Vessel: "KRISTINA THERESA"

Charterparty: 15.11.2006 (the "Charterparty")

Claims: Claims of Vardhman against Herning Shipping AS ("Herning") under the Charterparty as referred to in the New York Proceedings hereinafter defined.

In consideration of:

1) Vardhman immediately taking all necessary steps to vacate the ex parte order of maritime attachment and garnishment issued against Herning in the proceedings that Vardhman have commenced before the United States District Court for the Southern District of New York, under case number 08 CV 3620 (the "New York proceedings") and releasing all and any sums which have been attached in New York pursuant to or in connection with the New York proceedings and orders made therein, and

2) Vardhman refraining from, in respect of the Claims asserted in the New York proceedings, attaching, arresting, detaining, enforcing against and/or in any way whatsoever interfering with any and all assets of any kind whatsoever belonging to Herning or any associated companies, and

3) Vardhman promptly returning the original of this guarantee to us upon either

   1) The claims being settled in writing between Vardhman and Herning, and payment by Herning of any sum(s) agreed to be due to Vardhman,

   2) The collection of a final and unappealable award in the aforesaid arbitration proceedings, or the handing down of a final and unappealable judgment of a court of competent jurisdiction on appeal therefrom, which has the effect that, overall, no payment in respect of the Claims is due to Vardhman from Herning, or

# Handelsbanken

2) Receipt by Vardhman of such sum or sums as may be awarded and/or adjudged to be due to Vardhman from Herning of such sum as may be found to be due to be to Vardhman pursuant to a final and unappealable award in the aforesaid arbitration proceedings, or a final and unappealable judgment of a court of competent jurisdiction on appeal therefrom.

We Handelsbanken, Østergade 2, 7400 Herning, Denmark hereby irrevocably guarantee to pay to Vardhman within 14 days of Vardhman's first written demand such sum(s) as may

(i) Be agreed in writing by Vardhman and Herning, to be due to Vardhman in respect of the Claims or

(ii) To be adjudged due to Vardhman pursuant to a final and unappealable award in the aforesaid arbitration proceedings, or a final and unappealable judgment of a court of competent jurisdiction on appeal therefrom.

PROVIDED THAT

(i) Our overall liability hereunder shall not exceed the total sum of US$ 7,654,605.84 (United States Dollars seven million six hundred and fifty four thousand six hundred and five and eighty four cents) inclusive of all interest and costs, and

(ii) Any demands for payment hereunder shall be made in writing to us, Handelsbanken accompanied by either a settlement agreement signed by (or on behalf of) Vardhman and Herning, or by copy of the original final and unappealable award in the aforesaid arbitration proceedings or a copy of the final and unappealable judgment of a court of competent jurisdiction on appeal therefrom.

(iii) We further agree that this guarantee shall be a continuing guarantee for a period of 1 year from the date hereof, i.e., 25th April 2008, and we further agree that without being called upon to do so, we will before 25th April 2009, the expiry of this guarantee, extend this guarantee for another year unless this guarantee has been released to Vardhman in the same terms and conditions as this guarantee including this present covenant for renewal and that Vardhman shall be entitled to any number of renewals of this guarantee, each for a further period of one year until the final disposal of the claims and/or the return of this guarantee.

This guarantee is given entirely without prejudice to any and all rights and defences whatsoever which are or may be available to Herning and/or to any claim(s) which Herning may have against Vardhman and/or any rights of limitation of liability according to international conventions or local laws and/or Herning's right to seek a reduction of the amount of this guarantee in the New York proceedings. This guarantee is given as substitute security to secure the release of Herning's property attached in the Southern District of New York. This guarantee is intended to stand in the place of Herning's attached property as though it was a bond within the meaning of Supplemental Admiralty Rule E(5) of the Federal Rules of Civil Procedure. This guarantee is provided as substitute security for such alleged claims by Vardhman without waiver or prejudice of any of Herning's rights including, but not limited to, any and all defenses to the claims set forth in Vardhman's Verified Complaint and any and all defenses or rights in respect of the validity of the ex parte order of maritime attachment. It is provided without waiver of Herning's right to seek a reduction in the New York proceedings of the amount of this guarantee pursuant to Supplemental Admiralty Rule E(6) of the Federal Rules of Civil Procedure, and without waiver of Herning's right

# Handelsbanken

to seek counter-security from Vardhman in the New York proceedings pursuant to Supplemental Admiralty Rule E(7) of the Federal Rules of Civil Procedure.

Should an order be entered in the New York proceedings reducing the sum of security for which Vardhman is entitled, we further agree to issue a new guarantee for the reduced sum.

This guarantee is governed by English law, and any and all claim(s) and dispute(s) arising out of or in connection with this guarantee shall be subject to the exclusive jurisdiction of the High Court of England and Wales. For the purpose of enforcement hereof or for service of any claim or proceedings in connection herewith, our address for service in England and Wales is:

Handelsbanken, Østergade 2, 7400 Herning, Denmark

Handelsbanken

# EXHIBIT 3

LENNON, MURPHY & LENNON, LLC
Attorneys for Defendant
HERNING SHIPPING AS,
The GrayBar Building
420 Lexington Avenue, Suite 300
New York, New York 10170
Telephone: (212) 490-6050
Facsimile: (212) 490-6070
Charles E. Murphy (CM 2125)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VARDHMAN SHIPPING PVT LTD., Plaintiff,

- against -

HERNING SHIPPING AS, Defendant.

08 Civ. 3620 (RMB)

ECF Case

**VERIFIED ANSWER WITH COUNTERCLAIM**

Defendant, HERNING SHIPPING AS, (hereinafter "Defendant") through its attorneys, Lennon, Murphy & Lennon, LLC, responds, upon information and belief, to the Verified Complaint filed April 15, 2008 of Plaintiff, VARDHMAN SHIPPING PVT LTD. (hereinafter "Plaintiff") as follows:

1. Admits that this is an admiralty or maritime claim within the meaning or Rule 9(h) of Fed.R.Civ.P. in that it involves a claim for the breach of a maritime contract of charter party, and that the Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1333, and except as so admitted, denies the remainder of the allegations of Paragraph One of the Verified Complaint.

2. Admits the allegations contained in Paragraph Two of the Verified Complaint.

3. Admits the allegations of Paragraph Three of the Verified Complaint.

4. Admits the allegations of Paragraph Four of the Verified Complaint.

5. Denies the allegations of Paragraph Five of the Verified Complaint inasmuch as it is an incomplete statement of the terms of the Vetting Clause.

6. Denies the allegations of Paragraph Six of the Verified Complaint.

7. Denies the allegations of Paragraph Seven of the Verified Complaint.

8. Denies the allegations of Paragraph Eight of the Verified Complaint.

9. Denies the allegations of Paragraph Nine of the Verified Complaint.

10. Denies the allegations of Paragraph Ten of the Verified Complaint.

11. Denies the allegations of Paragraph Eleven of the Verified Complaint.

12. Denies the allegations of Paragraph Twelve of the Verified Complaint.

13. Denies the allegations of Paragraph Thirteen of the Verified Complaint.

14. Denies the allegations of Paragraph Fourteen of the Verified Complaint.

15. Denies the allegations of Paragraph Fifteen of the Verified Complaint.

16. Admits that the charter party provides for the application of English law, that disputes between the parties are to be resolved by arbitration in London, and that arbitration has been commenced, and except as so admitted, denies the allegations of Paragraph Sixteen of the Verified Complaint.

17. Denies the allegations of Paragraph Seventeen of the Verified Complaint.

18. Admits that under English law reasonable attorneys' fees, costs and interest are regularly awarded to the prevailing party, and except as so admitted denies the allegations of Paragraph Eighteen of the Verified Complaint.

19. Denies the allegations of Paragraph Nineteen of the Verified Complaint.

20. Denies the allegations of Paragraph Twenty of the Verified Complaint.

21. Denies the allegations of Paragraph Twenty-One of the Verified Complaint.

22. Denies the allegations of Paragraph Twenty-Two of the Verified Complaint inclusive of subsections (a) through (d).

AFFIRMATIVE DEFENSES

23. The Verified Complaint fails to state a cause of action upon which relief may be granted.

24. Plaintiff has improperly and/or insufficiently served process upon Defendant.

25. This forum is improper because the claims asserted by Plaintiff must be resolved in London arbitration pursuant to the charter party contract.

26. Plaintiff's claims are grossly overstated and, therefore, the Court's ex parte order of maritime attachment should be reduced to a reasonable sum.

27. Pursuant to Rule E(2)(b) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, Defendant reserves all rights to claim against Plaintiff for the costs associated with posting substitute security to lift the ex parte order of maritime attachment.

AS AND FOR A COUNTERCLAIM AGAINST PLAINTIFF, DEFENDANT ALLEGES UPON INFORMATION AND BELIEF AS FOLLOWS

28. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 United States Code § 1333.

29. On or about November 15, 2006, Defendant, as disponent owner, and Plaintiff, as charterer, entered into a time charter party ("Sub Charter Party"), on the "Shelltime 4" charter party form, for the charter of the M/T KRISTINA THERESA ("Vessel") for a period of one year beginning November 27, 2006, and later extended the charter period with one year from

November 27, 2007. *Sub Charter Party attached hereto as Exhibit One.* Pursuant to Clause 8 of the Sub Charter Party, Plaintiff was required to pay Defendant 14 days in advance for the use of the Vessel at a hire rate of $14,683.00 per day, and pro rata for any part of a day, from the time and date of the Vessel's delivery to Plaintiff until the time and date of redelivery to Defendant.

30. Defendant had previously become the disponent owner, *i.e.*, the chartered owner, of the Vessel by virtue of its head charter party contract dated February 10, 2006 ("Head Charter Party") on the "Shelltime 4" charter party form, for a five-year term, with a non-party named MS "PAUL SCHULTE" Schiffahrtsgesellschaft mbh & Co. KG ("Schulte"), who was the head owner of the Vessel. Under the Head Charter Party between Schulte and Defendant, the hire rate was $12,790.00 per day, and pro rata for any part of a day, from the time and date of the Vessel's delivery to Defendant until the time and date of redelivery to Schulte.

31. The two charter parties are on back-to-back, *i.e.*, identical terms, except for the charter period and the terms concerning the rate and payment of hire.

32. Certain disputes arose between Defendant and Plaintiff regarding *inter alia* Plaintiff's breach of the Sub Charter Party by illegally and unjustifiably failing to pay hire that was due and owing to Defendant.

33. Specifically, Plaintiff wrongfully and unjustifiably declared the Vessel off-hire on or about March 19, 2008 at 17:54 hours Central European Time. At that time, Plaintiff had paid hire until March 26, 2008 through 12:00 hours. Despite due demand by Defendant for payment, Plaintiff has failed to pay outstanding hire for all periods after March 26, 2008.

34. The two charter parties had different hire payment schedules. While the Head Charter Party provided that hire would be paid monthly in advance, the Sub Charter Party provided that hire would be paid 14 days in advance. Due to the differing hire payment

schedules, and due to Plaintiff's failure to pay hire to Defendant, Defendant ceased hire payments to Schulte on April 1, 2008. Head owner, Schulte, withdrew the Vessel on April 9, 2008 at 18:09 Central European Time and placed Defendant on notice for unpaid hire. Consequently, Defendant withdrew the Vessel from Plaintiff on the same day and for the same reason.

35. As a result of Plaintiff's breach of the Sub Charter Party as described above, Defendant has sustained damages for unpaid hire from March 26, 2008 at 12:00 hours to April 9, 2008 at 18:09 hours at $14,683 per day, *i.e.*, 14 days 06:09 hours x $14,683 per day, in the amount of $209,324.50.

36. Additionally, Defendant has suffered damages from Plaintiff's breach in respect of the hire differential between the Sub Charter Party rate less the Head Charter Party rate, *i.e.*, $14,683 - $12,790 = $1,893, which differential Defendant would have earned for an additional 232 days, which was the time remaining under the Sub Charter for which Plaintiff never paid. Thus, the hire rate differential due from Plaintiff to Defendant is $439,176 (*i.e.*, 232 days x $1,893).

37. Furthermore, Defendant has suffered damages from Plaintiff's breach in respect of bunkers consumed by the Vessel from the time that Plaintiff wrongfully declared the Vessel off-hire until the time when Defendant withdrew the Vessel. The cost of bunkers consumed during this period, for which Plaintiff is liable, is $51,753.12.

38. Still further, Plaintiff's unjustified declaration of off-hire and cessation of paying hire, which was the cause of the termination of the Sub Charter Party, resulted in Defendant having to incur Vessel repositioning costs in the amount of $214,137.23. Specifically, Plaintiff left the vessel open in Cotonou, West Africa notwithstanding that it was obligated to redeliver

the Vessel to Northern Europe or Mediterranean Sea. Gibraltar was the closest redelivery point to Cotonou. The distance from Cotonou to Gibraltar is 3,096 nautical miles. At 14 knots per hour, sailing time for the Vessel is 221:09 hours or 9 days 05:09 hours at $23,240 per day (time charter cost plus bunkers ($12,790 + 19 mt fuel per day x $550 pmt)). Thus, Plaintiff is liable to Defendant for damages in respect of Vessel repositioning in the amount of $214,137.23.

39. Pursuant to the Sub Charter Party, all disputes arising thereunder are to be submitted to arbitration in London with English Law to apply. The parties are currently engaged in an ongoing London arbitration to resolve their claims and counterclaims.

40. On the basis of the foregoing, Defendant's counterclaim against Plaintiff is summarized as follows:

| | | |
|---|---|---|
| a. | Unpaid hire: | $209,324.50; |
| b. | Unpaid hire rate differential: | $439,176.00; |
| c. | Unpaid cost of bunkers consumed: | $51,753.12; |
| d. | Unpaid cost of Vessel repositioning: | $214,137.23; |
| e. | Interest on principal claims at 7% compounded quarterly for 3 years: | $211,411.79; |
| f. | Estimated attorneys' fees and costs of prosecuting the counterclaim in London arbitration: | $550,000.00. |

As itemized above, Defendant's counterclaim against Plaintiff, inclusive of estimated recoverable interest, attorneys' fees and costs totals **$1,675,802.60**.

41. Defendant's counterclaim concerns *inter alia* Plaintiff's breach of the Sub Charter Party, which contract also forms the basis for Plaintiff's suit against Defendant. The issues of whether the Vessel was off-hire beginning on or about March 19, 2008, and which party was responsible for breaching the charter, are common to both Plaintiff's claim and Defendant's

counterclaim. Therefore, this counterclaim arises from the same transaction that forms the basis of Plaintiff's claim.

42. While reserving all of its rights and defenses, Defendant has posted, or will soon post, substitute security in the form of a bank guarantee or surety bond to Plaintiff in the amount of $7,654,605.84 in order to relieve itself of the burden of the ex parte order of maritime attachment obtained by Plaintiff in this case.

43. Defendant's counterclaim has not been secured by Plaintiff. For this reason, Defendant seeks from this Honorable Court an order pursuant to Rule E(7) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure directing Plaintiff to post countersecurity in favor of Defendant in the amount of **$1,675,802.60.**

**WHEREFORE**, Defendant prays that a Judgment be entered dismissing the Verified Complaint herein and that it be awarded judgment in its favor against Plaintiff on its counterclaim; that it also be awarded all costs, expenses and attorneys' fees incurred in connection with the defense of this action and counterclaim; and this Court grant such other, further and different relief as may be just and proper in the premises, including but not limited to an award of countersecurity pursuant to Rule E(7) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure in its favor in the amount of **$1,675,802.60.**

Dated: New York, New York
May 1, 2008

The Defendant,
HERNING SHIPPING AS,

By: ______________________

Charles E. Murphy (CM 2125)
LENNON MURPHY & LENNON, LLC
The GrayBar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 (phone)
(212) 490-6070 (fax)
cem@lenmur.com

**ATTORNEY'S VERIFICATION**

State of Connecticut )
) ss.: Town of Southport
County of Fairfield )

1. My name is Charles E. Murphy.

2. I am over 18 years of age, of sound mind, capable of making this Verification, and fully competent to testify to all matters stated herein.

3. I am an attorney with the firm of Lennon, Murphy & Lennon, LLC, attorneys for the Defendant.

4. I have read the foregoing Verified Answer with Counterclaim and know the contents thereof and believe the same to be true and accurate to the best of my knowledge, information and belief.

5. The reason why this Verification is being made by the deponent and not by the Defendant is that the Defendant is a business organization with no officers or directors now within this District.

6. The source of my knowledge and the grounds for my belief are the statements made, and the documents and information received from, the Defendant and agents and/or representatives of the Defendant.

7. I am authorized to make this Verification on behalf of the Defendant.

Dated: New York, New York
May 1, 2008

Charles E. Murphy

**AFFIRMATION OF SERVICE**

I hereby certify that on May 1, 2008, a copy of the foregoing Verified Answer with Counterclaim was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

Charles E. Murphy

# EXHIBIT 1



Code word for this Charter Party
"SHELLTIME 4"

Issued December 1984 amended December 2003

# Time Charter Party

~~LONDON~~ 15 NOV 2006

IT IS THIS DAY AGREED between herning shipping france sas as agents to herning shipping a.s., herning, denmark (hereinafter referred to as "Owners"), being Time Charter Owners of the good motor/steam* vessel called MS Kristina Theresa One new building tanker ex Sasaho Shipyard Hull 2056 (hereinafter referred to as "the vessel") described as per Clause 1 hereof and Vardhaman Shipping (I) Ltd, K.V. Shah's Bunglow, Surendranagar - 363002, Gujarat, India (hereinafter referred to as "Charterers"):

Stochems Antwerp remains responsible for the performance of the charter party.

**Description And Condition of Vessel**

1. At the date of delivery of the vessel under this charter and throughout the charter period:

(a) she shall be classed by a Classification Society which is a member of the International Association of Classification Societies;

(b) she shall be in every way fit to carry crude petroleum and/or its products including cargoes of the types stated in clause 69 hereof;

(c) she shall be tight, staunch, strong, in good order and condition, and in every way fit for the service, with her machinery, boilers, hull and other equipment (including but not limited to hull stress calculator, radar, computers and computer systems) in a good and efficient state;

(d) her tanks, valves and pipelines shall be oil-tight;

(e) she shall be in every way fitted for burning, in accordance with the grades specified in Clause 29 hereof:

(i) at sea, fuel oil for main propulsion and fuel oil/marine diesel oil for auxiliaries;

(ii) in port, fuel oil/marine diesel oil for auxiliaries;

(f) she shall comply with the regulations in force so as to enable her to pass through the Suez and Panama Canals by day and night without delay;

(g) she shall have on board all certificates, documents and equipment required from time to time by any applicable law to enable her to perform the charter service without delay;

(h) she shall comply with the description in the Time Charter Description OCIMF Harmonised Vessel Particulars Questionnaire appended hereto as Appendix A, provided however that if there is any conflict between the provisions of this questionnaire and any other provision, including this Clause 1, of this charter such other provisions shall govern;

(i) her ownership structure, flag, registry, classification society and management company shall not be changed without Charterers' prior consent. Such consent shall not be unreasonably withheld;

**Safety Management**

(j) Owners will operate:

(i) a safety management system certified to comply with the International Safety Management Code ("ISM Code") for the Safe Operation of Ships and for Pollution Prevention;

(ii) a documented safe working procedures system (including procedures for the identification and mitigation of risks);

(iii) a documented environmental management system;

(iv) documented accident/incident reporting system compliant with flag state requirements;

(k) Owners shall submit to Charterers a monthly written report detailing all accidents/incidents and environmental reporting requirements, in accordance with the "Shell Safety and Environmental Monthly Reporting Template" appended hereto as Appendix B;

(l) Owners shall maintain Health Safety Environmental ("HSE") records sufficient to demonstrate compliance with the requirements of their HSE system and of this charter. Charterers reserve the right to confirm compliance with HSE requirements by audit of Owners.

(m) Owners will arrange at their expense for a SIRE inspection to be carried out at intervals of twelve months plus or minus thirty days, subject to vessel's schedule and trading area/ pattern and to availability of sire inspector (see also Clause 86).

* Delete as appropriate.
† Delete as appropriate

ITJ

ORIGINAL

Code word for this Charter Party
"SHELLTIME 4"

Issued December 1984 amended December 2003

**Shipboard Personnel And their Duties**

2. (a) At the date of delivery of the vessel under this charter and throughout the charter period:

(i) she shall have a full and efficient complement of master, officers and crew for a vessel of her tonnage, who shall in any event be not less than the number required by the laws of the flag state and who shall be trained to operate the vessel and her equipment competently and safely;

(ii) all shipboard personnel shall hold valid certificates of competence in accordance with the requirements of the law of the flag state;

(iii) all shipboard personnel shall be trained in accordance with the relevant provisions of the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1995 or any additions, modifications or subsequent versions thereof;

(iv) there shall be on board sufficient personnel with a good working knowledge of the English language to enable cargo operations at loading and discharging places to be carried out efficiently and safely and to enable communications between the vessel and those loading the vessel or accepting discharge there from to be carried out quickly and efficiently;

(v) ~~the terms of employment of the vessel's staff and crew will always remain acceptable to The International Transport Worker's Federation and the vessel shall at all times carry a Blue Card~~ - see Clause 71

(vi) the nationality of the vessel's officers given in the Time Charter Description ~~OCIMF Vessel Particulars Questionnaire~~ provided on delivery will not change without Charterers' prior agreement.

(b) Owners guarantee that throughout the charter service the master shall with the vessel's officers and crew, unless otherwise ordered by Charterers;

(i) prosecute all voyages with the utmost despatch;

(ii) render all customary assistance; and

(iii) load and discharge cargo as rapidly as possible when required by Charterers or their agents to do so, by night or by day, but always in accordance with the laws of the place of loading or discharging (as the case may be) and in each case in accordance with any applicable laws of the flag state and in accordance with the strength and stability limitations.

**Duty to Maintain**

3. (a) Throughout the charter service Owners shall, whenever the passage of time, wear and tear or any event (whether or not coming within Clause 27 hereof) requires steps to be taken to maintain or restore the conditions stipulated in Clauses 1 and 2(a), exercise due diligence so to maintain or restore the vessel.

(b) If at any time whilst the vessel is on hire under this charter the vessel fails to comply with the requirements of Clauses 1, 2(a) or 10 then hire shall be reduced to the extent necessary to indemnify Charterers for such failure. If and to the extent that such failure affects the time taken by the vessel to perform any services under this charter, hire shall be reduced by an amount equal to the value, calculated at the rate of hire, of the time so lost.

Any reduction of hire under this sub-Clause (b) shall be without prejudice to any other remedy available to Charterers, but where such reduction of hire is in respect of time lost, such time shall be excluded from any calculation under Clause 24.

(c) If Owners are in breach of their obligations under Clause 3(a), Charterers may so notify Owners in writing and if, after the expiry of 30 days following the receipt by Owners of any such notice, Owners have failed to demonstrate to Charterers' reasonable satisfaction the exercise of due diligence as required in Clause 3(a), the vessel shall be off-hire, and no further hire payments shall be due, until Owners have so demonstrated that they are exercising such due diligence.

(d) Owners shall advise Charterers immediately, in writing, should the vessel fail an inspection by, but not limited to, a governmental and/or port state authority, and/or terminal and/or major charterer of similar tonnage. Owners shall simultaneously advise Charterers of their proposed course of action to remedy the defects which have caused the failure of such inspection.

~~(e) If, in Charterers reasonably held view:~~

~~(i) failure of an inspection, or,~~

~~(ii) any finding of an inspection,~~

~~referred to in Clause 3 (d), prevents normal commercial operations then Charterers have the option to place the vessel off-hire from the date and time that the vessel fails such inspection, or becomes commercially inoperable, until the date and time that the vessel passes a re-inspection~~

[illegible]

ORIGINAL

Code word for this Charter Party
"SHELLTIME 4"

Issued December 1984 amended December 2003

~~less favourable to Charterers than that at which she went off-hire.~~

(f) ~~Furthermore, at any time while the vessel is off-hire under this Clause 3 (with the exception of Clause 3(e)(ii)), Charterers have the option to terminate this charter by giving notice in writing with effect from the date on which such notice of termination is received by Owners or from any later date stated in such notice. This sub-Clause (f) is without prejudice to any rights of Charterers or obligations of Owners under this charter or otherwise (including without limitation Charterers' rights under Clause 21 hereof).~~

Period, Trading Limits and Safe Places

4. (a) Owners agree to let and Charterers agree to hire the vessel for a period of 1 year + 1 year in chtrs option. Chtrs option for the 2nd year to be declared 60 days prior expiry of 1st year. in Charterers' option, commencing from the time and date of delivery of the vessel, for the purpose of carrying all lawful merchandise (subject always to Clause 28) including in particular (see Clause 68) in any part of the world, as Charterers shall direct, subject to the limits of the current British Institute Warranties and any subsequent amendments thereof and subject to Clauses 57 and 68. ~~Notwithstanding the foregoing,~~ ~~but subject to Clause 35, Charterers may order the vessel to ice-bound waters or to any part of the world outside such limits provided that Owners consent thereto (such consent not to be unreasonably withheld) and that Charterers pay for any insurance premium required by the vessel's underwriters as a consequence of such order~~.

(b) Any time during which the vessel is off-hire under this charter may be added to the charter period in Charterers' option up to the total amount of time spent off-hire. In such cases the rate of hire will be that prevailing at the time the vessel would, but for the provisions of this Clause, have been redelivered.

(c) Charterers shall use due diligence to ensure that the vessel is only employed between and at safe places (which expression when used in this charter shall include ports, berths, wharves, docks, anchorages, submarine lines, alongside vessels or lighters, and other locations including locations at sea) where she can safely lie always afloat. Notwithstanding anything contained in this or any other clause of this charter, Charterers do not warrant the safety of any place to which they order the vessel and shall be under no liability in respect thereof except for loss or damage caused by their failure to exercise due diligence as aforesaid. Subject as above, the vessel shall be loaded and discharged at any places as Charterers may direct, provided that Charterers shall exercise due diligence to ensure that any ship-to-ship transfer operations shall conform to standards not less than those set out in the latest published edition of the ICS/OCIMF Ship-to-Ship Transfer Guide.

(d) Unless otherwise agreed, the vessel shall be delivered by Owners Dropping outward pilot 1 port South Korea in owners option Vessel to be delivered with virgin tanks ready to load at Owners' option and redelivered to Owners Dropping outward pilot 1 port North Europe or Mediterranean Sea and always within trading limitations as per trading area clause. Vsl to be redelivered with last 3 cargoes cln unlds and 2.0%pa and free of any slops/washing water. at Charterers' option.

(e) The vessel will deliver last cargoes on delivery and redelivery as agreed above

(f) Owners are required to give Charterers 15,10,7,5 days approx notice of delivery and 3,2,1 days def notice of delivery and Charterers are required to give Owners 30, 15, 10, 7, 5, 3, 1 day(s) prior notice of redelivery.

Laydays/

5. The vessel shall not be delivered to Charterers before 23 nov 2006 and Charterers shall have the option of cancelling this charter if the vessel is not ready and at their disposal on or before 20 dec 2006 (owners to narrow the lay/can to a 15 days l/c window latest 15th nov)

Owners to Provide

6. Owners undertake to provide and to pay for all provisions, wages (including but not limited to all overtime payments), and shipping and discharging fees and all other expenses of the master, officers and crew; also, except as provided in Clauses 4 and 34 hereof, for all insurance on the vessel, for all deck, cabin and engine-room stores, and for water; for all drydocking, overhaul, maintenance and repairs to the vessel; and for all fumigation expenses and deratisation certificates. Owners' obligations under this Clause 6 extend to all liabilities for customs or import duties arising at any time during the performance of this charter in relation to the personal effects of the master, officers and crew, and in relation to the stores, provisions and other matters aforesaid which Owners are to provide and pay for and Owners shall refund to Charterers any sums Charterers or their agents may have paid or been



compelled to pay in respect of any such liability. Any amounts allowable in general average for wages and provisions and stores shall be credited to Charterers insofar as such amounts are in respect of a period when the vessel is on-hire.

Charterers to Provide

7. (a) Charterers shall provide and pay for all fuel (except fuel used for domestic services), towage and pilotage and shall pay agency fees, port charges, commissions, expenses of loading and unloading cargoes, canal dues and all charges other than those payable by Owners in accordance with Clause 6 hereof, provided that all charges for the said items shall be for Owners' account when such items are consumed, employed or incurred for Owners' purposes or while the vessel is off-hire (unless such items reasonably relate to any service given or distance made good and taken into account under Clause 21 or 22); and provided further that any fuel used in connection with a general average sacrifice or expenditure shall be paid for by Owners.

(b) In respect of bunkers consumed for Owners' purposes these will be charged on each occasion by Charterers on a "first-in-first-out" basis valued on the prices actually paid by Charterers.

(c) If the trading limits of this charter include ports in the United States of America and/or its protectorates then Charterers shall reimburse Owners for port specific charges relating to additional premiums charged by providers of oil pollution cover, when incurred by the vessel calling at ports in the United States of America and/or its protectorates in accordance with Charterers orders.

Rate of Hire

8. Subject as herein provided, Charterers shall pay 15 days in advance for the use and hire of the vessel at the rate of 1st year: usd 14,680 pdpr (incl brokerage comm.) 2nd year: usd 15,417 pdpr (incl brokerage comm.) States Dollars per day, and pro rata for any part of a day, from the time and date of her delivery (local time) to Charterers until the time and date of redelivery (local time) to Owners. Hire to include overtime onboard. Communication / Representation at United States Dollars 500 per month, and pro rata for any part of a month.

Payment of Hire

9. Subject to Clause 3 (c) and 3 (e), payment of hire shall be made in immediately available funds to:

Directly into owners designated bank account as per details given on time charter hire invoices.

in United States Dollars per calendar 15 days in advance, less:

(i) any hire paid which Charterers reasonably estimate to relate to off-hire periods, and;

(ii) any amounts disbursed on Owners' behalf, any advances and commission thereon, and charges which are for Owners' account pursuant to any provision hereof, and;

(iii) any amounts due or reasonably estimated to become due to Charterers under Clause 3 (c) or 24 hereof,

any such adjustments to be made at the due date for the next monthly payment after the facts have been ascertained. Charterers shall not be responsible for any delay or error by Owners' bank in crediting Owners' account provided that Charterers have made proper and timely payment.

In default of such proper and timely payment;

(a) Owners shall notify Charterers of such default and Charterers shall within seven days of receipt of such notice pay to Owners the amount due, including interest, failing which Owners may withdraw the vessel from the service of Charterers without prejudice to any other rights Owners may have under this charter or otherwise; and

(b) Interest on any amount due but not paid on the due date shall accrue from the day after that date up to and including the day when payment is made, at a rate per annum which shall be 1% above the U.S. Prime Interest Rate as published by the Chase Manhattan Bank in New York at 12.00 New York time on the due date, or, if no such interest rate is published on that day, the interest rate published on the next preceding day on which such a rate was so published, computed on the basis of a 360 day year of twelve 30-day months, compounded semi-annually.

Space Available to Charterers

10. The whole reach, burthen and decks on the vessel and any passenger accommodation (including Owners' suite) shall be at Charterers' disposal, reserving only proper and sufficient space for the vessel's master, officers, crew, tackle, apparel, furniture, provisions and stores, provided that the weight of stores on board shall not, unless specially agreed, exceed 30 tonnes excluding fresh water and bunker and lub oil at any time during the charter period.

Segregated Ballast

11. In connection with the Council of the European Union Regulation on the implementation of IMO Resolution A747(18) Owners will ensure that the following entry is made on the International Tonnage Certificate (1969) under the section headed "remarks":

"The segregated ballast tanks comply with the Regulation 13 of Annex 1 of The International Convention for the prevention of pollution from ships, 1973, as modified by the Protocol of 1978 relating thereto, and the total tonnage of such tanks exclusively used for the carriage of segregated

ORIGINAL

water ballast is ______ The reduced gross tonnage which should be used for the calculation of tonnage based fees is ______".

Instructions and Logs

12. Charterers shall from time to time give the master all requisite instructions and sailing directions, and the master shall keep a full and correct log of the voyage or voyages, which Charterers or their agents may inspect as required. The master shall when required furnish Charterers or their agents with a true copy of such log and with properly completed loading and discharging port sheets and voyage reports for each voyage and other returns as Charterers may require. Charterers shall be entitled to take copies at Owners' expense of any such documents which are not provided by the master.

Bills of Lading

13. (a) The master (although appointed by Owners) shall be under the orders and direction of Charterers as regards employment of the vessel, agency and other arrangements, and shall sign Bills of Lading as Charterers or their agents may direct (subject always to Clauses 35 (a) and 40) without prejudice to this charter. Charterers hereby indemnify Owners against all consequences or liabilities that may arise:

(i) from signing Bills of Lading in accordance with the directions of Charterers or their agents, to the extent that the terms of such Bills of Lading fail to conform to the requirements of this charter, or (except as provided in Clause 13 (b)) from the master otherwise complying with Charterers' or their agents' orders;

(ii) from any irregularities in papers supplied by Charterers or their agents.

(b) "If Charterers by telex, facsimile or other form of written communication that specifically refers to this Clause request Owners to discharge a quantity of cargo either without Bills of Lading and/or at a discharge place other than that named in a Bill of Lading and/or that is different from the Bill of Lading quantity, then Owners shall discharge such cargo in accordance with Charterers's instructions in consideration of receiving the following indemnity which shall be deemed to be given by Charterers on each and every such occasion and which is unlimited in value ~~to 200% of the CIF value~~ of the cargo carried on board.

(i) Charterers shall indemnify Owners and Owners' servants and agents in respect of any liability loss or damage of whatsoever nature (including legal costs as between attorney or solicitor and client and associated expenses) which Owners may sustain by reason of delivering such cargo in accordance with Charterers' request.

(ii) If any proceeding is commenced against Owners or any of Owners' servants or agents in connection with the vessel having delivered cargo in accordance with such request, Charterers shall provide Owners or any of Owners' servants or agents from time to time on demand with sufficient funds to defend the said proceedings.

(iii) If the vessel or any other vessel or property belonging to Owners should be arrested or detained, or if the arrest or detention thereof should be threatened, by reason of discharge in accordance with Charterers instruction as aforesaid, Charterers shall provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such vessel or property and Charterers shall indemnify Owners in respect of any loss, damage or expenses caused by such arrest or detention whether or not same may be justified.

(iv) Charterers shall, if called upon to do so at any time while such cargo is in Charterers' possession, custody or control, redeliver the same to Owners.

(v) As soon as all original Bills of Lading for the above cargo which name as discharge port the place where delivery actually occurred shall have arrived and/or come into Charterers' possession, Charterers shall produce and deliver the same to Owners whereupon Charterers' liability hereunder shall cease.

Provided however, if Charterers have not received all such original Bills of Lading by 24.00 hours on the day 36 calendar months after the date of discharge, that this indemnity shall terminate at that time unless before that time Charterers have received from Owners written notice that:

(aa) Some person is making a claim in connection with Owners delivering cargo pursuant to Charterers request or,

(bb) Legal proceedings have been commenced against Owners and/or carriers and/or Charterers and/or any of their respective servants or agents and/or the vessel for the same reason.

When Charterers have received such a notice, then this indemnity shall continue in force until such claim or legal proceedings are settled. Termination of this indemnity shall not prejudice any legal rights a party may have outside this indemnity.

(vi) Owners shall promptly notify Charterers if any person (other than a person to whom Charterers ordered cargo to be delivered) claims to be entitled to such cargo and/or if the vessel or any other property belonging to Owners is arrested by reason of any such discharge of cargo.

(vii) This indemnity shall be governed and construed in accordance with the English law and each and any dispute arising out of or in connection with this indemnity shall be subject to the jurisdiction of the High Court of Justice of England".

(c) Owners warrant that the Master will comply with orders to carry and discharge against one or


ORIGINAL

more Bills of Lading from a set of original negotiable Bills of Lading should Charterers so require.

**Conduct of Vessel's Personnel**

14. If Charterers complain of the conduct of the master or any of the officers or crew, Owners shall immediately investigate the complaint. If the complaint proves to be well founded, Owners shall, without undue delay, make a change in the appointments and Owners shall in any event communicate the result of their investigations to Charterers as soon as possible.

**Bunkers at Delivery and Redelivery**

15. Charterers shall accept and pay for all bunkers on board at the time of delivery, and Owners shall on redelivery (whether it occurs at the end of the charter or on the earlier termination of this charter) accept and pay for all bunkers remaining on board, at the price actually paid, on a "first-in-first-out" basis. Such prices are to be supported by paid invoices.

Vessel to be delivered to and redelivered from the charter with, at least, a quantity of bunkers on board sufficient to reach the nearest main bunkering port.

Notwithstanding anything contained in this charter all bunkers on board the vessel shall, throughout the duration of this charter, remain the property of Charterers and can only be purchased on the terms specified in this charter at the end of the charter period or, if earlier, at the termination of the charter.

**Stevedores, Pilots, Tugs**

16. Stevedores, when required, shall be employed and paid by Charterers, but this shall not relieve Owners from responsibility at all times for proper stowage, which must be controlled by the master who shall keep a strict account of all cargo loaded and discharged. Owners hereby indemnify Charterers, their servants and agents against all losses, claims, responsibilities and liabilities arising in any way whatsoever from the employment of pilots, tugboats or stevedores, who although employed by Charterers shall be deemed to be the servants of and in the service of Owners and under their instructions (even if such pilots, tugboat personnel or stevedores are in fact the servants of Charterers their agents or any affiliated company); provided, however, that:

(a) the foregoing indemnity shall not exceed the amount to which Owners would have been entitled to limit their liability if they had themselves employed such pilots, tugboats or stevedores, and;

(b) Charterers shall be liable for any damage to the vessel caused by or arising out of the use of stevedores, fair wear and tear excepted, to the extent that Owners are unable by the exercise of due diligence to obtain redress therefor from stevedores.

**Super-Numeraries**

17. Charterers may send representatives and supercargo in the vessel's available accommodation upon any voyage made under this charter, Owners finding provisions and all requisites as supplied to officers, except alcohol. Charterers paying at the rate of United States Dollars 25 (twenty five) ~~15 (fifteen)~~ per day for each representative and supercargo while on board the vessel. The supercargo may assist and advise the vessel in tank cleaning, loading and discharging operation, but will otherwise not interfere. The supercargo is onboard strictly in an advisory capacity. Charterers to sign Owners' P&I Club letter of indemnity prior boarding.

**Sub-letting/ Assignment/ Novation**

18. Charterers may sub-let the vessel, but shall always remain responsible to Owners for due fulfilment of this charter. ~~Additionally, Charterers may assign or novate this charter to any company of the Royal Dutch/Shell Group of Companies.~~

**Final Voyage**

19. If when a payment of hire is due hereunder Charterers reasonably expect to redeliver the vessel before the next payment of hire would fall due, the hire to be paid shall be assessed on Charterers' reasonable estimate of the time necessary to complete Charterers' programme up to redelivery, and from which estimate Charterers may deduct amounts due or reasonably expected to become due for:

(a) disbursements on Owners' behalf or charges for Owners' account pursuant to any provision hereof, and;

(b) bunkers on board at redelivery pursuant to Clause 15.

Promptly after redelivery any overpayment shall be refunded by Owners or any underpayment made good by Charterers.

If at the time this charter would otherwise terminate in accordance with Clause 4 the vessel is on a ballast voyage to a port of redelivery or is upon a laden voyage, Charterers shall continue to have the use of the vessel at the same rate and conditions as stand herein for as long as necessary to complete such ballast voyage, or to complete such laden voyage and return to a port of redelivery as provided by this charter, as the case may be.

**Loss of Vessel**

20. Should the vessel be lost, this charter shall terminate and hire shall cease at noon on the day of her loss; should the vessel be a constructive total loss, this charter shall terminate and hire shall cease at noon on the day on which the vessel's underwriters agree that the vessel is a constructive total loss; should the vessel be missing, this charter shall terminate and hire shall cease at noon on the day on which she was last heard of. Any hire paid in advance and not earned shall be returned to Charterers and Owners shall reimburse Charterers for the value of the estimated quantity of bunkers on board at the time of termination, at the price paid by Charterers at the last bunkering port.

**Off-hire**

21. (a) On each and every occasion that there is loss of time (whether by way of interruption in the vessel's service or, from reduction in the vessel's performance, or in any other manner)

ORIGINAL

(i) due to deficiency of personnel or stores; repairs; gas-freeing for repairs; time in and waiting to enter dry dock for repairs; breakdown (whether partial or total) of machinery, boilers or other parts of the vessel or her equipment (including without limitation tank coatings); overhaul, maintenance or survey; collision, stranding, accident or damage to the vessel; or any other similar cause preventing the efficient working of the vessel ~~and such loss continues for more than three consecutive hours (if resulting from interruption in the vessel's service) or cumulates to more than three hours (if resulting from partial loss of service)~~; or

(ii) due to industrial action, refusal to sail, breach of orders or neglect of duty on the part of the master, officers or crew; or

(iii) for the purpose of obtaining medical advice or treatment for or landing any sick or injured person (other than a Charterers' representative carried under Clause 17 hereof) or for the purpose of landing the body of any person (other than a Charterers' representative), ~~and such loss continues for more than three consecutive hours~~; or

(iv) due to any delay in quarantine arising from the master, officers or crew having had communication with the shore at any infected area without the written consent or instructions of Charterers or their agents, or to any detention by customs or other authorities caused by smuggling or other infraction of local law on the part of the master, officers, or crew; or

(v) due to detention of the vessel by authorities at home or abroad attributable to legal action against or breach of regulations by the vessel, the vessel's owners, or Owners (unless brought about by the act or neglect of Charterers); then

without prejudice to Charterers' rights under Clause 3 or to any other rights of Charterers hereunder, or otherwise, the vessel shall be off-hire from the commencement of such loss of time until she is again ready and in an efficient state to resume her service from a geographical position not less favourable to Charterers than that at which such loss of time commenced; provided, however, that any service given or distance made good by the vessel whilst off-hire shall be taken into account in assessing the amount to be deducted from hire.

(b) If the vessel fails to proceed at any guaranteed speed pursuant to Clause 24, and such failure arises wholly or partly from any of the causes set out in Clause 21(a) above, then the period for which the vessel shall be off-hire under this Clause 21 shall be the difference between:

(i) the time the vessel would have required to perform the relevant service at such guaranteed speed, and

(ii) the time actually taken to perform such service (including any loss of time arising from interruption in the performance of such service).

For the avoidance of doubt, all time included under (ii) above shall be excluded from any computation under Clause 24.

(c) Further and without prejudice to the foregoing, in the event of the vessel deviating (which expression includes without limitation putting back, or putting into any port other than that to which she is bound under the instructions of Charterers) for any cause or purpose mentioned in Clause 21(a), the vessel shall be off-hire from the commencement of such deviation until the time when she is again ready and in an efficient state to resume her service from a geographical position not less favourable to Charterers than that at which the deviation commenced, provided, however, that any service given or distance made good by the vessel whilst so off-hire shall be taken into account in assessing the amount to be deducted from hire. If the vessel, for any cause or purpose mentioned in Clause 21 (a), puts into any port other than the port to which she is bound on the instructions of Charterers, the port charges, pilotage and other expenses at such port shall be borne by Owners. Should the vessel be driven into any port or anchorage by stress of weather hire shall continue to be due and payable during any time lost thereby.

(d) If the vessel's flag state becomes engaged in hostilities, and Charterers in consequence of such hostilities find it commercially impracticable to employ the vessel and have given Owners written notice thereof then from the date of receipt by Owners of such notice until the termination of such commercial impracticability the vessel shall be off-hire and Owners shall have the right to employ the vessel on their own account.

(e) Time during which the vessel is off-hire under this charter shall count as part of the charter period except where Charterers declare their option to add off-hire periods under Clause 4 (a).

(f) All references to "time" in this charter party shall be references to local time except where otherwise stated.

Periodical Drydocking

22. (a) Owners have the right and obligation to drydock the vessel at regular intervals of 60 months plus/minus 6 months and/or in case of emergency or class requirement.
On each occasion Owners shall propose to Charterers a date on which they wish to drydock the vessel, not less than 1 month, subject always to vessel's fixed program, before such date, unless there is an emergency case, and Owners shall nominate a port for such periodical drydocking and Charterers shall take all reasonable steps to make the vessel available as near to

such date and port as practicable.

Owners shall put the vessel in drydock at their expense as soon as practicable after Charterers place the vessel at Owners' disposal clear of cargo other than tank washings and residues. Owners shall be responsible for and pay for the disposal into reception facilities of such tank washings and residues and shall have the right to retain any monies received therefor, without prejudice to any claim for loss of cargo under any Bill of Lading or this charter.

(b) If a periodical drydocking is carried out in the port offered by Charterers (which must have suitable accommodation for the purpose and reception facilities for tank washings and residues), the vessel shall be off-hire from the time she arrives at such port until drydocking is completed and she is in every way ready to resume Charterers' service and is at the position at which she went off-hire or a position no less favourable to Charterers, whichever she first attains. However,

(i) provided that Owners exercise due diligence in gas-freeing, any time lost in gas-freeing to the standard required for entry into drydock for cleaning and painting the hull shall not count as off-hire, whether lost on passage to the drydocking port or after arrival there (notwithstanding Clause 21), and

(ii) any additional time lost in further gas-freeing to meet the standard required for hot work or entry to cargo tanks shall count as off-hire, whether lost on passage to the drydocking port or after arrival there.

Any time which, but for sub-Clause (i) above, would be off-hire, shall not be included in any calculation under Clause 24.

The expenses of gas-freeing, including without limitation the cost of bunkers, shall be for Owners account.

(c) If Owners require the vessel, instead of proceeding to the offered port, to carry out periodical drydocking at a special port selected by them, the vessel shall be off-hire from the time when she is released to proceed to the special port until she next presents for loading in accordance with Charterers' instructions, provided, however, that Charterers shall credit Owners with the time which would have been taken on passage at the service speed had the vessel not proceeded to drydock. All fuel consumed shall be paid for by Owners but Charterers shall credit Owners with the value of the fuel which would have been used on such notional passage calculated at the guaranteed daily consumption for the service speed, and shall further credit Owners with any benefit they may gain in purchasing bunkers at the special port.

(d) Charterers shall, insofar as cleaning for periodical drydocking may have reduced the amount of tank-cleaning necessary to meet Charterers' requirements, credit Owners with the value of any bunkers which Charterers calculate to have been saved thereby, whether the vessel drydocks at an offered or a special port.

Ship Inspection

23. Charterers shall have the right at any time during the charter period to make such inspection of the vessel as they may consider necessary. This right may be exercised as often and at such intervals as Charterers in their absolute discretion may determine and whether the vessel is in port or on passage. Owners affording all necessary co-operation and accommodation on board provided, however,

(a) that neither the exercise nor the non-exercise, nor anything done or not done in the exercise or non-exercise, by Charterers of such right shall in any way reduce the master's or Owners' authority over, or responsibility to Charterers or third parties for, the vessel and every aspect of her operation, nor increase Charterers' responsibilities to Owners or third parties for the same; and

(b) that Charterers shall not be liable for any act, neglect or default by themselves, their servants or agents in the exercise or non-exercise of the aforesaid right.

Detailed Description and Performance

24. (a) Owners advise that the speed and consumption of the vessel shall be as follows:

Owners warrant vessel's speed of knots in laden condition and knots in ballast condition on 10 metric tons IFO for main engine.

| Average speed in knots | Maximum average bunker consumption per day main propulsion fuel oil/ diesel oil tonnes | auxiliaries fuel oil/diesel oil tonnes |
|---|---|---|
| Laden | | |
| _____ | _____/_____ | _____/_____ |
| _____ | _____/_____ | _____/_____ |
| _____ | _____/_____ | _____/_____ |
| Ballast | | |
| _____ | _____/_____ | _____/_____ |
| _____ | _____/_____ | _____/_____ |
| _____ | _____/_____ | _____/_____ |

The foregoing bunker consumptions are for all purposes except cargo heating and tank cleaning and ballasting and deballasting and shall be pro-rated between the speeds shown.

m





The service speed of the vessel is 13 knots laden ~~and~~ 14 knots in ballast and in the absence of Charterers' orders to the contrary the vessel shall proceed at the service speed. However if more than one laden and one ballast speed are shown in the table above Charterers shall have the right to order the vessel to steam at any speed within the range set out in the table (the "ordered speed").

~~If the vessel is ordered to proceed at any speed other than the highest speed shown in the table, and the average speed actually attained by the vessel during the currency of such order exceeds such ordered speed plus 0.5 knots (the "maximum recognised speed"), then for the purpose of calculating a decrease of hire under this Clause 24 the maximum recognised speed shall be used in place of the average speed actually attained.~~

~~For the purposes of this charter the "guaranteed speed" at any time shall be the then current ordered speed or the service speed, as the case may be.~~

The average speeds and bunker consumptions shall for the purposes of this Clause 24 be calculated by reference to the observed distance from pilot station to pilot station on all sea passages during each period stipulated in Clause 24 (c), but excluding any time during which the vessel is (or but for Clause 22 (b) (i) would be) off-hire and also excluding "Adverse Weather Periods", being:

(i) any periods during which reduction of speed is necessary for safety in congested waters or in poor visibility;

(ii) any days, noon to noon, when winds exceed force 4 8 on the Beaufort Scale for more than 12 hours.

(b) If ~~during any year~~ from the date on which the vessel enters service ~~(anniversary to anniversary)~~ the vessel falls below ~~or exceeds~~ the performance guaranteed in Clause 24 (a) then if such shortfall ~~or excess~~ results:

(i) from a reduction ~~or an increase~~ in the average speed of the vessel, compared to the speed guaranteed in Clause 24 (a), then an amount equal to the value at the hire rate of the time so lost ~~or gained, as the case may be, shall be included in the performance calculation~~ deducted from the hire paid;

(ii) from an increase ~~or a decrease~~ in the total bunkers consumed, compared to the total bunkers which would have been consumed had the vessel performed as guaranteed in Clause 24 (a), an amount equivalent to the value of the additional bunkers consumed ~~or the bunkers saved, as the case may be~~, based on the average price paid by Charterers for the vessel's bunkers in such period, shall be ~~included in the performance calculation~~ deducted from the hire paid.

~~The results of the performance calculation~~ deduction from hire so calculated for laden and ballast mileage respectively shall be adjusted to take into account the mileage steamed in each such condition during Adverse Weather Periods, by dividing such addition or deduction by the number of miles over which the performance has been calculated and multiplying by the same number of miles plus the miles steamed during the Adverse Weather Periods, in order to establish the total ~~performance calculation~~ deduction for such period.

Reduction of hire under the foregoing sub-Clause (b) shall be without prejudice to any other remedy available to Charterers.

(c) ~~Calculations under this Clause 24 shall be made as per clause 24 for the yearly periods terminating on each successive anniversary of the date on which the vessel enters service, and for the period between the last such anniversary and the date of termination of this charter if less than a year.~~ Claims in respect of reduction of hire arising under this Clause during the final year or part year of the charter period shall in the first instance be settled in accordance with Charterers' estimate ~~made two months before the end of the charter period~~. Any necessary adjustment after this charter terminates shall be made by payment by Owners to Charterers ~~or by Charterers to Owners as the case may require~~.

(d) Owners and Charterers agree that this Clause 24 is assessed on the basis that Owners are not entitled to additional hire for performance in excess of the speeds and consumptions given in this Clause 24.

Salvage

25. Subject to the provisions of Clause 21 hereof, all loss of time and all expenses (excluding any damage to or loss of the vessel or tortious liabilities to third parties) incurred in saving or attempting to save life or in successful or unsuccessful attempts at salvage shall be borne equally by Owners and Charterers provided that Charterers shall not be liable to contribute towards any salvage payable by Owners arising in any way out of services rendered under this Clause 25.

All salvage and all proceeds from derelicts shall be divided equally between Owners and Charterers after deducting the master's, officers' and crew's share.

Lien

26. Owners shall have a lien upon all cargoes and all freights, sub-freights and demurrage for any amounts due under this charter; and Charterers shall have a lien on the vessel for all monies paid in

ORIGINAL

advance and not earned, and for all claims for damages arising from any breach by Owners of this charter.

**Exceptions**

27. (a) The vessel, her master and Owners shall not, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure arising or resulting from any act, neglect or default of the master, pilots, mariners or other servants of Owners in the navigation or management of the vessel; fire, unless caused by the actual fault or privity of Owners; collision or stranding; dangers and accidents of the sea; explosion, bursting of boilers, breakage of shafts or any latent defect in hull, equipment or machinery; provided, however, that Clauses 1, 2, 3 and 24 hereof shall be unaffected by the foregoing. Further, neither the vessel, her master or Owners, nor Charterers shall, unless otherwise in this charter expressly provided, be liable for any loss or damage or delay or failure in performance hereunder arising or resulting from act of God, act of war, seizure under legal process, quarantine restrictions, strikes, lock-outs, riots, restraints of labour, civil commotions or arrest or restraint of princes, rulers or people.

(b) The vessel shall have liberty to sail with or without pilots, to tow or go to the assistance of vessels in distress and to deviate for the purpose of saving life or property.

(c) Clause 27(a) shall not apply to, or affect any liability of Owners or the vessel or any other relevant person in respect of;

(i) loss or damage caused to any berth, jetty, dock, dolphin, buoy, mooring line, pipe or crane or other works or equipment whatsoever at or near any place to which the vessel may proceed under this charter, whether or not such works or equipment belong to Charterers, or;

(ii) any claim (whether brought by Charterers or any other person) arising out of any loss of or damage to or in connection with cargo. Any such claim shall be subject to the Hague-Visby Rules or the Hague Rules or the Hamburg Rules, as the case may be, which ought pursuant to Clause 38 hereof to have been incorporated in the relevant Bill of Lading (whether or not such Rules were so incorporated) or, if no such Bill of Lading is issued, to the Hague-Visby Rules unless the Hamburg Rules compulsorily apply in which case to the Hamburg Rules.

(d) In particular and without limitation, the foregoing subsections (a) and (b) of this Clause shall not apply to or in any way affect any provision in this charter relating to off-hire or to reduction of hire.

**Injurious Cargoes**

28. No acids, explosives or cargoes injurious to the vessel shall be shipped and without prejudice to the foregoing any damage to the vessel caused by the shipment of any such cargo, and the time taken to repair such damage, shall be for Charterers' account. No voyage shall be undertaken, nor any goods or cargoes loaded, that would expose the vessel to capture or seizure by rulers or governments.

**Grade of Bunkers**

29. Charterers shall supply fuel oil with a maximum viscosity of 380 centistokes at 50 degrees centigrade according to RMG-35 ~~and/or marine diesel oil~~ for main propulsion and marine diesel oil ~~fuel oil with a maximum viscosity of ____ centistokes at 50 degrees centigrade and/or diesel oil~~ for the auxiliaries. If Owners require the vessel to be supplied with more expensive bunkers they shall be liable for the extra cost thereof.

Charterers warrant that all bunkers provided by them in accordance herewith shall be of a quality complying with ISO Standard 8217 (latest version) for Marine Residual Fuels and Marine Distillate Fuels as applicable.

**Disbursements**

30. Should the master require advances for ordinary disbursements at any port, Charterers or their agents shall make such advances to him, in consideration of which Owners shall pay a commission of two and a half per cent, and all such advances and commission shall be deducted from hire.

**Laying-up**

31. Charterers shall have the option, after consultation with Owners, of requiring Owners to lay up the vessel at a safe place ~~nominated by~~ mutually agreed between Owners and Charterers, in which case the hire provided for under this charter shall be adjusted to reflect any net increases in expenditure reasonably incurred or any net saving which should reasonably be made by Owners as a result of such lay-up. Charterers may exercise the said option any number of times during the charter period.

32. Should the vessel be requisitioned by any government, de facto or de jure, during the period of this charter, the vessel shall be off-hire during the period of such requisition, and any hire paid by such government in respect of such requisition period shall be for Owners' account. Any such requisition period shall count as part of the charter period.

**Outbreak of War**

33. If war or hostilities break out between any two or more of the following countries: U.S.A., the countries or republics having been part of the former U.S.S.R (except that declaration of war or hostilities solely between any two or more of the countries or republics having been part of the former USSR shall be exempted), P.R.C., ~~U.K.,~~ Netherlands, Germany then both Owners and Charterers shall have the right to cancel this charter.

**Additional**

34. If the vessel is ordered to trade in areas where there is war (de facto or de jure) or threat of war



Charterers shall reimburse Owners for any additional insurance premia, crew bonuses and other expenses which are reasonably actually incurred by Owners as a consequence of such orders, provided that Charterers are given notice of such expenses as soon as practicable and in any event before such expenses are incurred, and provided further that Owners obtain from their insurers a waiver of any subrogated rights against Charterers in respect of any claims by Owners under their war risk insurance arising out of compliance with such orders.

Any payments by Charterers under this clause will only be made against proven documentation. Any discount or rebate refunded to Owners, for whatever reason, in respect of additional war risk premium shall be passed on to Charterers.

War Risks 35. (a) The master shall not be required or bound to sign Bills of Lading for any place which in his or Owners' reasonable opinion is dangerous or impossible for the vessel to enter or reach owing to any blockade, war, hostilities, warlike operations, civil war, civil commotions or revolutions.

(b) If in the reasonable opinion of the master or Owners it becomes, for any of the reasons set out in Clause 35(a) or by the operation of international law, dangerous, impossible or prohibited for the vessel to reach or enter, or to load or discharge cargo at, any place to which the vessel has been ordered pursuant to this charter (a "place of peril"), then Charterers or their agents shall be immediately notified in writing or by radio messages, and Charterers shall thereupon have the right to order the cargo, or such part of it as may be affected, to be loaded or discharged, as the case may be, at any other place within the trading limits of this charter (provided such other place is not itself a place of peril). If any place of discharge is or becomes a place of peril, and no orders have been received from Charterers or their agents within 48 hours after dispatch of such messages, then Owners shall be at liberty to discharge the cargo or such part of it as may be affected at any place which they or the master may in their or his discretion select within the trading limits of this charter and such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

(c) The vessel shall have liberty to comply with any directions or recommendations as to departure, arrival, routes, ports of call, stoppages, destinations, zones, waters, delivery or in any other wise whatsoever given by the government of the state under whose flag the vessel sails or any other government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority including any de facto government or local authority or by any person or body acting or purporting to act as or with the authority of any such government or local authority or by any committee or person having under the terms of the war risks insurance on the vessel the right to give any such directions or recommendations. If by reason of or in compliance with any such directions or recommendations anything is done or is not done, such shall not be deemed a deviation. If by reason of or in compliance with any such direction or recommendation the vessel does not proceed to any place of discharge to which she has been ordered pursuant to this charter, the vessel may proceed to any place which the master or Owners in his or their discretion select and there discharge the cargo or such part of it as may be affected. Such discharge shall be deemed to be due fulfilment of Owners' obligations under this charter so far as cargo so discharged is concerned.

Charterers shall procure that all Bills of Lading issued under this charter shall contain the Chamber of Shipping War Risks Clause 1952.

Both to Blame Collision Clause 36. If the liability for any collision in which the vessel is involved while performing this charter falls to be determined in accordance with the laws of the United States of America, the following provision shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the cargo carried hereunder will indemnify the carrier against all loss, or liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of the said cargo, paid or payable by the other or non-carrying ship or her owners to the owners of the said cargo and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier."

"The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact."

Charterers shall procure that all Bills of Lading issued under this charter shall contain a provision in the foregoing terms to be applicable where the liability for any collision in which the vessel is involved falls to be determined in accordance with the laws of the United States of America.

New Jason Clause 37. General average contributions shall be payable according to York/Antwerp Rules, 1994, as amended from time to time, and shall be adjusted in London in accordance with English law and practice

ORIGINAL

should adjustment be made in accordance with the law and practice of the United States of America, the following position shall apply:

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the cargo, shippers, consignees or owners of the cargo shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo."

"If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the cargo and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the cargo to the carrier before delivery."

Charterers shall procure that all Bills of Lading issued under this charter shall contain a provision in the foregoing terms, to be applicable where adjustment of general average is made in accordance with the laws and practice of the United States of America.

Clause Paramount

38. Charterers shall procure that all Bills of Lading issued pursuant to this charter shall contain the following:

"(1) Subject to sub-clause (2) or (3) hereof, this Bill of Lading shall be governed by, and have effect subject to, the rules contained in the International Convention for the Unification of Certain Rules relating to Bills of Lading signed at Brussels on 25th August 1924 (hereafter the "Hague Rules") as amended by the Protocol signed at Brussels on 23rd February 1968 (hereafter the "Hague-Visby Rules"). Nothing contained herein shall be deemed to be either a surrender by the carrier of any of his rights or immunities or any increase of any of his responsibilities or liabilities under the Hague-Visby Rules."

"(2) If there is governing legislation which applies the Hague Rules compulsorily to this Bill of Lading, to the exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hague Rules. Nothing therein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hague Rules."

"(3) If there is governing legislation which applies the United Nations Convention on the Carriage of Goods by Sea 1978 (hereafter the "Hamburg Rules") compulsorily to this Bill of Lading, to the exclusion of the Hague-Visby Rules, then this Bill of Lading shall have effect subject to the Hamburg Rules. Nothing therein contained shall be deemed to be either a surrender by the carrier of any of his rights or immunities or an increase of any of his responsibilities or liabilities under the Hamburg Rules."

"(4) If any term of this Bill of Lading is repugnant to the Hague-Visby Rules, or Hague Rules, or Hamburg Rules, as applicable, such term shall be void to that extent but no further."

"(5) Nothing in this Bill of Lading shall be construed as in any way restricting, excluding or waiving the right of any relevant party or person to limit his liability under any available legislation and/or law."

Insurance/ITOPF

39. Owners warrant that the vessel is now, and will, throughout the duration of the charter: SEE ALSO CLAUSE 63 & 64

~~(a) be owned or demise chartered by a member of the International Tanker Owners Pollution Federation Limited;~~

~~(b) be properly entered in ____ P & I Club, being a member of the International Group of P and I Clubs;~~

~~(c) have in place insurance cover for oil pollution for the maximum on offer through the International Group of P&I Clubs but always a minimum of United States Dollars 1,000,000,000 (one thousand million);~~

(d) have in full force and effect Hull and Machinery insurance placed through reputable brokers on Institute Time Clauses or equivalent for the value of United States Dollars as from time to time may be amended with Charterers' approval, which shall not be unreasonably withheld.

Owners will provide, within a reasonable time following a request from Charterers to do so, documented evidence of compliance with the warranties given in this Clause 39.

Export Restrictions

40. The master shall not be required or bound to sign Bills of Lading for the carriage of cargo to any place to which export of such cargo is prohibited under the laws, rules or regulations of the country in which the cargo was produced and/or shipped.

Charterers shall procure that all Bills of Lading issued under this charter shall contain the following clause:

"If any laws rules or regulations applied by the government of the country in which the cargo was produced and/or shipped, or any relevant agency thereof, impose a prohibition on export of the cargo

117


to the place of discharge designated in or ordered under this Bill of Lading, carriers shall be entitled to require cargo owners forthwith to nominate an alternative discharge place for the discharge of the cargo, or such part of it as may be affected, which alternative place shall not be subject to the prohibition, and carriers shall be entitled to accept orders from cargo owners to proceed to and discharge at such alternative place. If cargo owners fail to nominate an alternative place within 72 hours after they or their agents have received from carriers notice of such prohibition, carriers shall be at liberty to discharge the cargo or such part of it as may be affected by the prohibition at any safe place on which they or the master may in their or his absolute discretion decide and which is not subject to the prohibition, and such discharge shall constitute due performance of the contract contained in this Bill of Lading so far as the cargo so discharged is concerned".
The foregoing provision shall apply mutatis mutandis to this charter, the references to a Bill of Lading being deemed to be references to this charter.

Business Principles

41. ~~Owners will co-operate with Charterers to ensure that the "Business Principles", as amended from time to time, of the Royal Dutch/Shell Group of Companies, which are posted on the Shell Worldwide Web (www.Shell.com), are complied with.~~

Drugs and Alcohol

42. a) Owners warrant that they have in force an active policy covering the vessel which meets or exceeds the standards set out in the "Guidelines for the Control of Drugs and Alcohol On Board Ship" as published by the Oil Companies International Marine Forum (OCIMF) dated January 1990 (or any subsequent modification, version, or variation of these guidelines) and that this policy will remain in force throughout the charter period, and Owners will exercise due diligence to ensure the policy is complied with.
(b) Owners warrant that the current policy concerning drugs and alcohol on board is acceptable to ExxonMobil and will remain so throughout the charter period.

Oil Major Acceptability

43. ~~If, at any time during the charter period, the vessel becomes unacceptable to any Oil Major, Charterers shall have the right to terminate the charter.~~ SEE CLAUSE 35.

Pollution and Emergency Response

44. Owners are to advise Charterers of organisational details and names of Owners personnel together with their relevant telephone/facsimile/e-mail/telex numbers, including the names and contact details of Qualified Individuals for OPA 90 response, who may be contacted on a 24 hour basis in the event of oil spills or emergencies.

ISPS Code/US MTSA 2002

45. (a) (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) and the US Maritime Transportation Security Act 2002 (MTSA) in relation to the Vessel and thereafter during the currency of this charter, Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) and the "owner" (as defined by the MTSA) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company" and the requirements of MTSA relating to the vessel and the "owner". Upon request Owners shall provide documentary evidence of compliance with this Clause 45(a) (i).

(ii) Except as otherwise provided in this charter, loss, damage, expense or delay, caused by failure on the part of Owners or "the Company"/"owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for Owners' account.

(b) (i) Charterers shall provide Owners/Master with their full style contact details and shall ensure that the contact details of all sub-charterers are likewise provided to Owners/Master. Furthermore, Charterers shall ensure that all sub-charter parties they enter into during the period of this charter contain the following provision:
"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this charter, loss, damage, expense or delay, caused by failure on the part of Charterers to comply with this sub-Clause 45(b) shall be for Charterers' account.

(c) Notwithstanding anything else contained in this charter costs or expenses related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for Charterers' account, unless such costs or expenses result solely from Owners' negligence in which case such costs or expenses shall be for Owners' account. All measures required by Owners to comply with the security plan required by the ISPS Code/MTSA shall be for Owners' account.

(d) Notwithstanding any other provision of this charter, the vessel shall not be off-hire where there is a loss of time caused by Charterers' failure to comply with the ISPS Code/MTSA (when in force).

MT/

ORIGINAL

(e) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

Law and Litigation

~~45. (a) This charter shall be construed and the relations between the parties determined in accordance with the laws of England.~~

~~(b) All disputes arising out of this charter shall be referred to Arbitration in London in accordance with the Arbitration Act 1996 (or any re-enactment or modification thereof for the time being in force) subject to the following appointment procedure:~~

~~(i) The parties shall jointly appoint a sole arbitrator not later than 28 days after service of a request in writing by either party to do so.~~

~~(ii) If the parties are unable or unwilling to agree the appointment of a sole arbitrator in accordance with (i) then each party shall appoint one arbitrator, in any event not later than 14 days after receipt of a further request in writing by either party to do so. The two arbitrators so appointed shall appoint a third arbitrator before any substantive hearing or forthwith if they cannot agree on a matter relating to the arbitration.~~

~~(iii) If a party fails to appoint an arbitrator within the time specified in (ii) (the "Party in Default"), the party who has duly appointed his arbitrator shall give notice in writing to the Party in Default that he proposes to appoint his arbitrator to act as sole arbitrator.~~

~~(iv) If the Party in Default does not within 7 days of the notice given pursuant to (iii) make the required appointment and notify the other party that he has done so the other party may appoint his arbitrator as sole arbitrator whose award shall be binding on both parties as if he had been so appointed by agreement.~~

~~(v) Any Award of the arbitrator(s) shall be final and binding and not subject to appeal.~~

~~(vi) For the purposes of this clause 45(b) any requests or notices in writing shall be sent by fax, e-mail or telex and shall be deemed received on the day of transmission.~~

~~(c) It shall be a condition precedent to the right of any party to a stay of any legal proceedings in which maritime property has been, or may be, arrested in connection with a dispute under this charter, that that party furnishes to the other party security to which that other party would have been entitled in such legal proceedings in the absence of a stay.~~

46. BIMCO Standard Dispute Resolution Clause

(a) This Contract shall be governed by and construed in accordance with English law and any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

The reference shall be to three arbitrators. A party wishing to refer a dispute to arbitration shall appoint its arbitrator and send notice of such appointment in writing to the other party requiring the other party to appoint its own arbitrator within 14 calendar days of that notice and stating that it will appoint its arbitrator as sole arbitrator unless the other party appoints its own arbitrator and gives notice that it has done so within the 14 days specified. If the other party does not appoint its own arbitrator and give notice that it has done so within the 14 days specified, the party referring a dispute to arbitration may, without the requirement of any further prior notice to the other party, appoint its arbitrator as sole arbitrator and shall advise the other party accordingly. The award of a sole arbitrator shall be binding on both parties as if he had been appointed by agreement.

Nothing herein shall prevent the parties agreeing in writing to vary these provisions to provide for the appointment of a sole arbitrator.

In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure current at the time when the arbitration proceedings are commenced.

~~(b) This Contract shall be governed by and construed in accordance with Title 9 of the United States Code and the Maritime Law of the United States and any dispute arising out of or in connection with this Contract shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for the purposes of enforcing any award, judgement may be entered on an award by any court of competent jurisdiction. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc.~~



~~In cases where neither the claim nor any counterclaim exceeds the sum of US$50,000 (or such other sum as the parties may agree) the arbitration shall be conducted in accordance with the Small Claims Procedure of the Society of Maritime Arbitrators, Inc. current at the time when the arbitration proceedings are commenced.~~

~~(c) This Contract shall be governed by and construed in accordance with the laws of the place mutually agreed by the parties and any dispute arising out of or in connection with this Contract shall be referred to arbitration at a mutually agreed place, subject to the procedures applicable there.~~

(d) Notwithstanding (a), (b) or (c) above, the parties may agree at any time to refer to mediation any difference and/or dispute arising out of or in connection with this Contract.

In the case of a dispute in respect of which arbitration has been commenced under (a), (b) or (c) above, the following shall apply :-

(i) Either party may at any time and from time to time elect to refer the dispute or part of the dispute to mediation by service on the other party of a written notice (the "Mediation Notice") calling on the other party to agree to mediation.

(ii) The other party shall thereupon within 14 calendar days of receipt of the Mediation Notice confirm that they agree to mediation, in which case the parties shall thereafter agree a mediator within a further 14 calendar days, failing which on the application of either party a mediator will be appointed promptly by the Arbitration Tribunal ("the Tribunal") or such person as the Tribunal may designate for that purpose. The mediation shall be conducted in such place and in accordance with such procedure and on such terms as the parties may agree or, in the event of disagreement, as may be set by the mediator.

(iii) If the other party does not agree to mediate, that fact may be brought to the attention of the Tribunal and may be taken into account by the Tribunal when allocating the costs of the arbitration as between the parties.

(iv) The mediation shall not affect the right of either party to seek such relief or take such steps as it considers necessary to protect its interest.

(v) Either party may advise the Tribunal that they have agreed to mediation. The arbitration procedure shall continue during the conduct of the mediation but the Tribunal may take the mediation timetable into account when setting the timetable for steps in the arbitration.

(vi) Unless otherwise agreed or specified in the mediation terms, each party shall bear its own costs incurred in the mediation and the parties shall share equally the mediator's costs and expenses.

(vii) The mediation process shall be without prejudice and confidential and no information or documents disclosed during it shall be revealed to the Tribunal except to the extent that they are disclosable under the law and procedure governing the arbitration.

47. All terms and conditions of this charter arrangement shall be kept private and confidential.

48. The side headings have been included in this charter for convenience of reference and shall in no way affect the construction hereof.

Appendix A: Timecharter Description for the vessel, as attached, shall be incorporated herein.

Appendix B: Shell Safety and Environmental Monthly Reporting Template, as attached, shall be incorporated herein.

Additional Clauses 49 THROUGH 73 BOTH INCLUSIVE: As attached, shall be incorporated herein

IN WITNESS WHEREOF, THE PARTIES HAVE CAUSED THIS CHARTER, CONSISTING OF PART A

CLAUSES 1 THROUGH 48 AND PART B, CLAUSES 49 THROUGH 73 TO BE EXECUTED IN DUPLICATE

Commission: 1.25 pct to Odin Marine on hire

AS OF THE DAY AND YEAR FIRST ABOVE WRITTEN.

SIGNED FOR OWNERS
FULL NAME [illegible]
POSITION [illegible]

Fleming shipping france s.a.r.l.
as agent to owners

SIGNED FOR CHARTERERS
FULL NAME [illegible]



Additional Clauses

Clause 49

In the event of loss of time due to blockades or boycott of the vessel in any port or place by shore labor or others (whether arising from government restrictions or not) by reason of :

A) The vessel's flag or ownership;
B) The terms and conditions on which the members of the crew are employed;
C) The trading of any other vessel under same ownership;
D) Any proven physical or documentary deficiency in the relation to the vessel's safety, cargo gear, or other equipment as on board;

Then payment of hire shall cease for the time hereby lost.

Clause 50

Safety equipment on board the vessel shall be as per class requirements and flag administration regulations for ships of similar size, type and trading area. Owners warrant to operate vessel in accordance with Charterers' time charter instructions and all applicable international regulations, including but not limited to "ISM Code" and "OCIMF Drug and Alcohol policy".
Owners warrant that all class and trading certificates will be on board valid and un-expired throughout the entire period of the charter.
It is understood that the Vessel shall always be in class and that deficiencies and / or recommendations shall be attended to without undue delay, except for those recommendations that can be safely postponed to next scheduled dry-docking. The Vessel shall not be excluded from calling any ports due to deficiencies/recommendations given by port state control. All certificates shall be maintained throughout the Charter

Clause 51

The vessel to be equipped with radios with suitable frequencies. Vessel will maintain watch on communication equipment on board in order to enable flexibility and fast responses concerning cargo plans, alterations of destinations, deviations and any other similar kind of commercial requirements. Vessel to be equipped with E-Mail and telex and telefax communication.

ORIGINAL

Additional Clauses

Clause 52

The master, officers and crew shall be employed by the Owners and/or the ship managers. The vessel, master, and crew must carry out commercial operations with utmost dispatch.
All officers shall be able to give good working command in the English language. All crew shall have proper knowledge of the English language.
2/3 of the crew always including Master and Senior Officers shall have experience and knowledge of running chemical tankers.

Vessel is to load quantity as instructed by the Charterers and always in accordance with the vessel's cargo tank capacity and the Master never to accept any other quantity than that specified by Charterers in their voyage orders.

Clause 53

Gangway watchmen to be for Owners' account. Fire watchmen to be for Owners' account if so requested by Master and/or Owners or to be for Charterers' account if compulsory by port/other authorities.

Clause 54

Owners shall keep the Vessel sufficiently and properly manned to efficiently perform all duties and functions normally connected to chemical parcel, general liquid chemicals and petroleum products trade including but not necessarily limited to loading, discharging, transferring of cargo and/or ballast, rigging cargo gear, and sweeping and cleaning tanks. Multiple, simultaneous operations are expected. It is understood and agreed that the above mentioned duties and functions shall be done at sea as well as in port. In this connection, the master shall prosecute his voyage with utmost dispatch and shall render all reasonable assistance with the Vessel's crew and equipment.
During the currency of this charter Owners to keep a good house-holding on board the vessel and keep the ship clean everywhere including but not limited to on deck, the outside, in the accommodation and in the engine room.

ORIGINAL

Additional Clauses

Clause 55

Tank cleaning within the parcel tanker and general liquid products trade includes washing, mopping and drying and other duties and functions required to make the tank(s) suitable for the next cargo. Tank cleaning includes a broad scope of methods, which may be required in some instances: it may include washing with high-pressure nozzles rigged from deck (butterworthing); it may require crew members to enter the tanks and physically scrape and remove any rust, scale or foreign matter that can be injurious to the intended cargo; it may include gas freeing; it may require application of tank cleaning chemicals or solvent with either spraying equipment or through the vessel's fixed tank washing equipment. These examples are not complete as it is always the responsibility of the Owners and the crew to follow Charterers customary to the trade voyage orders and cleaning instructions which shall always be provide timely and appropriately to the master along with the voyage orders in orderly format.

Tank cleaning shall always be performed as early after completion of discharging as possible.

The vessel's crew is, when required by Charterers, to perform sweeping (squeegeeing) of cargo tanks, which is defined as part of the final discharge operation whereby the crew agitates, mixes and physically pushes or squeegees the cargo to the suction pipe when required by the Charterers. This particular operation shall be paid by Charterers at USD100,- per tank per sweeping operation to the Master directly.
Subsequent to washing cargo tanks with seawater, the tanks shall always be flushed with fresh water.

All necessary cleaning equipment and chemicals to be supplied and paid for by Charterers.

Clause 56

Ballasting will when possible be done concurrent with discharging-operation and will in no way disturb or interrupt the discharge or in any other way cause delays to effective operation of the vessel, subject to terminal regulations.
De-ballasting will when possible be done concurrent with loading operation and will in no way disturb or interrupt the loading or in any other way cause delays to effective operation of the vessel, subject to terminal regulations.



Additional Clauses

Clause 57

The Charterers shall have the option of loading over top i.e. through the deck hatches. In such case, the distribution of the cargo throughout the Vessel shall be undertaken by Master, connecting the hoses on board the Vessel is to be performed by the Vessel's crew, provided this operation is not in conflict with law and safety regulations of port authorities, always at Master's discretion related to safety of ship and crew and the environment. Any additional equipment and or costs related to such operation for Charterers' account. Charterers confirm they will be responsible for the risk.
Any STS operations shall always be performed in a safe port or place suitable for the intended operation and shall always be in accordance with OCIMF guidelines for STS operations. All fenders, hoses, mooring/loading master, if required, and associated equipments to be for Charterers account and to be supplied by them.

Clause 58

The vessel shall during discharge operations be able to maintain 100 PSI at vessel's manifold provided shore facilities permit.

During discharge operations the vessel shall maintain pumping logs and issue letters of protest if so required and the crew shall make best endeavors to have both countersigned by the terminal.

Should it become necessary to withdraw the vessel from the berth as a result of vessel being unable to discharge the cargo at its warranted capacity, all time so lost as well as shifting expenses to anchorage to be for Owners' account. To clarify the principle agreed between the parties, time and shifting expense to anchorage shall not be for Owners account if reduced discharge capacity is caused by restrictions at shore, vessel is allowed to discharge freely through all manifolds into 10" lines, notwithstanding cargo in one grade or several within vessels natural segregation. I.e. time and expense for shifting to anchorage shall only be for Owners account if the reduced discharge capacity is caused solely by technical problems onboard the vessel.

Clause 59

Vessel to be equipped with 4 cargo hoses each of 8-inch diameter and each of 10 meters length. Hoses must be duly pressure tested and certified with intervals of no more than 12 months.
Cargo manifold must comply with the applicable OCIMF rules for oil tankers of similar size and type. All flanges to be of ANSI standard.
Personnel on board are always to be made available to Charterers to load or discharge as many grades of cargo simultaneously as the vessel can separate as per the OCIMF



Additional Clauses

Cont'd Clause 59

Questionnaire.

Owners agree that without causing delays to the vessel the Master and Crew will connect/disconnect cargo hoses and bunker hoses on board Vessel only at both loading and discharging ports provided this operation is not in conflict with international law and safety regulations of port authorities and to take and keep on board cargo samples from vessel's sample taps as per Charterers' instructions, within capacity of Vessel's cargo sample bottles.

Clause 60

If Charterers require cargo heating, the vessel shall, on passage to and whilst at discharging port(s), maintain the cargo at the loaded temperature or at the temperature stated in Charterers voyage instructions always in accordance with the cargo resistance list and the capabilities of the heating system. Charterers may request that the temperature of the cargo be raised above or lowered below that at which it was loaded, in which event Owners shall use their best endeavors to comply with such request.

Clause 61

Deleted.

Clause 62

(a)   The Vessel shall not be obliged to force ice nor to follow ice-breakers.

(b)   The Vessel shall not be required to enter or remain in any icebound port or area, nor any port or area where lights, lightships, markers or buoys have been or are about to be withdrawn by reason of ice, nor where on account of ice there is, in the Master's sole discretion, a risk that, in the ordinary course of events, the Vessel will not be able safely to enter and remain at the port or area or to depart after completion of loading or discharging. If, on account of ice, the Master in his sole discretion considers it unsafe to proceed to, enter or remain at the place of loading or discharging for fear of the Vessel being frozen in and/or damaged, he shall be at liberty to sail to the nearest ice-free and safe place and there await the Charterers' instructions.

(c)   Any delay or deviation caused by or resulting from ice shall be for the Charterers' account and the Vessel shall remain on-hire.



Cont'd Clause 62

(d) Any additional premiums and/or calls required by the Vessel's underwriters due to the Vessel entering or remaining in any icebound port or area shall be for the Charterers' account.

(e) Any costs and expenses actually incurred by the Owners as a result of the vessel trading in ice shall be for Charterers account.

Clause 63

The Owners warrant that during the currency of this charter the vessel will comply with the following requirements:

A) The vessel shall have P and I insurance from a recognized P and I club, which is a member of IGA (International Group Agreement),
B) That P & I insurance premiums are correctly paid,
C) That the vessel is covered for oil spillage at the highest possible amount with its P & I club which at present is USD 1 billion,
D) That valid P&I certificates always are on board,
E) That the vessel will be owned (or demise-chartered) by a member of "The International Tanker Owners Pollution Federation Ltd.",
F) That the Owners will give the Charterers, provided there is no conflict of interest, the full use and coverage of its P and I club services as far as the P and I rules permit.
G) That upon delivery and again latest 3 days before expiry of each insurance period, Owners to give Charterers copies of P&I certificates for the respective periods.

Clause 64

The Charterers shall during the currency of this Charter take out and maintain "Charterers' liability insurance" with underwrite. Upon delivery and again latest 3 days before expiry of each insurance period, Charterers to give Owners copies of appropriate insurance certificates for the respective periods.

Additional Clauses

__Clause 65 (Vetting clause)__

Owners warrant that no later than 4 (four) months after delivery the vessel and her management are approved by 4 (four) of the following major oil companies Exxon Mobil, Chevron Texaco, Shell, BP-Amoco, Total-Final-Elf, Stat oil and Kuwait Petroleum, and 6 (six) months after delivery the remaining 3 (three) Major oil companies approvals, as listed above, to be obtained. These 7(seven) approvals to be maintained during the currency of this Charter.
If Owners are or become in breach of this warranty, they are immediately to make necessary arrangement in order for the Owners/vessel to again comply.

Should Owners fail to comply and become in breach of this warranty and one of the above major oil company's approval is outstanding (not available) 6 (six) months after delivery or during the currency of this Charter Owners fail to renew/extend an approval and same is outstanding for more than 16 (sixteen) days, Charterers will have the option to put the vessel off-hire until Owners have ensured the vessel and her Management again are in compliance. In the instance that the Charterers should exercise such option to put the vessel off-hire, then the vessel shall cease to be at the Charterers' disposal until such time as the vessel is again on-hire it being understood that Owners shall do their utmost to have the vessel comply with this clause as soon as possible.

16 days => off hire

It is understood that the Owners shall not be held responsible for not obtaining and maintaining oil major approvals should a) the vessel trade to areas where the oil majors will not inspect or b) the oil majors have no commercial interest in the vessel (and is thus not willing to inspect).

V 1

V 2

__Clause 66__

Owners warrant that the vessel will be at all times in compliance with the Marpol regulations currently in force and applicable to the vessel basis her construction date or as possibly amended during the charter and is certified to carry Marpol annex I and II cargoes in accordance with vessel's Cargo list and Certificate of Fitness and has corresponding valid certificates at all times on board.

__Clause 67__

[signature] 417



Additional Clauses

Clause 68

World wide trade always within IWL but excluding United Nations sanctioned and/or Embargo countries, Ethiopia, Eritrea, Somalia, Yemen, North Korea, Lebanon, Cuba, war and warlike zones/areas. Always via good and safe, always afloat, always accessible and ice free ports, berths and/or anchorages. Charterers have the option to trade the vessel outside IWL against paying for additional insurance, if any, and always subject to acceptance by hull underwriters and Owners' approval which not to be unreasonable withheld. Charterers shall, however, not trade the vessel to United States with persistent oils.

Clause 69

Clean petroleum products including lubricating oils; dirty petroleum products including crude oils; Marpol Annex II cargoes in accordance with vessel's Certificate of Fitness and coating resistance list which please forward for Charterers' approval.
If Charterers so requests, Owners agree to add named cargo(es) to vessel's Certificate of Fitness provided coating manufacturers and/or classification society approve same. Additional costs, if any, to be for Charterers' account.
All cargoes carried shall be in accordance with cargo resistance list, maximum allowable temperature, and trim and stability booklet and within natural segregation.

Clause 70

Owner's guarantee that the vessel's officers and crew belong to a union recognized and affiliated to The International Transport Worker's Federation and / or its equivalent.

Clause 71

If Charterers have reason to be dissatisfied with the performance of the vessel or the Manager, the Owner upon receiving complaints shall immediately investigate and take appropriate steps to correct the situation.

Additional Clauses

Clause 72

Managers of the vessel shall be VBSK (Vorsetzen Bereederungs- und Schiffahrtskontor GmbH & Co. KG, Hamburg). Owners shall change to another acceptable technical manager upon Charterers' request in case Vorsetzen Bereederungs-und Schiffahrtskontor GmbH & Co. KG for some reason should lose any of the accreditations or the reputable position making them unable to obtain and / or maintain any of the majors' approvals which is required by Charterers under this Charter Party.

Clause 73

Additional Clauses

Appendix A

Owners shall as soon as possible and within 6 weeks of expected delivery date, provide Charterers with :

1. OCIMF Vessel Particulars Questionnaire

2. Full size plans:

a) General Arrangement

b) Capacity Plan with Deadweight scale

c) Pumping diagram showing Vessel's segregations

Description: 12,800 Dwt ex Samho Shipbuilding – Hull no. 1054

Flag : Panama or equivalent
Class : NK. NS* (tanker, oils-flashpoint on & below 60°c & chemicals type ii & iii) (esp) designed for carriage of oils, chemicals & molasses MNS*

Built : 2006
Sdwat : 12,800 mts
LOA : 127.2 mts
Beam : 20.40
Cubic capacity for cargo: Minimum 13,769 cbm basis 98% filling in 12 epoxy coated cargo tanks and 2 epoxy coated slop tanks suitable for cargo. Coating in cargo & slop tanks to be Epoxy – SIGMA PHENOLIC EPOXY – SIGMA PHENGUARD – resistance list handed over to Charterers
12 + 2 grades complete segregation by separate lines, pumps and double valves
12 Framo SD 150 (300 cbm/h) Cargo pumps + 2 Framo SD 100 (100 cbm/h) Slop tank pumps
Steam heating by Miura vertical water tube auxiliary boiler 12 tonnes / hr steam
At 0.7 Mpa. Maximum fuel consumption 866 kg/h

* Vessel is able to load a homogenous cargo with a single line through a 300 mm manifold connection at a loading rate of 1,922 m3/h Total loading time less than 7 hours, excluding topping off.

* Vessel is able to load all grades simultaneously at 137 M3/hour. Total loading rate, as for homogenous cargo 1,922 M3/hour.

* Vessel is able to discharge a homogenous cargo in less than 12 hours by means of 1 cargo line to shore.

407



Additional Clauses

Cont'd Appendix A

* Vessel is able to discharge a homogenous cargo at 1.200 m3/hr (excluding stripping).
* Vessel is able to discharge 4 grades simultaneously at 1.200 M3/hour. Discharge rate for each grade 300 M3/hour. The above warranties are based on no restriction from shore line(s).

Speed/consumption:

Speed + consumption
Laden : 13,0 knots in max BF4 on 19 mt ifo380 mtpd
Ballast : 14,0 knots in max BF4 on 19 mt ifo380 mtpd

Boiler running full capacity : about 0,866 mts/hour.
In port discharging with max number of pumps : about 0,25 mts/hour.
At sea idle : about 0,8 mts/hour In port idle : about 0,06 mts/hour.
Manouvering : about 0,13 mts/hour. Boiler is running on HFO and generators on HFO.

[illegible signature/initials]



Appendix B

SHELLTIME 4

| Shell Safety and Environmental Monthly Reporting Template | Return to Shell Trading HSE & Shipping Standards<br>Charterers marked for the attention of OTS/43<br>Fax: +44(0)20 7934 7473<br>Phone: +44(0)20 7934 8079<br>Email: STASCOSHEData@shell.com |
|---|---|
| Time Chartered Vessel Name | |
| Management Company | |
| Month | |
| OIL SPILL INCIDENTS<br>(Any incident entering the water)<br>Approximate volume in barrels and brief details. | |
| ANY OTHER INCIDENTS<br>resulting in or having potential for injury, damage or loss | |

FOR DEFINITIONS OF INCIDENT CLASSIFICATION AND EXPOSURE HOURS PLEASE SEE OIL COMPANIES INTERNATIONAL MARINE FORUM (OCIMF) BOOKLET "Marine Injury Reporting Guidelines" (February 1997) or any subsequent version, amendment, or variation to them

| A. No. Of crew: | |
|---|---|
| B. Days in month / period: | |
| EXPOSURE HOURS (A x B x 24): | |

| LOST TIME INJURIES (LTI'S) including brief details / any treatments |
|---|
| |

| TOTAL RECORDABLE CASE INJURIES (TRC'S) including brief details / any treatments |
|---|
| |

PLEASE CONFIRM YOUR RETURN CONTACT DETAILS:

| Name: | |
|---|---|
| Phone: | |
| Fax: | |
| Email: | |

Return for each calendar month – by 10th of following month.



Appendix B
SHELLTIME 4

| Shell Safety and Environmental Monthly Reporting Template | Return to: Shell Trading HSE & Shipping Standards<br>Charterers marked for the attention of: OTGM3<br>Fax: +44 (0)20 7546 7472<br>Phone: +44 (0)20 7546 8070<br>Email: STASCOMSEData@shell.com |
|---|---|

| | |
|---|---|
| Time Chartered Vessel Name | |
| Management Company | |
| Month | |

Notes: Please enter zero i.e. "0" where any amount is nil (rather than entering "nil" or "N/A")
Please do not enter a % sign in the entry boxes for Fuel Sulphur content i.e. if it is 3% then just enter "3".
Cargo loaded for LNG vessels should also be reported as tonnes and not as m³.
If not possible to measure your refrigerants accurately by weighing, please use best estimate.

| | |
|---|---|
| Monthly Consumption – Fuel Oil mt | |
| Sulphur content of Fuel Oil (percentage weight) | |
| Monthly Consumption – Diesel and/or Gas Oil mt | |
| Monthly Consumption (LNG ships only) – Fuel Gases mt | |

| | |
|---|---|
| Monthly Distance Steamed | |
| Monthly Cargo Loaded – mt | |

| | |
|---|---|
| Halon Release – (lbs) | |
| Refrigerant Gas – Type | |
| Refrigerant Gas – ROB carried fwd from end last month (kgs) | |
| Refrigerant Gas – Received (kgs) | |
| Refrigerant Gas Consumption – (kgs) | |
| Refrigerant Gas – ROB end of this month (kgs) | |

| | |
|---|---|
| Garbage Disposal m3 – At Sea | |
| Garbage Disposal m3 – Incinerated on Board | |
| Garbage Disposal m3 – Sent Ashore | |

| | |
|---|---|
| OIL SPILL INCIDENTS<br>(Other than those entering the water)<br>Approx. volume & brief details | |

Return for each calendar month – by 10th of following month.



ADDENDUM NO. I

TO

MV KRISTINA THERESA

CHARTER PARTY DATED 15 NOV 2006

It is mutually agreed on this date between herning shipping france as agents to herning shipping as. as Owners and Vardhman Shipping (P) Ltd as Charterers that additional clause on Bunker Emission to read as of :

BIMCO Bunker Fuel Sulphur Content Clause

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that :

(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

Cont'd Additional Clause

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

All other terms and conditions remain unchanged and fully in force as per MV Kristina Theresa Charter Party dated 15th nov 2006

*For Owners,*

[handwritten, signature]

*For Charterers,*

[handwritten, signature]

hemming shipping france s.a.r.l.
as agent to owners




ADDENDUM NO. 2

TO

MV Kristina Theresa

CHARTER PARTY DATED 15th Nov 2006

It is mutually agreed on this date between herning shipping france as agents to herning shipping a.s., herning, denmark , as Owners and Vardhman Shipping (P) Ltd as Charterers that Clause 22(a)Line 399 be amended as of :

Owners have the right and obligation to drydock the vessel at regular intervals of 30 months plus/minus 6 months and /or in case of emergency or class requirement.

All other terms and conditions remain unchanged and fully in force as per MV Kristina Theresa Charter Party dated 15th Nov 2006

*For Owners,*

HANS THORSEN
MANAGING DIRECTOR

herning shipping france s.a.r.l.
as agent to owners

*For Charterers,*

SACHIN R SHAH
MANAGING DIRECTOR