UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
VARDHMAN SHIPPING PVT. LTD

             Plaintiff

   -against-

HERNING SHIPPING AS

             Defendant
------------------------------------------------------------x

08 Civ. 3620 (RMB)

### DECLARATION OF NICHOLAS WILSON IN SUPPORT OF DEFENDANT'S MOTION FOR COUNTER-SECURITY

I, **NICHOLAS WILSON**, pursuant to section 1746 of Title 28 of the United States Code, hereby declare and say the following under penalty of perjury:-

1. I am a partner in the firm of Bentleys, Stokes & Lowless, a firm specialising solely in shipping law, and am English counsel for the plaintiff.

2. I am instructed on behalf of Herning Shipping AS ("Herning" or "Owners") in this matter and I am authorised to make this declaration on their behalf in relation to their motion for countersecurity in respect of counterclaims being brought by my clients against Vardhman Shipping Pvt Limited ("Vardhman" or "Charterers").

3. In particular I make this declaration in response to the declaration of John Hicks in opposition to my client's motion for counter security.

4. It is agreed that the underlying dispute in this matter arises out of an alleged breach by the Defendant Herning of clause 65 of the charterparty. Furthermore, clause 65 of the said charterparty is correctly set out in the declaration of John Hicks.

5. Mr Hicks suggests that the meaning of the clause is clear enough and, indeed, the first three paragraphs of the clause are, indeed, relatively clear. However, the final paragraph of the clause is equally clear in its terms and, for the sake of convenience, is re-stated herein:-

   > "It is understood that the owners shall not be held responsible for not obtaining and maintaining oil major approvals should (a) the vessel trade to areas where the oil majors will not inspect or (b) the oil majors have no commercial interest in the vessel (and is thus not willing to inspect)".

   It is admitted that the vessel was delivered on 29th November 2006. The vessel was delivered to Vardhman as a new build and, correspondingly, in first class condition. Although no approvals were in place by the 29th March 2007, Herning's position in the London arbitration reference will be that, in accordance with the last paragraph of clause 65 as set out above, the vessel did not have oil major approvals at this point because the vessel was not traded by Vardhman to areas where the oil majors could inspect and/or that the oil majors had no commercial interest in inspecting the vessel.

In this regard oil majors will not inspect a vessel unless they are interested in or intent upon fixing the said vessel for the carriage of cargo. Furthermore, notwithstanding that Vardhman filed their verified complaint in the sum of US$7,654,605.84 on 15th April 2008, Herning have yet to receive claim submissions in the London arbitration reference such that Vardhman's exact case and claims remain unclear.

6. As to the approvals of BP, Shell, Chevron and Exxon, obtained in the space of less than a month between 20th April and 18th May 2007, such approvals were readily obtained precisely because the vessel was traded to areas where oil majors were willing to inspect and in circumstances where they had a commercial interest in fixing the vessel.

7. It is accepted that as of 29th May 2007 the approvals of Total, Statoil and Kuwait Petroleum were outstanding.

8. Given the lack of commercial interest from Total, Statoil and Kuwait Petroleum it would have been impossible to obtain the approval of three oil majors in 16 days in circumstances where, I understand, there was no commercial interest in the vessel from such oil majors for such purpose. Furthermore the vessel was, as at that point, trading in West Africa where it is almost impossible to obtain inspection of a vessel by an oil major.

9. Great play is made by Mr Hicks of the fact that Herning merely denies the provisions of the complaint where it is asserted that the vessel lacked major approvals. However, until such time as Vardhman's case is properly pleaded in the London arbitration reference, it is of course unclear exactly what Vardhman's case will be. What is more, Mr Hicks entirely ignores the final sentence of clause 65. With respect, Mr Hicks must ignore that paragraph because, of course, it is my client's contention that the vessel did not trade to areas where oil majors would inspect and/or that approvals were not obtainable in circumstances where oil majors had no commercial interest in the vessel. Vardhman, will, in those circumstances, itself be in breach of contract in having placed the vessel off-hire because, of course, no right to place the vessel off-hire would have arisen. This is likely to be the key area of dispute between Vardhman and Herning respectively and, indeed, between Herning and Head Owners. Herning will of course plead their specific defence in full as and when they have seen claim submissions in the arbitration reference.

10. It is suggested by Mr Hicks that Herning is trying to have things both ways and that the dispute involves a simple question as to whether the vessel had the requisite major approvals or not. However, as will be evident from my comments above, this position summary is, somewhat conveniently, a gross over-simplification of the true position. Furthermore, as will likewise be evident from the foregoing, the London arbitration reference will effectively determine why the vessel had some but not all of the requisite approvals in place and whether Vardhman or Herning, or indeed Head Owners, will bear responsibility for the same. In this regard I would mention that the same tribunal has been appointed up the line as against Head Owners as sits in respect of the disputes between Vardhman and Herning. The fact is that if Vardhman do bear responsibility for a shortfall in the requisite number of approvals, they will of course

have been in breach of contract in placing the vessel off-hire because, pursuant to clause 65, they had no right to do so.

11. Needless to say Herning maintain that all of the categories of damage are recoverable as a matter of English law.

12. For the reasons set out above, if Vardhman had no right to place the vessel off-hire because they, in effect, bear responsibility for the missing approvals, it follows that the vessel remained on-hire for the period 26th March to 9th April and Herning's claim in the amount of US$209,324.50 will succeed in full. The point will be the subject of determination by the Tribunal in London.

13. With respect, the position as to payment of hire or otherwise under the Head Charterparty with Schulte is irrelevant to the question of whether Vardhman were in breach of contract in failing to pay hire for the period 26th March to 9th April. That question concerns a stand alone point. If the vessel remained on-hire then Vardhman must pay hire in full, regardless.

14. Vardhman suggest that Herning could have maintained the charterparty in existence between themselves and the Head Owners by paying hire to the Head Owners. Quite aside from the fact that this point entirely ignores the commercial realities of the position, it also ignores the fact that, had the head charterparty been maintained, Herning would have been faced with having to trade the vessel for their own account. That, it would appear, is what Vardhman maintain Herning should have done. I am advised by Herning that the market for this vessel was and remains considerably below the US$14,683 per day hire payable by Vardhman under the charterparty and that, had they put the vessel into the market on back-to-back terms, the vessel could only have been fixed at a level such that a similar loss to the US$1,893 per day differential between the hire rate under the Herning/Vardhman and the Schulte/Herning Head Charter would have been sustained. Either way Herning maintain that this loss has been caused to them by Vardhman by virtue of their unlawful refusal to pay hire. Again this will have to be determined by the tribunal in London.

15. Following discussions with our clients the claim for bunker costs will not, we understand, be pursued further.

16. As regards the costs of repositioning the vessel from Cotonou to Gibraltar, these costs arise by virtue of the fact that the vessel was required to be redelivered to northern Europe or the Mediterranean Sea pursuant to clause 4(d) of the charterparty. This does not appear to be disputed. Vardhman's liability in this regard again turns upon the question of breach under clause 65 or otherwise. If Vardhman were in breach and Herning have legitimately withdrawn the vessel, as we maintain, then, de facto, the vessel has also not been redelivered as per clause 4(d) of the charterparty and Vardhman are in breach of contract in this regard. The vessel is therefore left in a less attractive position in West Africa than had she been contractually redelivered. An alternative way of putting such claim is that the vessel's present charter rate will be correspondingly lower, were she fixed from West Africa, than would be the case were she fixed from Gibraltar.

17. The fact that the vessel remains off the coast of West Africa is irrelevant to the breach of contract on the part of Vardhman in leaving the vessel open in West Africa instead of redelivering her to Gibraltar as required by the charterparty.

18. It is therefore denied that the counterclaims must fail as a matter of English law and they will, we say, be upheld in each and every case by the arbitration tribunal.

I DECLARE under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on 2nd June 2008

in London, England

NICHOLAS WILSON