UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
VARDHMAN SHIPPING PVT LTD.,  :   08 Civ. 3620 (RMB)
:
                Plaintiff,  :   ECF Case
:
- against -  :
:
HERNING SHIPPING AS,  :
:
                Defendant.  :
------------------------------------------------------------X

### DEFENDANT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ORDER TO SHOW CAUSE WHY COUNTERSECURITY SHOULD NOT BE POSTED BY PLAINTIFF, OR, IN THE ALTERNATIVE, TO VACATE MARITIME ATTACHMENT

Defendant, HERNING SHIPPING AS, (hereinafter "Herning" or "Defendant"), by its undersigned counsel, Lennon, Murphy & Lennon, LLC, files the within Reply Memorandum of Law in Further Support of Defendant's Motion for Countersecurity. For the reasons set forth herein and in Herning's main Memorandum of Law and supporting Declarations, the Motion for Countersecurity should be granted.

### FACTS

The relevant facts are set out in the Declarations of Nicholas Wilson and Charles E. Murphy.

### PRELIMINARY STATEMENT

It will not be lost on the Court that whereas Plaintiff, Vardhman Shipping Pvt Ltd. (hereinafter "Vardhman" or "Plaintiff") has alleged stunningly inflated damage claims in its Verified Complaint, that now total $7,654,605.84, for which Herning has already voluntarily posted security to relieve itself from the burden of maritime attachment, Vardhman describes Herning's counterclaim as "frivolous, speculative, and/or clearly lacking in merit." As will be demonstrated herein, and in the supporting Declaration of Nicholas Wilson, Herning's counterclaims are valid under English law.

1

Simply stated, unless Vardhman can prove in the arbitration that it was justified in placing the vessel off-hire, which is something it will not be able to do, then necessarily Herning's counterclaim will succeed. Thus, the only way that Herning's counterclaim could be considered frivolous would be if Vardhman had already obtained a final arbitration award in its favor, which of course it has not.

Vardhman's opposition to the Motion for Countersecurity completely ignores well-established and controlling case law which makes clear that the type of microscopic analysis of claims at the pleading stage, especially in circumstances where the claim will be judged on the merits in a separate arbitral proceeding, is inappropriate. The only issues this Court is required to resolve on Herning's Motion for Countersecurity are whether: (a) Herning has alleged a *prima facie* valid claim; (b) whether Herning's claim is frivolous; and (c) whether Herning's claim is reasonably calculated. The answer to all three inquiries, as set forth herein, is yes.

Accordingly, because Herning has sufficiently pled its counterclaim and reasonably calculated its damages the motion should be granted without the Court over-scrutinizing the counterclaim under the merits based inquiry urged by Vardhman because to do otherwise would be for this Court to invade the sole province of the London arbitration.

## POINT I

### THE TYPE OF FACTUAL INQUIRY URGED BY VARDHMAN IS IMPROPER

The concept of countersecurity is found in the first promulgation of the rules in American admiralty courts and it continues today with little substantive change in Supplemental Admiralty Rule E(7). Supplemental Rule E(7)(a) provides in relevant part as follows:

> When a person who has given security for damages in the original action asserts a counterclaim that arises from the transaction or occurrence that is the subject of the original action, a plaintiff for whose benefit the security has been given must give security for damages in the counterclaim unless the court for cause shown directs otherwise.

2

*See* Fed. R. Civ. P. Supp. Adm. E(7)(a).

By failing to address the issue, Vardhman concedes that Herning's counterclaim arises from the same transaction or occurrence as Vardhman's claims. Thus, this part of Rule E(7) is satisfied.

Nonetheless, Vardhman challenges the validity of Herning's counterclaim on a factual basis. The vast majority of district courts in the context of the Supplemental Admiralty Rules have understood the Second Circuit's decision in *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd.*, 460 F. Supp. 434 (2d Cir. 2006) to require the application of the *prima facie* standard when considering the adequacy of a claim in a maritime vacatur motion. *See Dolco Invs., Ltd. v. Moonriver Dev., Ltd.*, 486 F. Supp. 2d 261, 266 (S.D.N.Y. 2007); *SPL Shipping Ltd.*, 2007 U.S. Dist. LEXIS 18562; *Tide Line, Inc. v. Eastrade Commodities, Inc.*, 2006 U.S. Dist. LEXIS 95870 (S.D.N.Y. Aug. 15, 2006). There is no just reason, and no basis in the Supplemental Admiralty Rules or interpretive case law, for the application of a different standard to a maritime claim asserted as a counterclaim, as opposed to an affirmative claim. In other words, if in challenging the validity of the maritime attachment of its property by Herning, this court would have to apply a *prima facie* pleading standard when analyzing Vardhman's Verified Complaint, there is no basis in law or logic for Herning's counterclaim to be scrutinized on the merits in the manner advocated by Vardhman.

As was Vardhman, Herning was only required to plead a *prima facie* valid counterclaim. It is commonly accepted that verified allegations in a complaint submitted with accompanying request for an ex parte order for Rule B attachment are sufficient to assert and establish a *prima facie* claim in admiralty, which is exactly how Vardhman obtained the ex parte orders issued in this case. As stated by Chief Judge Wood in *Tide Line Inc. v. Eastrade Commodities Inc.*, 2006 U.S. Dist. LEXIS 95870 *15-16 (S.D.N.Y. August 15, 2006):

> For a plaintiff to show that "it has a valid prima facie admiralty claim against the defendant" . . . in the context of maritime attachment, it appears that a plaintiff need

3

> not provide anything beyond its Verified Complaint, pursuant to Supplemental Rules B and E. A court relies only on a plaintiff's complaint to determine if the plaintiff has shown that it has such a claim against the defendant . . . See Fed. R. Civ. P. Supp. Rule B(1) . . . see also *Aqua Stoli Shipping Ltd.*, 460 F.3d at 438, 2006 WL 2129336, at *3, 2006 U.S. App. LEXIS 19302 at *8-9 . . . Furthermore, Aqua Stoli implies that a plaintiff is likewise not required to provide evidence showing that it has a claim against defendant to carry its burden under Supplemental Rule E(4)(f). See *Aqua Stoli Shipping Ltd.*, 460 F.3d 19302 at *12 (holding that "once a plaintiff has carried his burden to show that his attachment satisfies the requirements of Supplemental Rule B, a district court may vacate an attachment only upon [certain] circumstances," which are very limited. . . . ).

*Tide Line*, 2006 U.S. Dist. Lexis 95780 at *15-16. If Vardhman was only required to plead a *prima facie* claim, it cannot contend, in law or equity, that Herning's counterclaim should be adjudged under a different standard. Accordingly, under the *prima facie* pleading standard applied by the district courts applying the Supplemental Admiralty Rules, Herning was required only to plead a *prima facie* valid claim. The allegations contained in Herning's Counterclaim, together with the Declaration of Nicholas Wilson, Herning's English counsel who will argue the merits of the counterclaim in the ongoing London arbitration, sufficiently carry Herning's burden of proving that it has sufficiently pled such a claim. Thus, because Herning has pled a *prima facie* valid claim under English law, its motion for countersecurity must be granted.

## POINT II

### COUNTERSECURITY IS WARRANTED BECAUSE VARDHMAN HAS FAILED TO SHOW CAUSE WHY IT SHOULD NOT BE ORDERED

A court should consider whether the posting of countersecurity will prevent the plaintiff from prosecuting its claims, whether the countersecurity involves the release of seized property, whether the counterclaim is frivolous or so lacking in merit that it was advanced "solely to secure a negotiating advantage over the complainant," whether the counterplaintiff could have proceeded *in rem*, and the potential injustice of requiring one party to post security while the other party does not. See *Titan Navigation, Inc. v. Timsco, Inc.*, 808 F.2d 400, 403 (5th Cir. 1987). Here, Vardhman has

not shown cause why Herning should be denied countersecurity. The injustice that would result if this Court were to allow Vardhman to have security in the amount of $7,654,605.84 while at the same time denying Herning countersecurity in significantly smaller amount is patent.

Although Vardhman acknowledges and cites the controlling case law on the issue of countersecurity, it fails to heed their basic tenets. For example, Vardhman cites *Titan Navigation, supra*, but its discussion of this case is minimal. Rather, Vardhman delves right back into a detailed factual and merits based criticism of Herning's counterclaim which, as set forth in Point I, *supra*, is improper. It is noteworthy that Herning's motion is for a statutorily authorized order for countersecurity. Yet, Vardhman's opposition papers read more like a motion to dismiss the counterclaim. If Vardhman ultimately seeks dismissal of Herning's counterclaim, it must do so in the arbitration proceedings between the parties in London, England.

For this Court to rise to the bait offered by Vardhman's opposition papers by engaging in a detailed factual inquiry into the merits of Herning's counterclaim would be to invade the province of the arbitrators who have been given the sole authority to decide the merits of all of the claims arising from the overall charter party dispute. *See Finecom Shipping Ltd. v. Multi Trade Enterprises AG*, 2005 U.S. Dist. LEXIS 25761 (S.D.N.Y. October 24, 2005) (court granted countersecurity despite plaintiff's allegation that counterclaim was frivolous because the ultimate merits were to be decided by foreign arbitrators applying foreign law). Judge Lynch's following reasoning in *Finecom* is equally apt here: "a court's ability to understand the merits of a dispute at an early stage is limited, and **courts should be reluctant to prejudge the merits** of claims based essentially on the pleadings and a sparse record consisting of a few documents, in advance of any discovery. **This is particularly so when the ultimate merits will be decided not by this Court, but by an arbitration panel in another country.**" *Id.* at *4 (emphasis added).

With regard to the 1987 *Titan* case by the Fifth Circuit, Vardhman gives short shrift to its import. As the Second Circuit recognized in *Result Shipping Co. Ltd. v. Feruzzi Trading USA Inc.*, 56 F.3d 394, 399 (2d Cir. 1995), this case stands for the proposition that the goal of Supplemental Rule E(7) is to place the parties on equality as regards security, but not at the cost of imposing burdensome costs on the plaintiff that might prevent it from bringing suit. *Id.* Here, Vardhman hardly suggests that the costs imposed by having to post countersecurity for Herning's claims would have the effect of imposing such costs that Vardhman might abandon its claims against Herning.

The concept of equality of security has uniformly been applied by the courts with regard to the relative *amount* of damages claimed by the parties, and not to the nature or type of damages sustained by each party. In any event, the concept of reciprocal security for claims is expressly provided for by the Supplemental Admiralty Rules and the mechanism for such has been construed as furthering the goal of placing the parties on equal footing. *See Result Shipping Co., Ltd. v. Ferruzzi Trading USA, Inc.*, 56 F.3d 394, 399-400 (2d Cir. 1995) citing *Titan Navigation, Inc. v. Timsco, Inc.*, 808 F.2d 400, 404 (5th Cir. 1987).

## POINT III

## HERNING'S COUNTERCLAIM IS REASONABLY CALCULATED

On the question of damages, the counterclaimant is not expected to prove damages to the same degree as would be required at trial. It is well settled that in an attachment proceeding, the plaintiff need not prove its damages with exactitude but the court must be satisfied that the plaintiff's claims are not frivolous. *Dongbu Express Co. v. Navios Corp.*, 944 F. Supp. 235 (S.D.N.Y. 1996). The rule with regard to a defendant's counterclaim should be no different. Here, Herning has reasonably calculated its loss of profit claim and provided sufficient evidence in the form of its English counsel's declaration (*see Wilson Declaration*) to establish that it has alleged a *prima facie*

valid claim for recovery of such loss of profit under governing English law. The viability of Herning's counterclaim in this regard is explained by Herning's English counsel, Nicholas Wilson, in his Declaration.

To defeat Herning's Motion for Countersecurity, it is simply insufficient for Vardhman to deny the facts alleged in Herning's counterclaim or to recast them for purposes of its opposition to this motion. Even more so than in the context of motion to dismiss, Herning's alleged facts must be accepted as true and the Court must then simply determine if, as a matter of pleading, Herning has alleged a *prima facie* valid claim under English law. Thus, Vardhman's opposition simply amounts to a denial of the factual allegations in Herning's counterclaim. The factual issues about which the parties disagree represent a classic dispute for ultimate resolution by the fact finder. The fact finder in this case is the London arbitration panel. For example, in *U.S. Maritime Services, Inc. v. Trade Ventures, Inc.*, 1998 U.S. Dist. LEXIS 10608 (E.D.La. July 8, 1998), although the court denied the defendant's motion for countersecurity, the court was acting as the ultimate trier of fact in dealing with the substantive merits of the parties' competing claims and had the benefit of an advanced factual record, including a fully briefed motion for summary judgment. *Id.*

None of the authorities Vardhman relies upon stand for the proposition Vardhman advances, *i.e.* that Herning is required to prove the ultimate merits of its claim in order to obtain countersecurity. Vardhman's argument in this regard turns Rule E(7) on its head, together with the well-established body of precedent cited herein. As explained in the supporting Declaration of Nicholas Wilson, it is common ground that the underlying dispute in this matter arises out of an alleged breach by Herning of clause 65 of the charter party. The final paragraph of the clause is clear and states as follows:

> It is understood that the owners shall not be held responsible for not obtaining and maintaining oil major approvals should (a) the vessel trade to areas where the oil

7

majors will not inspect or (b) the oil majors have no commercial interest in the vessel (and is thus not willing to inspect).

Herning admits that the vessel was delivered on November 29, 2006. The vessel was delivered to Vardhman as a new build and, correspondingly, in first class condition. Although no approvals were in place by March 29, 2007, Herning's position in the London arbitration will be that, in accordance with the last paragraph of clause 65 as set out above, the vessel did not have oil major approvals at this point because the vessel was not traded by Vardhman to areas where the oil majors could inspect and/or that the oil majors had no commercial interest in inspecting the vessel. In this regard oil majors will not inspect a vessel unless they are interested in or intent upon fixing the said vessel for the carriage of cargo.

As to the approvals of BP, Shell, Chevron and Exxon, obtained in the space of less than a month between April 20 and May 18, 2007, such approvals were readily obtained precisely because the vessel was traded to areas where oil majors were willing to inspect and in circumstances where they had a commercial interest in fixing the vessel. Given the lack of commercial interest from Total, Statoil and Kuwait Petroleum it would have been impossible to obtain the approval of three oil majors in 16 days in circumstances where there was no commercial interest in the vessel from such oil majors for such purpose. Furthermore, the vessel was, as at that point, trading in West Africa where it is almost impossible to obtain inspection of a vessel by an oil major because of the instability and dangers associated with the region. Most significantly, Vardhman ignores the final paragraph of Clause 65 which is particularly relevant because it is Herning's contention that the vessel did not trade to areas where oil majors would inspect and/or that approvals were not obtainable in circumstances where oil majors had no commercial interest in the vessel. Vardhman, will, in those circumstances, itself be in breach of contract in having placed the vessel off-hire because no right to place the vessel off-hire would have arisen. This is likely to be the key area of dispute between

Vardhman and Herning respectively and, indeed, between Herning and Head Owners. The London arbitration will effectively determine why the vessel had some but not all of the requisite approvals in place and whether Vardhman or Herning, or indeed Head Owners, will bear responsibility for the same. In this regard the same tribunal has been appointed up the line as against Head Owners as sits in respect of the disputes between Vardhman and Herning. The fact is that if Vardhman is found liable for a shortfall in the requisite number of approvals, it will have been in breach of contract in placing the vessel off-hire because, pursuant to clause 65, they had no right to do so.

Based on the foregoing, Mr. Wilson has explained why, as a matter of English law, Herning's counterclaims are meritorious. Specifically, if Vardhman had no right to place the vessel off-hire because it, in effect, bears responsibility for the missing approvals, it follows that the vessel remained on-hire for the period March 26 to April 9 and Herning's claim in the amount of $209,324.50 will succeed in full. Additionally, the position as to payment of hire or otherwise under the Head Charter party with Schulte is irrelevant to the question of whether Vardhman were in breach of contract in failing to pay hire for the period March 26 to April 9. That question concerns a stand alone point. If the vessel remained on-hire then Vardhman must pay hire in full, regardless.

Vardhman has suggested that Herning should have maintained the charter party between themselves and the Head Owners by paying hire to the Head Owners. This argument ignores the commercial realities and ignores the fact that, had the head charter party been maintained, Herning would have been faced with having to trade the vessel for their own account. Unfortunately for Vardhman, the arbitration is expected to reveal that the market for this vessel was and remains considerably below the $14,683 per day hire payable by Vardhman under the charter party and that, had Herning put the vessel into the market on back-to-back terms, the vessel could only have been fixed at a level such that a similar loss to the $1,893 per day differential between the hire rate under

the Herning/Vardhman and the Schulte/Herning Head Charter would have been sustained. Either way, Herning maintains that this loss was caused by Vardhman by virtue of their unlawful refusal to pay hire. This is one of the issues to be determined by the tribunal in London.

In respect of the costs of repositioning the vessel from Cotonou to Gibraltar, these costs arise by virtue of the fact that the vessel was required to be redelivered to northern Europe or the Mediterranean Sea pursuant to clause 4(d) of the charter party. Vardhman does not dispute this fact. Vardhman's liability in this regard again turns upon the question of breach under clause 65 or otherwise. If Vardhman were in breach and Herning have legitimately withdrawn the vessel then, de facto, the vessel has also not been redelivered as per clause 4(d) of the charter party and Vardhman are in breach of contract in this regard. The vessel is therefore left in a less attractive position in West Africa than had she been contractually redelivered. An alternative way of putting such claim is that the vessel's present charter rate will be correspondingly lower, were she fixed from West Africa, than would be the case were she fixed from Gibraltar.[1]

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, and those reasons set forth in Herning's main motion papers, the Motion for Countersecurity should be granted in the amount of $1,612,286.00.

---

[1] Herning has decided not to pursue against Vardhman a claim for unpaid bunkers consumed. Thus, the quantum of countersecurity that this court should award is $1,612,286.00, which can be itemized as follows: a. Unpaid hire is $209,324.50; Unpaid hire rate differential is $439,176.00; Unpaid cost of Vessel repositioning is $214,137.23; Interest on principal claims at 7% compounded quarterly for 3 years is $199,648.30; and Estimated attorneys' fees and costs of prosecuting the Counterclaim in London arbitration is $550,000.00.

Dated: June 2, 2008
    New York, NY

                    The Defendant,
                    HERNING SHIPPING AS,

By: _____
Charles E. Murphy (CM 2125)
LENNON, MURPHY & LENNON, LLC
The Gray Bar Building
420 Lexington Ave., Suite 300
New York, NY 10170
(212) 490-6050 - phone
(212) 490-6070 - facsimile

11

## AFFIRMATION OF SERVICE

I hereby certify that on 6/2/08, a copy of the foregoing Reply Memorandum of Law in Further Support of Motion for Countersecurity was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

*/s/ Charles E. Murphy*
Charles E. Murphy